U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT 2022 DEC 13  PM 3: 56

CLERK

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA            )
                                    )
        v.                          )
                                    )        No. 5:22-cr-58 -1-2-3
SERHAT GUMRUKCU,                    )
BERK ERATAY, and                    )
JERRY BANKS,                        )
        Defendants.                 )

## SECOND SUPERSEDING INDICTMENT

The grand jury charges:

### Count One

Between in or about May 2017 and in or about February 2018, within the District of

Vermont and elsewhere, the defendants, SERHAT GUMRUKCU, BERK ERATAY and JERRY

BANKS, together and with others, knowingly and intentionally conspired to cause JERRY

BANKS to travel in interstate commerce, and to use and cause another to use facilities of

interstate commerce, namely cellular telephone networks and financial wires, with intent that the

murder of Gregory Davis be committed, in violation of 13 V.S.A. § 2301, as consideration for

the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary

value, and the death of Gregory Davis resulted.

(18 U.S.C. § 1958)

1

## Count Two

On or about January 6, 2018, in the District of Vermont, the defendant, JERRY BANKS, unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away for reward and otherwise Gregory Davis, when JERRY BANKS travelled in interstate commerce and used a facility or instrumentality of interstate commerce in committing and in furtherance of the commission of the offense, and the death of Gregory Davis resulted.

(18 U.S.C. § 1201)

Count Three

1.       In or about January 2015, the defendant, SERHAT GUMRUKCU, represented to

G.G. that he owned a controlling interest in Lauran Trading, LLC, a business alleged to be

organized in Oman, to be used for oil trading.

2.       Between 2015 and January 2018, Gregory Davis operated Mode Commodities,

LLC ("Mode"), which sought to engage in oil trading.

3.       During that time, G.G. operated Quadrant Financial Group, LLC ("Quadrant"),

which participated as a principal and broker for various business transactions. G.G. often acted

as a middleman in wire communications between GUMRUKCU and Davis, relaying many of

their statements about the other.

4.       The defendant, BERK ERATAY, who had information technology (IT) work

experience, served as a business assistant to GUMRUKCU.

5.       In late January 2015, Quadrant organized an oil trading deal designed to yield

millions of dollars in profits. Quadrant would be buying oil from Mode and selling the oil to a

different group at a higher price. GUMRUKCU agreed to participate in the deal as Quadrant's

partner. As part of the transaction, Quadrant needed to provide a "bank comfort letter" showing

that Quadrant had access to €22 million. GUMRUKCU represented to G.G. that he had access to

such funds and that he would obtain the bank comfort letter.

6.       On or about January 28, 2015, GUMRUKCU and ERATAY caused the email

transmission of a fraudulent letter signed by "Constantine Poryalis" sent to G.G. and Davis. The

letter from Cyprus First Bank falsely claimed that €22.5 million was immediately available to

Quadrant for the oil deal. Davis and G.G. almost immediately determined that the bank comfort

letter was fraudulent, in part because Cyprus First Bank did not exist. These and other issues undermined the planned oil deal.

7.      In early February 2015, in the aftermath of the Cyprus First events, G.G. helped GUMRUKCU and Davis form Mode Lauran, a partnership designed to engage in the same sort of oil deals contemplated in January 2015. Under the partnership agreement, GUMRUKCU and Lauran Trading were obligated to obtain financing for future oil deals, through banking arrangements such as stand-by letters of credit, while Davis and Mode would execute the oil transactions.

8.      Between February 2015 and April 2015, GUMRUKCU and ERATAY caused the transmission of various emails falsely representing that Lauran Trading had found financing for Mode Lauran through Sekerbank, a Turkish Bank. During the course of these communications, GUMRUKCU represented to G.G. and Davis that his brother, Murat Gumrukcu, was assisting in Mode Lauran's business. Beginning in February 2015, GUMRUKCU and ERATAY used a Google account, muratsgumrukcu@gmail.com (hereafter "the murats Gmail account"), to further the scheme to defraud and to falsely represent Murat Gumrukcu's involvement in the fraud. During this period, GUMRUKCU promised to pay Davis $30,000 because of the funding delays. In light of this promise, G.G. paid Davis $30,000 in the first half of 2015 without receiving repayment from GUMRUKCU.

9.      By May 2015, GUMRUKCU had not successfully obtained financing. Davis complained to G.G. and GUMRUKCU about GUMRUKCU's failure to perform and about potential fraud. Beginning in May 2015, G.G. helped negotiate a buy-out of Mode's interest in the Mode Lauran partnership. These negotiations were not resolved until November 2015, when Lauran Trading and Mode entered into a "Redemption Agreement." During the negotiations,

4

GUMRUKCU and ERATAY caused the sending of emails from the murats Gmail account reflecting that Murat Gumrukcu had bought out GUMRUKCU's interest in Lauran Trading. As a result, the Redemption Agreement contained what appeared to be Murat Gumrukcu's signature. In fact, ERATAY supplied the signature to the Redemption Agreement for transmission to G.G. and Davis. Under the Redemption Agreement, Lauran Trading owed Mode $5 million to be paid over time, based on future oil deals taking place. The Redemption Agreement stated that Quadrant would act as escrow agent for the $5 million. It also obligated Lauran Trading to pay Mode $950,000 if Lauran Trading terminated the Redemption Agreement. In short, the Redemption Agreement required payments to Mode and obligated Lauran Trading to obtain financing for future oil deals. In November 2015, GUMRUKCU and ERATAY caused the murats Gmail account to send G.G. four fraudulent bank confirmations, each for €50,000.

10.    Between December 2015 and May 2016, GUMRUKCU and ERATAY caused the transmission of various wire communications falsely representing that Lauran Trading had $30 million available for oil trading at the National Bank of Abu Dhabi and that the funds for the escrow account would be sent to Quadrant. In addition, GUMRUKCU and ERATAY caused wire communications from false and fictitious third parties, including "Emre Aras," who was supposedly Murat Gumrukcu's personal assistant with an office in Hong Kong, and "Mohammed Salem," who was supposedly working with the Washington, D.C. branch of the National Bank of Abu Dhabi. G.G. never received money from the National Bank of Abu Dhabi. During this period, Davis continued to complain to G.G. about Lauran Trading's false claims.

11.    In May 2016, GUMRUKCU and ERATAY caused the murats Gmail account to send G.G. fraudulent statements about Murat Gumrukcu having over $30 million in a Wells Fargo bank account to cover Lauran Trading's obligations. G.G. never received money from

5

Wells Fargo. Instead, GUMRUKCU falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, some of which was due to Davis. On or about May 13, 2016, GUMRUKCU sent G.G. a picture of a fraudulent Bank of America cashier's check. At that same time, GUMRUKCU deposited into Quadrant's bank account four checks for $150,000, all of which eventually bounced because GUMRUKCU's account had insufficient funds. Prior to the last check being returned for insufficient funds, G.G. sent Davis $75,000. The return of funds deposited by GUMRUKCU caused G.G. to use personal funds to cover the Davis payment. After the bounced check incident, GUMRUKCU and ERATAY caused the murats Gmail account to send G.G. two false bank confirmation statements for $600,000, falsely representing that GUMRUKCU's father was wiring Quadrant. GUMRUKCU did not pay G.G. any funds during 2016. By the end of 2016, G.G. had lost over $100,000 from the Mode Lauran transactions. Throughout this period, GUMRUKCU and ERATAY caused the murats Gmail account to make a variety of false claims to delay Lauran Trading's obligations, including false statements about Murat Gumrukcu's travel. On or about December 13, 2016, GUMRUKCU and ERATAY caused the murats Gmail account to send a fraudulent bank confirmation for $500,000 supposedly from UBS, a Swiss bank.

12. On February 9, 2017, GUMRUKCU was arrested on state fraud charges in California, including charges related to the bounced checks deposited in Quadrant's account in May 2016. That same day, ERATAY deleted the murats Gmail account. Three days later, ERATAY began using a new Google email to pose as Murat Gumrukcu, murtagumrukcu@gmail ("the murtag Gmail account"). ERATAY sent G.G. numerous fraudulent emails from the murtag Gmail account between February 2017 and January 2018, including emails falsely claiming that

Lauran Trading was obtaining funds from UBS and falsely documenting Murat Gumrukcu's travel and illnesses.

13.     By May 2017, GUMRUKCU was involved in negotiating a multimillion-dollar biotech merger involving GUMRUKCU's discovery of an alleged cure for human immunodeficiency virus (HIV). GUMRUKCU discussed these negotiations with G.G.. At this time, Davis was actively complaining to G.G. about the fraudulent representations made to G.G., suggesting that criminal charges against GUMRUKCU should be pursued.  G.G. relayed Davis's claims to GUMRUKCU. Davis agreed to "stand down" from legal proceedings in exchange for $20,000 in early May and another $20,000 in late May, paid by GUMRUKCU through G.G. In June, GUMRUKCU also paid G.G. over $100,000, in part to reimburse G.G.'s 2016 payment to Davis, in connection with G.G. being interviewed by a federal agent relating to the pending California fraud case.

14.     Later in 2017, Davis continued making fraud allegations to G.G., who passed them on to GUMRUKCU. By mid-November, ERATAY, using the murtag Gmail account, proposed further partial payments to Davis to continue to hold off his fraud claims from going public. GUMRUKCU paid G.G. $65,000 in November, and G.G. in turn paid Davis $50,000.

15.     After these payments, GUMRUKCU and ERATAY avoided further communications with G.G.. By late December, Davis was again threatening legal action, threats G.G. passed on to GUMRUKCU. On January 6, 2018, Davis was murdered.

16.     Between January 2015 and January 2018, in the District of Vermont and elsewhere, the defendants, SERHAT GUMRUKCU and BERK ERATAY, knowingly and willfully conspired to commit wire fraud, in violation of 18 U.S.C. § 1343, by devising and executing a scheme to defraud G.G. and Gregory Davis by attempting to deceive them about

funds available to GUMRUKCU and Lauran Trading, about the identity of individuals involved with GUMRUKCU and his business activities, and about past and future financial transactions related to Mode Lauran.

(18 U.S.C. § 1349)

A TRUE BILL

FOREPERSON

Nikolas P. Kerest (PJV/JAQ)
United States Attorney
Burlington, Vermont
December 13, 2022

8