UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) No. 5:22-cr-58 |
| SERHAT GUMRUKCU, | ) |
| BERK ERATAY, and | ) |
| JERRY BANKS, | ) |
| Defendants. | ) |

## THIRD SUPERSEDING INDICTMENT

The Grand Jury charges:

### Count One

Between in or about May 2017 and in or about February 2018, within the District of Vermont and elsewhere, the defendants, SERHAT GUMRUKCU, BERK ERATAY and JERRY BANKS, together and with others, knowingly and intentionally conspired to cause JERRY BANKS to travel in interstate commerce, and to use facilities of interstate commerce, with the intent that the murder of Gregory Davis be committed, in violation of the laws of Vermont, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Gregory Davis resulted.

(18 U.S.C. § 1958)

## Count Two

Between on or about January 1, 2018 and on or about January 6, 2018, in the District of Vermont and elsewhere, the defendant, JERRY BANKS, traveled in interstate commerce, and the defendants, SERHAT GUMRUKCU and BERK ERATAY, caused JERRY BANKS to travel in interstate commerce, from Colorado to Vermont, with the intent that the murder of Gregory Davis be committed, in violation of the laws of the State of Vermont, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Gregory Davis resulted.

(18 U.S.C. §§ 1958 & 2)

## Count Three

On or about January 6, 2018, in the District of Vermont, the defendant, JERRY BANKS, unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, and carried away for reward and otherwise Gregory Davis, when JERRY BANKS traveled in interstate commerce and used a facility or instrumentality of interstate commerce in committing and in furtherance of the commission of the offense, and the death of Gregory Davis resulted.

(18 U.S.C. § 1201)

Count Four

1. Between 2013 and 2018, G.G. operated Quadrant Financial Group, LLC ("Quadrant"), which participated as a principal and broker for various business transactions, including commodities trading.

2. In 2013, the defendant, SERHAT GUMRUKCU, began corresponding with G.G. about potential business opportunities. Prior to January 2015, GUMRUKCU represented to G.G. that he had access to substantial funds and owned a controlling interest in Lauran Trading, LLC, a business alleged to be organized in Oman, to be used for oil trading.

3. The defendant, BERK ERATAY, who had information technology (IT) work experience, served as an assistant to GUMRUKCU.

4. Between 2015 and January 2018, Gregory Davis operated Mode Commodities, LLC ("Mode"), which sought to engage in oil trading.

5. In late January 2015, Quadrant organized an oil trading deal designed to yield millions of dollars in profits. Quadrant would purchase oil from Mode and sell the oil to a different group at a higher price. GUMRUKCU agreed to participate in the deal as Quadrant's partner. As part of the transaction, Quadrant needed to provide a "bank comfort letter" showing that Quadrant had access to €22 million. GUMRUKCU represented to G.G. that he had access to such funds and that he would obtain the bank comfort letter.

6. On or about January 28, 2015, GUMRUKCU and ERATAY caused the email transmission of a fraudulent letter signed by "Constantine Poryalis" of "Cyprus First Bank" to G.G. and Davis. The Cyprus First Bank letter falsely claimed that €22.5 million was immediately available to Quadrant for the oil deal with Mode. Davis and G.G. almost immediately determined

4

that the bank comfort letter was fraudulent, in part because Cyprus First Bank did not exist. These and other issues undermined the planned oil deal.

7. In early February 2015, in the aftermath of the Cyprus First Bank letter and the failure of the Mode deal, G.G. helped GUMRUKCU and Davis form Mode Lauran, a partnership between Davis's and GUMRUKCU's businesses designed to engage in future oil deals. Under the partnership agreement, Lauran Trading was obligated to obtain financing for future oil deals, through banking arrangements such as stand-by letters of credit, while Mode would execute the oil transactions.

8. Between February 2015 and April 2015, GUMRUKCU and ERATAY caused the transmission of various emails falsely representing that Lauran Trading had found financing for Mode Lauran through Sekerbank, a Turkish Bank. During the course of these communications, GUMRUKCU represented to G.G. and Davis that his brother, Murat Gumrukcu, was assisting in Mode Lauran's business. Beginning in February 2015, GUMRUKCU and ERATAY used a Google account, muratsgumrukcu@gmail.com (hereafter "the murats Gmail account"), to further the scheme to defraud and to falsely represent Murat Gumrukcu's involvement in the fraud. When the funding was not forthcoming, GUMRUKCU promised to pay Davis $30,000 because of the funding delays. In light of this promise, G.G. paid Davis $30,000 in the first half of 2015 without receiving any repayment from GUMRUKCU until later in 2015.

9. By May 2015, Lauran Trading had not successfully obtained financing. Davis complained to G.G. and GUMRUKCU about Lauran Trading's failure to perform and about potential fraud. Beginning in May 2015, G.G. helped negotiate a buy-out of Mode's interest in the Mode Lauran partnership. These negotiations were not resolved until November 2015, when Lauran Trading and Mode entered into a "Redemption Agreement." The Redemption Agreement

required payments to Mode to buy out Mode's interest in the partnership. Under the Redemption Agreement, Lauran Trading owed Mode $5 million to be paid over time, based on future oil deals taking place. The Redemption Agreement stated that Quadrant would act as escrow agent for the $5 million. It also obligated Lauran Trading to pay Mode $950,000 if Lauran Trading terminated the Redemption Agreement. The Redemption Agreement contemplated that the parties would participate in future oil deals, still obligating Lauran Trading to obtain financing for those future oil deals. In November 2015, GUMRUKCU and ERATAY caused the murats Gmail account to send G.G. four fraudulent bank confirmations, each for €50,000, as the first payments under the Redemption Agreement.

10. During the Redemption Agreement negotiations, GUMRUKCU and ERATAY caused the sending of emails from the murats Gmail account reflecting that Murat Gumrukcu had bought out GUMRUKCU's interest in Lauran Trading. As a result, the Redemption Agreement contained what appeared to be Murat Gumrukcu's signature. In fact, ERATAY supplied the signature to the Redemption Agreement for transmission to G.G. and Davis.

11. Between December 2015 and May 2016, GUMRUKCU and ERATAY caused the transmission of various wire communications falsely representing that Lauran Trading was performing on its two obligations under the Redemption Agreement: that funds for the Mode buy out would be sent to Quadrant to fund the escrow account and that Lauran Trading had $30 million available at the National Bank of Abu Dhabi to fund future oil deals. In addition, GUMRUKCU and ERATAY caused wire communications to G.G. from false and fictitious third parties, including "Emre Aras," who was supposedly Murat Gumrukcu's personal assistant with an office in Hong Kong, and "Mohammed Salem," who was supposedly working with the Washington, D.C. branch of the National Bank of Abu Dhabi. G.G. never received money from

the National Bank of Abu Dhabi. During this period, Davis continued to complain to G.G. about Lauran Trading's failure to pay him funds due to Mode under the Redemption Agreement and GUMRUKCU's false claims.

12. In May 2016, GUMRUKCU and ERATAY caused the murats Gmail account to send G.G. fraudulent statements about Murat Gumrukcu having over $30 million in a Wells Fargo bank account to cover Lauran Trading's obligations. G.G. never received money from Wells Fargo. Instead, GUMRUKCU falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, some of which was due to Davis. On or about May 13, 2016, GUMRUKCU sent G.G. a picture of a fraudulent Bank of America cashier's check. At that same time, GUMRUKCU deposited into Quadrant's bank account four checks for $150,000 each, all of which eventually bounced because GUMRUKCU's account had insufficient funds. Prior to the last check being returned for insufficient funds, G.G. sent Davis $75,000. The return of funds deposited by GUMRUKCU caused G.G. to use personal funds to cover the Davis payment. After the bounced check incident, GUMRUKCU and ERATAY caused the murats Gmail account to send G.G. two false bank confirmation statements for $600,000, falsely representing that GUMRUKCU's father was wiring Quadrant to fund Lauran Trading's obligations to Mode. GUMRUKCU did not pay G.G. any funds during 2016. By the end of 2016, G.G. had lost over $100,000 from the Mode Lauran transactions. Throughout this period, GUMRUKCU and ERATAY caused the murats Gmail account to make a variety of false claims to delay Lauran Trading's obligations, including false statements about Murat Gumrukcu's travel. On or about December 13, 2016, GUMRUKCU and ERATAY caused the murats Gmail account to send a fraudulent bank confirmation for $500,000 supposedly from UBS, a Swiss bank.

13.     On February 9, 2017, GUMRUKCU was arrested on state fraud charges in California, including charges related to the bounced checks deposited in Quadrant's account in May 2016. That same day, ERATAY deleted the murats Gmail account. Three days later, ERATAY began using a new Google email to pose as Murat Gumrukcu, murtagumrukcu@gmail ("the murtag Gmail account"). ERATAY sent G.G. numerous fraudulent emails from the murtag Gmail account between February 2017 and January 2018, including emails falsely claiming that Lauran Trading was obtaining funds from UBS to satisfy Lauran Trading's dual obligations under the Redemption Agreement and falsely documenting Murat Gumrukcu's travel and illnesses.

14.     By May 2017, GUMRUKCU was involved in negotiating a multimillion-dollar biotech merger relating in part to GUMRUKCU's alleged discovery of a cure for human immunodeficiency virus (HIV). GUMRUKCU discussed these negotiations with G.G. At this time, Davis was actively complaining to G.G. about the fraudulent representations made to G.G., suggesting that criminal charges against GUMRUKCU should be pursued. G.G. relayed Davis's claims to GUMRUKCU and noted that GUMRUCKU had exposure from the events over the past two years. Davis agreed to "stand down" from legal proceedings in exchange for $20,000 in early May and another $20,000 in late May, paid by GUMRUKCU through G.G. In June, GUMRUKCU paid G.G. over $100,000, in part to reimburse G.G.'s 2016 payment to Davis, after learning that G.G. would be interviewed by law enforcement investigating the pending California fraud case.

15.     Later in 2017, Davis continued making fraud allegations to G.G., who passed the allegations on to GUMRUKCU. Throughout their relationship, G.G. relayed certain information he received from GUMRUKCU to Davis and from Davis to GUMRUKCU, in his role as

8

middleman. By mid-November, ERATAY, using the murtag Gmail account, proposed further partial payments to Davis to continue to hold off his fraud claims from going public. GUMRUKCU paid G.G. $65,000 in November, and G.G. in turn paid Davis $50,000.

16. After these payments, GUMRUKCU and ERATAY avoided further communications with G.G. By late December, Davis was again threatening legal action, threats G.G. passed on to GUMRUKCU. On January 6, 2018, Davis was murdered in Vermont.

17. Between January 2015 and January 2018, in the District of Vermont and elsewhere, the defendants, SERHAT GUMRUKCU and BERK ERATAY, knowingly and willfully conspired to commit wire fraud, in violation of 18 U.S.C. § 1343, by devising and executing a scheme to defraud G.G. and Gregory Davis by attempting to deceive them about funds available to GUMRUKCU and Lauran Trading, about the identity of individuals involved with GUMRUKCU and his business activities, and about past and future financial transactions related to Mode Lauran.

(18 U.S.C. § 1349)

A TRUE BILL

FOREPERSON

*for* Nikolas P. Kerest (PJV/JAO)
United States Attorney
Burlington, Vermont
February 28, 2023