UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SERHAT GUMRUKCU and<br>BERK ERETAY,<br>    Defendants. | Docket No. 22-CR-58 |

GOVERNMENT'S RESPONSE TO DEFENDANTS'
MOTION TO DISMISS COUNT FOUR

    The defendants have filed motions to dismiss Count Four of the Third Superseding Indictment, which charges them with a wire fraud conspiracy. They raise several different claims. To begin, they argue that the charged conspiracy fails to adequately allege a scheme to deprive the victims of money or property. Second, they urge dismissal of Count Four based on the statute of limitations. Third, they claim that Count Four is duplicitous with the murder-for-hire conspiracy charged in Count One. The defense arguments fail in large part because the Court's assessment of the charges prior to trial must be based on the allegations in the indictment, and the indictment squarely alleges a conspiracy to defraud aimed at depriving Gregory Davis and G.G. of property, which continued into 2018, less than five years before the charges were brought. Further, the allegation in Count Four that Davis was murdered on January 6, 2018, raises no duplicity concerns. The defendants' motions should be denied.

    I.        Legal Standard for Pre-trial Assessment of Count Four

    It is well-established that the defense cannot challenge the government's evidence in a motion to dismiss. "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(a). In short, the Court

1

must avoid pretrial review of the government's evidence. The government is entitled to have a jury review its evidence based on a facially valid indictment. Federal courts lack the authority to review the validity of the grand jury's finding probable cause. "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). "The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Kaley v. United States*, 571 U.S. 320, 328 (2014). Rule 29 allows the court to determine, after the government has rested its case, whether "the evidence is insufficient to sustain a conviction" on any particular count. Fed. R. Crim. P. 29. It is well established, however, that such review is limited. The court assesses the evidence in a light most favorable to the government, resolving all inferences in favor of the prosecution. *See United States v. White*, 7 F.4th 90, 102-03 (2d Cir. 2021); *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991).

      The Second Circuit has squarely held that Fed. R. Crim. P. 12 does not allow the sort of review sought by the defendants. Here, the defendants' motion to dismiss cannot be resolved without assessing the trial evidence. When "a defense raises 'evidentiary questions,' a district court must defer resolving those questions until trial." *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018) (citing *United States v. Knox*, 396 U.S. 77, 83 (1969)). "Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of

the defense.'" *United States v. Pope*, 613 F.3d 1255, 1260-61 (10th Cir. 2010) (quoting *United States v. Covington,* 395 U.S. 57, 60 (1969)).[1]

The defendants' challenge to Count Four at this point must rest on a claim that it fails "to state an offense" in violation of Rule 12(b)(3)(B)(iv). "The pleading standard for an indictment is entirely different from the evidentiary standard at trial." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021). "An indictment is sufficient as long as it (1) 'contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend,' and (2) 'enables [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense. . . . [A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *Id.* (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)).

II.  Count Four Alleges a Scheme to Defraud Davis and G.G. of Property

The defendants' claim rests on an overly cramped reading of the indictment. The indictment alleges all the essential elements of wire fraud conspiracy. To begin with, paragraph 17 explicitly alleges that between January 2015 and January 2018 defendants Serhat Gumrukcu and Berk Eratay "willfully conspired to commit wire fraud, in violation of 18 U.S.C. § 1343, by

---

[1] Nor do these motions fall within the "extraordinarily narrow" exception to this rule articulated in *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981), and limited in *United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998). In *Mennuti*, the government made a full proffer of the evidence it intended to present at trial, which allowed the Court to assess the government's trial evidence without a trial. In *Alfonso* and *United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018), the government had not offered such a proffer of its evidence. The *Sampson* court noted that a district court cannot "require the government, before trial, to make such a presentation." *Id.* at 282. Here, the government has not made a full proffer of the evidence it intends to present at trial about the wire fraud conspiracy.

3

devising and executing a scheme to defraud G.G. and Gregory Davis." Dkt. No. 69 ¶ 17. That allegation alone should be sufficient to satisfy the pleading standard necessary to get past a motion to dismiss based on a "failure to state an offense." That allegation describes the conspirators, alleges the appropriate mental state, the dates of the conspiracy, and the object of the conspiracy – a scheme to defraud two identified individuals. The Second Circuit has rejected dismissal when the indictment alleged far less detail. *See United States v. Montague*, 67 F.4th 520, 529-30 (2d Cir. 2023) (rejecting challenge to sufficiency of indictment that did not detail CCE predicates); *United States v. Flaharty*, 295 F.3d 182, (2d Cir. 2002) (same).

The indictment here, however, also outlines the elements of wire fraud with significant detail. "The elements of wire fraud are: '(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the wires to further the scheme.'" *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)). To be sure, a scheme to defraud under the wire fraud statute requires proof that the scheme involved deceit aimed at depriving the victims, here G.G. and Gregory Davis, of property.[2]

Count Four alleges various kinds of deceit. It alleges that the scheme generally involved deceit "about funds available to Gumrukcu and Lauran Trading, about the identity of individuals involved with Gumrukcu and his business activities, and about past and future financial transactions related to Mode Lauran." Dkt. No. 69 ¶ 17. Moreover, the indictment outlines a

---

[2] The defendants point to no case law requiring that the indictment must allege all the deceit involved in the scheme or all the property interests at stake. A failure to sufficiently allege these details of the scheme to defraud should be the subject of a motion for a bill of particulars not a motion to dismiss.

variety of examples of false statements and false documents, from a fictious bank, *Id.* ¶ 6, to a phony bank check, *Id.* ¶12, to false statements about "Lauren Trading . . . obtaining funds from UBS," *Id.* ¶ 13. Count Four also alleges the use of various wire communications in furtherance of the scheme. *Id.* ¶¶ 6, 8, 9, 10, 11, 12, 13, 15.

The defendants' motions focus on a claimed failure to identify the victim property involved in the scheme. Here, the indictment specifically identifies victim property alleged as the object of the scheme to defraud.

While the scheme involved varied and extensive deceits, the indictment clearly identifies the money and property of the two victims at the heart of those deceits. Count Four alleges that the defendants' scheme sought to deprive Gregory Davis of money he was owed under the Redemption Agreement, negotiated between April and November 2015, when it was executed. *Id.* ¶ 9. Count Four also alleges that G.G., who was granted authority as escrow agent under the Redemption Agreement and who acted as a middleman in the business dealings between Gumrukcu and Davis, was deprived of monies he paid Davis and others based on false representations, including that he was being reimbursed by Gumrukcu for those expenditures. *Id.* ¶ 9. Count Four makes obvious that the defendants' deceit was aimed at avoiding paying the money owed to Davis and to having G.G. lose money as the middleman.

Further, Count Four outlines the arch of the business relationship between Gumrukcu and Davis as well as G.G.'s role in that relationship. That arch led directly to the Redemption Agreement. It began in January 2015, when G.G., on behalf of his company Quadrant Financial, and Gumrukcu entered into a joint venture to support a Quadrant Financial contract to purchase oil from a group that included Davis's company, Mode Commodities. *Id.* ¶ 5. At the same time, Quadrant entered into a contract to sell the oil to a different group at a higher price, generating a

profit. Count Four alleges that the defendants lied about Gumrukcu's key contribution to this business arrangement, a bank comfort letter, which claimed that G.G. and Gumrukcu had ample funds to conduct the transaction. Davis discovered various false representations involved in the bank comfort letter and this initial deal fell apart. *Id.* ¶ 6. Almost immediately, Gumrukcu, with G.G.'s advice, entered into a Joint Venture, called Mode Lauran, between Gumrukcu's company, Lauran Trading, and Davis's company, Mode Commodities. This joint venture aimed in large part to compensate for the problems with the initial Quadrant deal that fell apart. Count Four notes that Gumrukcu was obligated under the agreement to provide financing for oil trading and that Davis would conduct the trading. *Id.* ¶ 7. The defendants are alleged to have made false statements about the financing, and no oil transactions took place. *Id.* ¶ 8.

Gumrukcu and G.G. recognized Davis's financial interest in Mode Lauran and, after the problems getting Mode Lauran off the ground, Gumrukcu agreed to buy out Davis's interest. The buyout of Davis's property interest in Mode Lauran was agreed to in the Redemption Agreement. *Id.* ¶ 9. A principal object of the charged scheme was avoiding paying that debt to Davis. In that contract, Gumrukcu's company, Lauran Trading, agreed to pay money to Mode in consideration for the lost business opportunities in 2015. The indictment identifies the Redemption Agreement but does not describe all its terms. Count Four, however, makes clear that the Redemption Agreement addressed two issues: the buyout of Mode's interest in the Joint Venture, creating a debt to Mode and Davis, and plans for additional oil trading financed by Lauran Trading. *Id.* But after November 2015, Lauran Trading owed Davis at least $950,000. *Id.*

6

Count Four thus makes clear that the defendants deceived G.G. and Davis to avoid paying Davis money that he was owed.[3] The indictment mentions this money due Davis at multiple points:

- "The Redemption Agreement required payments to Mode to buy out Mode's interest in the partnership"

- "Lauran Trading owed Mode $5 million dollars to be paid over time"

- "It also obligated Lauran Trading to pay Mode $950,000 if Lauran Trading terminated the contract"

- "Davis continued to complain to G.G. about Lauran Trading's failure to pay him funds due to Mode under the Redemption Agreement and GUMRUKCU's false claims"

- "GUMRUKCU falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, some of which was due to Davis"

- "falsely representing the GUMRUKCU's father was wiring Quadrant to fund Lauran Trading obligations to Mode"

- "ERATAY sent G.G. numerous fraudulent emails from the murtag Gmail account between February 2017 and January 2018, including emails falsely claiming that Lauran Trading was obtaining funds from UBS to satisfy Lauran Trading's dual obligations under the Redemption Agreement"

Dkt. No. 69 ¶¶ 9, 11, 12, 13. In this way, Court Four adequately identifies money and property of Davis as an object of the defendants' scheme to defraud.

To be sure, Count Four alleges a scheme to deprive Davis of traditional, tangible property. Debt or money owed from the defendant to the victim of the scheme to defraud is property under the wire fraud statute. Debt, or bonds, is sold in open markets. At common law, a

---

[3] The defendants seem to assert that monies due Davis were contingent on oil trading. This assertion is incorrect. As noted above, the Redemption Agreement required a $950,000 cancellation payment, if Lauran Trading broke the Agreement. Moreover, the defendants have been provided with copies of the Redemption Agreement. While the indictment is not specific about this fact, the Agreement provided for Davis to paid $500,000 immediately, without regard to future oil deals, if the agreement was not broken.

private debt could be bought and sold. The Supreme Court recognized debt as property in *Pasquantino v. United States*, 544 U.S. 349 (2005). The Court wrote that "[v]aluable entitlements like [the entitlement to collect money] are property as that term ordinarily is employed." *Id.* at 355. "The right to be paid money has long been thought to be a species of property." *Id.* at 356. "Consistent with that understanding, fraud at common law included a scheme to deprive a victim of his entitlement to money. For instance, a debtor who concealed his assets when settling debts with his creditors thereby committed common-law fraud." *Id.* The *Pasquantino* Court followed the Second Circuit's holdings that money due to the government, even a foreign government, as tax revenue is property that can support a wire fraud conviction. *Id.* at 356-57; *accord United States v. Trapilo*, 130 F.3d 547 (2d Cir. 1997); *United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989). "The fact that the victim of the fraud happens to be the government, rather than a private party, does not lessen the injury." *Pasquantino*, 544 U.S. at 356.[4]

The defendants place significant reliance on the Supreme Court's recent decisions in *Ciminelli v. United States*, 598 U.S. 306 (2023), and *Kelly v. United States*, 140 S. Ct. 1565 (2020). Neither decision bears on the government's case here. In *Ciminelli*, the Court rejected the Second Circuit's line of cases holding that the intangible right to control one's assets is a

---

[4] "The Supreme Court has upheld fraud convictions based on schemes to defraud victims of '[t]he right to be paid money,' which 'has long been thought to be a species of property.' *Pasquantino v. United States*, 544 U.S. 349, 356, (2005). Along those lines, we recently held that the right to the uncollected fines and costs associated with unadjudicated traffic tickets — claims that a motor-vehicle-code violation has taken place — constituted 'a property interest.' *United States v. Hird*, 913 F.3d 332, 339–45 (3d Cir. 2019)." *United States v. Neff*, 787 F. App'x 81, 91 (3d Cir. 2019).

property right under the wire fraud statute. As noted above, the indictment here alleges traditional, tangible property, not the right to control assets.

*Kelly* is likewise inapposite. That case involved a scheme to close lanes over the George Washington Bridge, apparently in retaliation for political decision-making. The Court focused its attention on the scope of the property fraud committed by public officials. 140 S. Ct. at 1571. The government attempted to identify two property interests of the Port Authority, which ran the bridge: 1) control of the bridge lanes and 2) the time of public employees wasted by the lane closures. *Id.* With regard to the first, the Court held that lane "realignment" was regulatory not a property interest, similar to government licenses, which the Court had previously held were not property of the government under the wire fraud statute. *Id.* About the second, the Court noted that government costs can be property, but those costs must be the "object of the fraud" not "play a bit part in the scheme." *Id.* This indictment does not involve public official abuse. As noted above, it involves a deceit aimed squarely at depriving Davis of money he is owed, aimed at traditional, tangible property

As noted above, Count Four also states that the defendants' scheme was aimed at an independent property right of the second victim, G.G. The indictment outlines how the scheme deprived G.G. of his own money, the most typical deprivation under the wire fraud statute. Moreover, these losses were also directly related to G.G.'s involvement in Mode Lauran and the Redemption Agreement. For example, the indictment alleges that Gumrukcu promised to pay Davis $30,000 "because of funding delays" regarding the Mode Lauren joint venture. Dkt. No. 69 ¶ 8.  The indictment then alleges that "G.G. paid Davis $30,000 in the first half of 2015 without receiving any repayment from Gumrukcu until later in 2015." *Id.* According to the indictment, again in mid-2016, when G.G. was acting as escrow agent under the Redemption

Agreement, "Gumrukcu falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, some of which was due to Davis." *Id.* ¶12. The indictment alleges that G.G. "sent Davis $75,000" after Gumrukcu provided checks that eventually bounced. "The return of funds deposited by Gumrukcu caused G.G. to use personal funds to cover the Davis payment." *Id.* In short, G.G. lost money based on defendants' fraud scheme.[5]

      III.      <u>Count Four Alleges a Conspiracy Within the Statute of Limitations</u>

The grand jury returned Count Four in the Second Superseding Indictment on December 16, 2022. Count Four alleged a conspiracy that continued until January 2018, into the five-year statute of limitations. The Court should decline the defendants' invitation to look beyond the alleged end date of the conspiracy.

As with their property argument, this statute of limitations argument fails to heed the limited review allowed under Rule 12. Defendants' arguments run afoul of the Second Circuit's holding in *Sampson*, 898 F.3d at 280. There, the district court dismissed an embezzlement charge based on the court's conclusion that the embezzlement was complete more than five years before the charge, despite the indictment's allegation that the embezzlement took place within the statute of limitations. The court of appeals reversed, finding that the district court had improperly attempted to impose civil "summary judgment" on a Rule 12 motion to dismiss. *Id.* at 279-80

---

[5] The indictment notes that Gumrukcu "paid G.G. over $100,000, in part to reimburse G.G.'s 2016 payment to Davis." Dkt. No. 69 ¶ 14. The government's evidence will show that G.G. was never made fully whole by Gumrukcu. And in any event, a victim does not have to suffer a permanent loss of funds under the wire fraud statute. That is, paying back a victim for his losses does not undercut the fraud scheme. *See e.g. United States v. Gross*, 416 F.2d 1205 (8th Cir. 1969) (holding fraud was not erased where defendant eventually reimbursed victim for losses); *United States v. Sylvanus*, 192 F.2d 96, 105 (7th Cir. 1951) (rejecting defendants' argument that their offer to refund money negated convictions for mail fraud).

(citing various cases). The court of appeals held that a district judge cannot usurp the power of the jury to decide the facts, namely when the embezzlement took place. Here, the indictment alleges that the conspiracy continued into 2018. The court cannot look beyond this allegation. The defendants can put the government to their burden of proof at trial but cannot argue the evidence at this stage.

The defendants present various statute-of-limitations points, none of which hold up. To begin, the defendants note that the indictment also alleges a murder-for-hire conspiracy beginning in or about May 2017, in Count One. They then claim that they could have intended to "cheat G.G. or Davis of their property," presumably because they aimed to kill Davis, after May 2017. This argument misses the mark for two reasons. First, logic permits the defendants to engage in two conspiracies during the same period. That is, they could agree to kill Davis while they were deceiving him to avoid paying him what Lauran Trading owed him. For example, the government could argue at trial that the defendants wanted to keep Davis deceived about their intentions to pay Davis until they had him killed.[6] Indeed, the partial payments to Davis in November 2017 provide key support for ongoing execution of the wire fraud conspiracy. Count Four makes clear that they continued their deceit into 2018. Second, this argument turns on conclusions about the government's evidence, not the terms of the indictment. Defendants can raise this claim at trial, but not in a motion to dismiss.

Next, the defendants claim that the last communication from the defendants to G.G. took place in November 2017, and thus the statute of limitations ran in November 2017. Again, the

---

[6] Further, Count Four alleges that the wire fraud conspiracy also sought to defraud G.G., an object that did not turn on a plan to murder Davis.

claim is flawed for at least three reasons. First, they misread the indictment. Count Four alleges that "Eratay sent G.G. numerous fraudulent emails from the murtag Gmail account between February 2017 and January 2018," Dkt. 69 ¶ 13, into the five-year statute-of-limitations period. Second, the statute of limitations does not necessarily end with the last communication from the defendants. The wire fraud statute does not require that the wires be sent by a defendant. Rather, it is sufficient if the interstate wires were used to further the scheme. *See United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000). In short, wires between Davis and G.G. could be sufficient to prove wire fraud. Third, and in any event, the wire fraud conspiracy statute does not require prove of an overt act or a particular wire. *United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015). Thus, the statute of limitations does not begin to run until the agreement ends. The indictment alleges that the agreement continued until at least January 2018. The defendants must await trial to counter this allegation.

IV. <u>Count Four Does Not Raise Duplicity Concerns</u>

A count of an indictment runs afoul of duplicity when it "joins two or more distinct crimes in a single count," *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992), but only if that joinder prejudices the defendant. *United States v. Margiotta*, 646 F.2d 729, 732–33 (2d Cir. 1981) (observing that duplicity objection is properly invoked only when challenged indictment affects doctrine's underlying policy concerns: (1) avoiding uncertainty of general guilty verdict by concealing finding of guilty as to one crime and not guilty as to other, (2) avoiding risk that jurors may not have been unanimous as to any one of the crimes charged, (3) assuring defendant adequate notice of charged crimes, (4) providing basis for appropriate sentencing, and (5) providing adequate protection against double jeopardy in subsequent prosecution). The defendants fail to make either showing.

To begin with, Count One, charging a murder-for-hire conspiracy, does not charge the same offense as Count Four, which charges a wire-fraud conspiracy. Count One requires proof of different elements and involves different co-conspirators from Count Four. Indeed, Court Four nowhere alleges that the defendants agreed to have Davis killed. Rather it merely alleges the fact that Davis was murdered in January 2018, a fact unlikely to be disputed at trial, and a fact that bears on the object of the conspiracy to defraud him.[7]

The defendants also rely on the assumption that the murder was "part and parcel of the wire fraud scheme" because Count Four "alleges no act in furtherance of the conspiracy to have occurred beyond the . . . payments in November, 2017," Dkt. 109 at 14. As noted above, the factual and legal premises of this point are mistaken. On the one hand, the indictment does not need to allege, and the government does not need to prove, an act in furtherance of the wire fraud scheme within the statute of limitations period. On the other hand, the indictment alleges, and the government intends to prove, acts in furtherance of the conspiracy within the statute of limitations period.

In any event, the murder allegation in Count Four hardly prejudices the defendants. The inclusion of Davis's murder in Count Four does not raise any of the concerns outlined in *Margiotta*. Any slight concerns can be addressed by jury instructions, a redaction of any superfluous allegations, or an appropriate sentencing decision if the defendants are convicted of both charges. *See United States v. Sturdivant*, 244 F.3d 71, 80 (2d Cir. 2001); *United States v. Helmsley*, 941 F.2d 71, 91 (2d Cir. 1991).

---

[7] The business relationship between Davis and Gumrukcu from 2015 to 2018 is highly relevant to the murder-for-hire charges, including as to motive. Such relevance, however, does not create a duplicity concern.

Indictments regularly allege conduct in one count that overlaps with conduct in another count. Such overlap does not amount to duplicity. There is no risk of confusion here. Any duplicity concerns should await trial and sentencing. They do not provide a basis for dismissal.[8]

V.      Conclusion

For the foregoing reasons, the Court should deny the defendants motions in their entirety.

Dated at Burlington, in the District of Vermont, 3rd day of November 2023.

                                              Respectfully submitted,
                                              NIKOLAS P. KEREST
                                              United States Attorney

                                              By: _/s/ Paul J. Van de Graaf_
                                              PAUL J. VAN DE GRAAF
                                              ZACHARY STENDIG
                                              Assistant U.S. Attorneys
                                              P.O. Box 570
                                              Burlington, VT 05402-0570
                                              (802) 951-6725

---

[8] Defendant Gumrukcu continues to call himself Dr. Gumrukcu in his motion. The Court has already noted that it does not intend to rule on the government's objection to this appellation at this point. Prior to trial, however, the government will file a motion seeking to have the Court bar the use of this appellation in front of the jury or, in the alternative, allowing the government to counter the fraud by presenting evidence that Gumrukcu never received a medical degree.