1       UNITED STATES DISTRICT COURT
           FOR THE
2        DISTRICT OF VERMONT

3

4  United States of America  )
                )
5            )
  v.           ) Case No. 5:22-cr-58-1-2
6            )
                )
7  Serhat Gumrukcu     )
  Berk Eratay       )
8            )
  _____)

9

10  RE:  Pretrial Conference and Hearing on Motion to Dismiss Count
   IV of the Indictment (Doc. 109), Motion to Dismiss Count Four
11  of the Third Superseding Indictment (Doc. 110), and Motion for
   Joinder as to Motion to Dismiss Count IV of the Indictment
12  (Doc. 111)

13  DATE:  January 19, 2024

14  LOCATION:  Burlington, Vermont

15  BEFORE:  Honorable Geoffrey W. Crawford
       Chief District Judge

16

17  **APPEARANCES**:

18  Paul J. Van de Graaf, AUSA
  Zachary B. Stendig, AUSA
19  United States Attorney's Office
  District of Vermont
20  PO Box 570
  Burlington, VT 05402-0570

21

22  Ethan A. Balogh, Esq.
  Balogh & Co. APC
23  100 Pine Street, Suite 1250
  San Francisco, CA 94111

24

25       - Continued on Next Page -

```
1    Susan K. Marcus, Esq.
     Law Firm of Susan K. Marcus
2    29 Broadway, Suite 1412
     New York, NY 10006
3

4    Lisa B. Shelkrot, Esq.
     Langrock, Sperry & Wool
5    210 College Street, Suite 400
     Burlington, VT 05401
6

7    Allan J. Sullivan, Esq.
     Sullivan PLLC
8    59 Coventry Street #702
     Newport, VT 05855
9

10

11

12           TRANSCRIBED BY:  Sunnie Elizabeth Donath, RMR
                     United States District Court Reporter
13                        verbatim@vermontel.net

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
 1                    (The Court opened at 1:05 p.m.)
 2            COURTROOM DEPUTY:  Your Honor, the matter before the
 3    Court is Case Number 22-cr-58, Defendants 1 and 2, United
 4    States of America versus Serhat Gumrukcu and Berk Eratay.
 5    Present on behalf of the Government are Assistant US Attorneys
 6    Paul Van de Graaf and Zachary Stendig.  Present on behalf of
 7    Defendant Gumrukcu is, are, excuse me, Attorneys Lisa Shelkrot,
 8    Ethan Balogh, and Susan Marcus.  Present for Defendant Eratay
 9    is Attorney Allan Sullivan.  And we are here for a pretrial
10    conference, a hearing on motion to dismiss Count IV of the
11    indictment, a motion to dismiss Count Four of the third
12    superseding indictment, and motion for joinder as to motion to
13    dismiss Count IV of the indictment.
14            THE COURT:  All right.  Afternoon.  Good to see
15    everybody.  The Wyatt facility where Mr., Dr. Gumrukcu is held
16    isn't connecting with us.  We could wait and see if they
17    establish a connection, or we could go forward.  I know your
18    client was really observing more than participating, but I
19    don't want to step on his toes.  If you'd like to wait and see
20    what happens, we could give it some time, or we could go
21    forward.
22            ATTORNEY MARCUS:  What's the communication with
23    Wyatt?  Are they --
24            THE COURT:  Their system is down.  It might be
25    different in ten minutes.
```

```
 1              ATTORNEY MARCUS:  Can we keep trying?  If we go
 2      forward, can we keep --
 3              THE COURT:  Oh, of course, yeah, yeah.  If they let
 4      him in, you'll be the first to know.
 5              ATTORNEY MARCUS:  I'm wondering if we can take a
 6      minute and get a quick call to our client just to let him know
 7      that we're doing this.
 8              THE COURT:  Sure, okay.  And, while we're at it,
 9      you'll remind me, Mr. Sullivan, of Mr. Eratay's preference
10      today.  He waived his appearance altogether?
11              ATTORNEY SULLIVAN:  Altogether, yes, sir.
12              THE COURT:  Got it, thanks.  When you're ready, I'll
13      come out.
14          (A recess was taken from 1:08 p.m. to 1:11 p.m.)
15              THE COURT:  All right.  Back on the record.  I can
16      see Dr. Gumrukcu.  If you can hear me, Dr. Gumrukcu, can you
17      raise your hand?  There you go.  I think we have a connection.
18      So which of the defendants would like to lead off?
19              ATTORNEY BALOGH:  I will if I may, Your Honor.
20              THE COURT:  Certainly.
21              ATTORNEY BALOGH:  What we'll do if we may, I'm just
22      going to argue the Count Four dismissal, what I'm going to
23      refer to as the *Pasquantino* argument, and, with respect to the
24      other challenges to Count Four, my colleague Mr. Sullivan will
25      handle those, as he did brief those.
```

```
 1          THE COURT:  Great.
 2          ATTORNEY BALOGH:  Thank you.  I'll be brief.  As we
 3   know sort of under Rule 12, a challenge to an indictment is
 4   kind of akin to a demurrer.  We accept the grand jury's
 5   allegations.  We don't look behind them, and we say, Do they
 6   state a crime?  And, back from Pirro in the Second Circuit,
 7   which is a leading case which describes, It just can't be the
 8   statutory language, there has to be some factual averment
 9   within to be a proper indictment, we assess those claims, and
10   this goes back to the Supreme Court's work.  I think Hamling
11   was a '74 opinion that goes back to quote Hess from 1888, which
12   is, We look at it, and we accept it or not.
13          And, here, what the, the crime -- we're not challenging
14   the heavier crimes.  Count Four is a 1349 conspiracy
15   allegation, Did the defendants enter an agreement to defraud,
16   in this case, Greg Davis or Greg Gac?  And, with respect to
17   both of them there, the indictment simply does not argue that
18   they targeted their money, and, in response, the government is
19   clear that they're arguing a breach-of-contract theory.  And
20   what the government tells the Court is that the money that was
21   targeted was owed to Greg Davis under a contract and the
22   defendants lied to him and made false statements using the
23   wires to avoid paying that contract debt, and they say that's
24   sufficient under Pasquantino, and, respectfully, that's just
25   incorrect.
```

1        The case law is clear.  A breach of contract, you know,

2    first-year law school, contract and torts are different.

3            THE COURT:  Right.  One is at 10:00, and the other is

4    at 2:00 in the afternoon.

5            ATTORNEY BALOGH:  Correct.

6            THE COURT:  Right.

7            ATTORNEY BALOGH:  So it's a contract claim, and

8    *Pasquantino*, what made *Pasquantino* appropriate and what the

9    case said was the second the importers into Canada brought the

10   liquor over illegally, as it crossed the border, the tax was

11   due.  It's sort of how we define contraband in the United

12   States.  The second I try to bribe a judicial official, that

13   money is vested in the United States as I hand it.  We've

14   written the laws that way so the act can have direct legal

15   consequences.

16       Not the same for a contract.  It's a chosen action, and

17   that's why the *Adler* case out the Fourth Circuit, it's just

18   dead on.  It makes that exact distinction.  If you're saying --

19   and you can.  That is a proper right.  A chosen action can be

20   assigned, it can be sold, but the scheme alleged isn't that

21   Messrs. Eratay and Gumrukcu interfered with that right, tried

22   to have him not sued, did something to affect that chosen

23   action.

24       They're saying -- and this is clear in their opposition

25   brief -- he was owed money under the contract, and that's just

1    not, that doesn't sound in fraud, and it might seem weird to

2    you.  Your Honor's been doing this a minute.  You know, why in

3    a murder case with a life cap are we arguing about a fraud

4    count?  Like, what is it?  What does that bring to the mix?  It

5    seems odd almost, and it's a very important motion, and, while

6    the government does --

7         You know, motive is not an element, and the Government can

8    shape motive and argue motive as they want, and it seems

9    reasonable to say that, if they want to argue that Mr. Davis

10   was murdered because he would say something or do something and

11   they wanted to avoid that consequence, that strikes me as

12   pretty standard fare, but to vouch for a fraud theory is a

13   horse of a different color, and, if we're right about it -- and

14   we are right about it -- if this case does go to trial on the

15   fraud theory, it's not going to hold up, but it affects the

16   murder case, because it allows vouching for a theme of fraud

17   that's just not sound in law.

18              THE COURT:  Let me stop you there.  I was thinking

19   about the same thing.  Had the government not brought this

20   fraud count, it seemed to me that all of the conduct described

21   in Count Four would be admissible on motive and kind of

22   described the relationship between the alleged murderers and

23   the victim, and, I mean, all of it is -- nothing in there would

24   have been inadmissible, right?

25              ATTORNEY BALOGH:  Well, I think all of it might be a

1    bridge too far.  I think, when they plead something, they have
2    greater rights to prove it up.  But, to your general idea, Your
3    Honor, that is some --
4            THE COURT:  Yeah, yeah.
5            ATTORNEY BALOGH:  -- is, you know, what is excluded
6    under 403, or what are the limits of 404(b), those are worthy
7    discussions so there can be some limitation.
8            THE COURT:  Yeah.  I'm not trying to trap you on a
9    detail.
10           ATTORNEY BALOGH:  Right.  But that theory you're
11   expressing is correct, which is, Can the government say this
12   guy was murdered because of this?  Well, yeah, that's generally
13   permitted in homicide trials, but there's a difference if you
14   plead it, and here they had it, and, if they want to plead it
15   again, the government is the master of the grand jury's
16   indictment.  They type them up.
17       Here, what they've argued, and they've confessed it,
18   they've argued a breach-of-contract case, and a breach of
19   contract isn't property fraud under *Kelly* or *Ciminelli*.  And we
20   also, and I think it's worth the Court noting, we have a series
21   of Supreme Court cases in the last decade where there's one
22   clear message:  The fraud statutes are being misused by federal
23   prosecutors.  They're being overbroadly brought.
24       A lie in money isn't fraud, and they've been advocating
25   this, the United States Supreme Court, that the Court's got to

1     play close attention to rein in misuse.  The fraud statutes

2     focus on traditional property rights.  Here, the basis is a

3     contract right.  It doesn't meet it under *Pasquantino*.  That

4     was the sole case they cited, and *Adler* disposed of it

5     effectively.  Absent questions from Your Honor, I'll rest.

6            THE COURT:  No.  Why don't we give the government a

7     chance?  And I'll make sure to give you a more fulsome reply,

8     because I think that would be helpful.

9            ATTORNEY BALOGH:  I appreciate that, Your Honor.

10           THE COURT:  Yeah, all right.  Mr. Sullivan?

11           ATTORNEY SULLIVAN:  Good afternoon, Your Honor.

12           THE COURT:  Good afternoon.

13           ATTORNEY SULLIVAN:  From Mr. Eratay, we join in the

14    argument, the *Pasquantino* argument that was made.  As Your

15    Honor knows, I came into this case a little late.  The third

16    superseding indictment had been returned by the grand jury,

17    and, excuse me, but that was my initial frame of reference when

18    I came into the case is I picked up the third superseding

19    indictment and read it very, very closely, and that exercise

20    was a little bit of a head-scratcher.

21        I saw that there was certainly forms of deception alleged.

22    There was various ventures that had been set up, false starts.

23    There had been contemplated future sales.  But what I couldn't

24    glean from that indictment was, What was it that the defendants

25    were trying to steal?  It's a fraud count.  It's a theft count.

1      I'll put the indictment down.  I'll look at the discovery.

2    I'll get better informed.  I'll pick it back up again and look

3    at it again.  And, when I came back, I really focused in on the

4    gravamen clause and the failure of the gravamen provision,

5    Paragraph 17, to state what the object of the fraud scheme.  It

6    was no object clause.  It's a specific intent crime.

7         THE COURT:  Right.

8         ATTORNEY SULLIVAN:  And so the object clause informs

9    what the government's burden is as to mental state as to what

10   the purpose of the defendants' conduct was, and that, to me,

11   was a big red flag.  Since 1987 and *McNally,* the Supreme Court

12   is laser focused on the object of the conspiracy, and it's not

13   so much, again, what the type of crime it is.  It is the type

14   of -- type of property it is -- it is the type of property

15   that, that the defendants intended to obtain by virtue of their

16   fraudulent conduct.

17      By not having a, an explanation of what that object was,

18   we submit that there is a hole in the indictment, and it's a

19   hole of constitutional dimension, and it warrants dismissal.

20   It is black-letter law.  All essential elements of an offense

21   need to be pled.  And there is no disagreement between the

22   government and the defense as to what those essential elements

23   are:  A scheme to defraud, one; money or property as the object

24   of that scheme, that's two; and the use of the wires, three.

25   They got one and three.

1          THE COURT:  Right.

2          ATTORNEY SULLIVAN:  But, on my read, they didn't hit

3    two, and that's enough by itself to warrant dismissal of, of

4    the indictment.  This is not just a Rule 7(c) issue.  This

5    issue has, it really has constitutional, is of a

6    constitutional, has constitutional dimensions.  The case law --

7          THE COURT:  Just so I make sure I follow, can you

8    spell that out?  Is it the right to indictment or the Due

9    Process Clause or some combination?

10          ATTORNEY SULLIVAN:  It's a combination of them.  So I

11    would -- there are three, there are three issues that feed into

12    and form the basis for Rule 7(c).  First, the Indictment Clause

13    in the Fifth Amendment --

14          THE COURT:  Right.

15          ATTORNEY SULLIVAN:  -- so that we could be assured

16    that the grand jury was properly focused when it returned its

17    indictment, but, secondly, of course, the Due Process Clause

18    and fair notice.  And, finally --

19          THE COURT:  Yeah.

20          ATTORNEY SULLIVAN:  -- it gives us assurance, better

21    assurance, that the jury will be unanimous as to all of the

22    essential elements and the objects of the scheme or fraud.

23          So, for the very first time, we've learned what that

24    object was, and that was when the government filed its

25    responsive brief, and, as co-counsel has said, this is

1    essentially a breach-of-contract case, and that flies in the

2    face of the line of cases, Supreme Court cases, that basically

3    said, We're not going to criminalize torts and breaches of

4    contract.  They said it last year in the *Ciminelli* decision,

5    unanimous opinion.  The Second Circuit has said it in various

6    forms.  So we submit that there is a hole on the face of the

7    indictment and that hole mandates, under Rule 12, dismissal.

8    So we join, we join in the argument and --

9         THE COURT:  All right.  And I'll give -- I know you

10   have another string to your bow, but why don't we deal with

11   this issue first and then get you back up?

12        ATTORNEY SULLIVAN:  Right.

13        THE COURT:  Thank you.

14        ATTORNEY SULLIVAN:  Thank you.

15        THE COURT:  Mr. Van de Graaf?

16        ATTORNEY VAN DE GRAAF:  Thank you, Your Honor.  So,

17   as it's been set out, there's two issues that the defense

18   raises.  One is the sufficiency of the language of Count Four,

19   and the second is the legal adequacy of the property interests

20   identified in Count Four.

21        THE COURT:  Right.

22        ATTORNEY VAN DE GRAAF:  So let me focus on, I think,

23   the issue Mr. Sullivan addressed first, because I was going to

24   talk about that first, unless the Court --

25        THE COURT:  No.  That's helpful.  I have been

1    thinking of it as sort of the procedural half of the argument

2    and then the substantive half to follow.

3            ATTORNEY VAN DE GRAAF:  I think that's the way I see

4    it, too, Your Honor.  So, turning to the first issue, I think

5    the Second Circuit case law is strong that the indictment need

6    do little more than track the language of the statute charged,

7    state the time and place of the alleged crime.  There's a

8    variety of Second Circuit cases that say that, including the

9    *Wedd* case, 993 F.3d 104; the *Stavroulakis* case, which is 952

10   F.2d 686, I think.

11           So Count Four charges, as defense noted, a conspiracy to

12   commit wire fraud, and the language of that statute, 1349, is

13   relatively brief:  Any person who conspires to commit any

14   offense under this chapter is guilty of a federal offense.

15   Count Four specifically alleges that the two defendants, Eratay

16   and Gumrukcu, conspired to violate the wire fraud statute and

17   provides a timeframe for that violation.

18           Count Four also tracks the wire fraud statute, which has

19   two independent prongs under the statutory language.  One is a

20   scheme to defraud, which is typically a scheme to deprive

21   somebody of property, and then a prong which is to obtain

22   property through false pretenses.  And here Count Four tracks

23   the former prong of the statute, which reads, basically,

24   whoever devises any scheme to defraud, having devised any

25   scheme to defraud, transmits or caused to be transmitted by

1    means of wire in interstate commerce for the purpose of
2    executing the scheme shall be guilty of a federal offense.
3         Now, Count Four alleges specifically that the defendants
4    devised and executed a scheme to defraud two people, Mr. Gac
5    and Mr. Davis.  Count Four references numerous emails involving
6    the alleged scheme.  Now, to be sure, the Supreme Court has
7    interpreted the "scheme to defraud" phrase as requiring a
8    deprivation of some property interest.
9              THE COURT:  Right.
10             ATTORNEY VAN DE GRAAF:  And we acknowledge that.  We
11   acknowledge that that property interest is an element of the
12   offense.
13             THE COURT:  Right.
14             ATTORNEY VAN DE GRAAF:  But all the indictment need
15   do is identify that property interest.  There's no requirement
16   of magic language or specific language.  The indictment has to
17   give notice or allege the property interest, and, Your Honor,
18   we believe that Count Four alleges a property interest for the
19   two victims.
20        Now, there are slightly different property interests for
21   the two victims.  So Count Four alleges that Gregory Davis was
22   due money that he was not paid.
23             THE COURT:  All right.  So let me catch up with you.
24   Which paragraph?
25             ATTORNEY VAN DE GRAAF:  So in multiple places, as our

1    pleading notes, as our pleading notes on Page 7, there's

2    numerous representations to debt or required payments,

3    obligations in the indictment.  They're in Paragraph 9,

4    Paragraph 11, Paragraph 12, Paragraph 13.  There's numerous

5    places that the indictment specifically alleges that Mr. Davis

6    is owed money, that he has a entitlement to funds --

7              THE COURT:  Right.

8              ATTORNEY VAN DE GRAAF:  -- a current entitlement to

9    funds, and so that is the property interest that the government

10   believes is identified in the indictment consistent with Rule

11   12.

12             THE COURT:  So let me tell you what I did, which is I

13   went through.  I've read this count many times, as you have,

14   and I went through, and I made a table of the payments alleged

15   amongst the three parties.  And, Mr., according to the

16   indictment, Mr. Gac paid Davis $30,000 in April of 2015,

17   $75,000 in May of 2016, and $50,000 in November of 2017.  I

18   think those are the payments that you say he's out of pocket

19   and missing.

20             ATTORNEY VAN DE GRAAF:  Those are the payments that,

21   yes, Mr. Gac is out.  So Mr. Gac --

22             THE COURT:  These went from Gac to Davis, and then

23   Gumrukcu paid $100,000, plus maybe a little bit more -- it's

24   not entirely clear -- to Gac in May of 2017 and $65,000 in

25   November of 2017.  So Gac came out a small amount ahead

1     according to the indictment.

2           So what did he lose there with respect just to these

3     payments?

4                 ATTORNEY VAN DE GRAAF:  So, first of all, the

5     indictment does not allege all the payments.  There are

6     additional losses that aren't identified in the indictment, and

7     the indictment doesn't have to list every loss.  It has to

8     simply identify that there was a loss.  But, even if Mr. Gac

9     was repaid before the end of the scheme, that does not mean

10    that there wasn't a scheme to defraud.  That is, you can lose

11    money and eventually be repaid.  It can still be a fraud.  So,

12    you know, the fact, even if he was repaid -- and the indictment

13    doesn't say that he was repaid everything.

14                THE COURT:  These are the numbers out of the

15    indictment, more to Gac than Gac paid out, but you tell me

16    there's a lot more to it and there are payments that I know

17    nothing of?

18                ATTORNEY VAN DE GRAAF:  There are, there are a

19    variety of things associated with Mr. Gac that are not in the

20    indictment.

21                THE COURT:  So how do I weigh whether he lost

22    property when I don't know what that property is in the

23    indictment?

24                ATTORNEY VAN DE GRAAF:  All you need to find is that

25    he spent his own money when he didn't have it, when he spent

1    money that was supposed to be somebody else's money, that he

2    lost money even temporarily.  Even a temporary loss of money

3    could be sufficient.  But this gets to this issue of what the

4    indictment needs to do.

5              THE COURT:  Right.

6              ATTORNEY VAN DE GRAAF:  The indictment does not, in

7    the government's view, need to state every fact or even

8    identify the specific loss that the, that the victim had.  In

9    other words, we don't have to do a calculation of this loss

10    versus this gain.  That is not required by Rule 12.

11        Now, it could be that they could, the defense, could argue

12    certain things at trial about, about how the evidence presents,

13    but, for purposes of Rule 12 and an indictment, all the

14    indictment need do is identify that Mr. Gac parted with his

15    funds at some point in time and he lost money at that point.

16    That is enough for there to be an allegation of a deprivation

17    of property.

18              THE COURT:  Really almost anybody that goes into

19    business and pays money and doesn't get it back would qualify

20    then.

21              ATTORNEY VAN DE GRAAF:  No, no.

22              THE COURT:  Assuming there was also some deceit on

23    the defendant's side.

24              ATTORNEY VAN DE GRAAF:  Yeah.  If there was a fraud

25    scheme in which somebody went to the Court and convinced you to

1    spend money that you were not going to otherwise spend and you

2    lost and you spent that money --

3              THE COURT:  Right.

4              ATTORNEY VAN DE GRAAF:  -- based on fraud, that would

5    be a possible fraud scheme.  Now, even if you got that money

6    back eventually later, that would not be itself impossible to

7    be fraud.  Right now, the question is, Is it impossible that

8    there was fraud, right?  I mean, is there no possible way that

9    the government can prove fraud?  That's the standard here.

10   We've identified a property interest, that is, Mr. Gac, if

11   we're focusing on him right now --

12             THE COURT:  Are you starting with him?

13             ATTORNEY VAN DE GRAAF:  I was trying to start with

14   Mr. Davis.  So I apologize if you misheard me.  I was trying to

15   start with Mr. Davis, but we're on Mr. Gac.  The indictment

16   alleges that he was out money, and it says, indeed, in

17   Paragraph 12, "By the end of 2016, Gac, GG, had lost over

18   $100,000 from the Mode Lauran transactions".  That is enough of

19   an allegation of a deprivation of property to satisfy, to make

20   it past this stage of a challenge to the indictment.  So

21   that's, that's my Gac view.

22        The defense, neither the defense nor the Court should

23   calculate up, according to the indictment, exactly how much

24   money moved in what transactions because we don't have to list

25   all the facts in a wire fraud scheme.  This is, I mean, however

1    the case plays out, these events involving the defendants,

2    Mr. Gac, and Mr. Davis will be complicated.  It's, it's a

3    somewhat tortured and complicated series of events over three

4    years.  And the government tried, maybe not as well as some

5    others might have done, to summarize some of the key events but

6    certainly didn't intend to describe all the events and didn't

7    intend to give some accounting --

8                (A beeping sound is heard in the courtroom.)

9                THE COURT:  Sorry.  It's a medical monitor.  It's not

10   a cell phone.

11               ATTORNEY VAN DE GRAAF:  No problems, Your Honor.  And

12   didn't intend to do some kind of calculation, Here's how much

13   he was out, here's how much he got back.  The indictment didn't

14   intend to do that, and it didn't need to do that, in my view.

15         Let's turn to Mr. Davis and his property interest, which

16   is different.  His property interest is an entitlement to

17   money, that he did not give somebody the money; he was entitled

18   to money.  And this gets to the question of whether or not this

19   kind of debt is property.  I'll put that for a second, but the

20   indictment itself, we believe, identifies that property

21   interest.  If it is a property interest, it identifies it, and

22   that, again, is all that need to be done for purposes of a Rule

23   12 challenge to the indictment itself.

24               THE COURT:  So it's the $950,000 that the indictment

25   says he's due if the joint venture is dissolved?

1          ATTORNEY VAN DE GRAAF:  Your Honor, there is, again,

2     the indictment was not attempting, and I don't think we have

3     to, describe exactly how the debts worked.  Again, you know,

4     these relationships were somewhat complicated.  The indictment

5     does not state all of the facts about the redemption agreement,

6     how the redemption agreement worked, and the Court shouldn't

7     try to figure out how the redemption agreement worked.  All

8     that should matter now is that there was an obligation, that

9     the indictment alleges an obligation to pay money to Mr. Davis.

10    Whether we can prove that, what the evidence shows about that

11    are for the trial.  They're not for right now and deciding

12    whether or not this indictment is sufficient.

13         THE COURT:  So I don't even look at whether this is

14    contract-based or property-based.  I just say the government

15    says -- really, what I think what you're saying is Paragraph 17

16    is enough.  You chose, for which I'm grateful, you chose to

17    kind of provide a speaking indictment with a lot of detail,

18    which I take as, as read as true, but, really, if you had just

19    filed Paragraph 17, which covers the elements, that would be

20    enough?

21         ATTORNEY VAN DE GRAAF:  No, I don't think so.

22    Paragraph 17 does not identify the property interests.  So

23    other paragraphs identify the property interest, which is an

24    entitlement to funds, and I believe it fairly, when you read

25    it, fairly describes that the misrepresentations are aimed at

1    these exact property interests of this entitlement of funds.

2    That is, they are not paying him funds and lying about why, you

3    know, that he's going to be paid and not paid back.

4              THE COURT:  Yeah.

5              ATTORNEY VAN DE GRAAF:  So the, you know,

6    Mr. Sullivan's concern about the object of the conspiracy,

7    again, we don't have to use magic words, The object was this.

8    I think the rest of the indictment fairly describes that the

9    scheme was aimed at not paying Mr. Davis everything he was

10   entitled to, and that's all that the indictment has to do.

11             THE COURT:  And is that a contract right or a

12   property right or something else?

13             ATTORNEY VAN DE GRAAF:  Well, contract rights are

14   property rights.  So I don't agree with --

15             THE COURT:  I don't think the Supreme Court will buy

16   that.  You can't -- give me a chance.  You can't, in light of

17   the recent case law, you couldn't simply say, Look, I had a

18   contract with the guy.  It was an employment contract.  He

19   didn't pay me.  He said he would and didn't, and I've got a

20   wire fraud case.  I don't think they would say that.

21        They would say -- and I'm looking for the phrase -- we are

22   interested in intangible -- that sounds to me like an

23   intangible interest unconnected to traditional property rights,

24   which would describe most contract rights.

25             ATTORNEY VAN DE GRAAF:  I disagree.  So let me go to

1    general principles of property and *Pasquantino*.

2              THE COURT:  Right.

3              ATTORNEY VAN DE GRAAF:  By the way, the Second

4    Circuit has said in other contexts, in the *Miller* case, that

5    contract rights can be property.

6              THE COURT:  Yeah, but you have to watch the dates,

7    because they said a lot that doesn't count anymore.

8              ATTORNEY VAN DE GRAAF:  So let me go through the

9    cases.

10             THE COURT:  So, I mean, was that 1998?  2005?  It's

11   got to be current after the conservative majority has cut back

12   on the scope of the fraud.  That has happened.  You've seen

13   that, too, right?  I'm not dreaming this?

14             ATTORNEY VAN DE GRAAF:  No.  We can talk about these

15   more recent cases, and I'd be glad to talk about them.  I've

16   thought plenty about them.

17             THE COURT:  I know you have.

18             ATTORNEY VAN DE GRAAF:  But let's talk about

19   *Pasquantino* first.

20             THE COURT:  That's the tax case?

21             ATTORNEY VAN DE GRAAF:  That's the tax case.  So

22   Justice Thomas, a conservative if you're going to talk about

23   conservative members --

24             THE COURT:  Sure.

25             ATTORNEY VAN DE GRAAF:  -- analyzed what property is

1    and tried to define what property is under the wire and mail

2    fraud statutes.

3              THE COURT:  Right.

4              ATTORNEY VAN DE GRAAF:  And, you know, certainly, the

5    case involved a tax potentially due and owing to the Canadian

6    government, but, you know, Supreme Court analysis, in my view,

7    shouldn't be limited simply to the facts of the case.  That is,

8    we should look to Justice Thomas's analysis of what property

9    interests are protected, and Justice Thomas began by noting

10   that an entitlement to collect money is property.  He cited

11   *Black's Law* definition for the meaning of property.  He focused

12   on common law definitions of property.  He made clear that

13   depriving an alleged victim of money legally due is a

14   deprivation of property.

15        Now, indeed, the court said fraud at common law included a

16   scheme to defraud a victim of his entitlement to money, and

17   they provide an example:  a debtor who concealed his assets

18   while settling debts with his creditors thereby committed

19   common law fraud.  So, you know, Justice Thomas began with

20   private debt as property, and, of course, private debt is

21   property.  You know, the bond market is made up of private

22   debt.

23             THE COURT:  But that's not what we're talking about

24   here.

25             ATTORNEY VAN DE GRAAF:  Your Honor, I don't -- I

1 disagree that private debt should be distinguished.  If you

2 make a promissory note to someone, if you, if you agree to pay

3 somebody a promissory note, that's not different than a bond.

4 It's not legally different than a corporate bond.  A promissory

5 note can be sold just like a bond can be sold.  And a debt,

6 even if it is a debt in contract, a promissory note is just a

7 debt in contract, right?

8     THE COURT:  Okay.  So we can cut to the chase, and I

9 can really summarize your position, which is, for which I have

10 a lot of respect, is any enforceable promise to pay money is a

11 property right for purposes of the federal fraud statute?

12     ATTORNEY VAN DE GRAAF:  Yes, I would agree with that,

13 promise to pay money.  Now, that's different than saying any

14 contract violation is a --

15     THE COURT:  Yeah.  No.  There are examples that would

16 break the, the --

17     ATTORNEY VAN DE GRAAF:  Right.

18     THE COURT:  But any, from your perspective, all you

19 need to allege in the indictment is an enforceable promise to

20 pay money?

21     ATTORNEY VAN DE GRAAF:  Yes.

22     THE COURT:  Okay.

23     ATTORNEY VAN DE GRAAF:  That is my position.

24     THE COURT:  Yeah.

25     ATTORNEY VAN DE GRAAF:  Now, you know, they can fight

1     about whether there is one in this case at trial.  You know,

2     we, that's an element of the offense, and they can challenge

3     that I can prove that.

4             THE COURT:  Right.

5             ATTORNEY VAN DE GRAAF:  But, if I can prove that,

6     that would be a property right that can be enforced with the

7     wire fraud statute.  So let me get to the two Supreme Court

8     cases that Your Honor and the defense seems to be referring to,

9     because they are very different issues that they're describing.

10            THE COURT:  Right.

11            ATTORNEY VAN DE GRAAF:  So the, you know, the

12    *Ciminelli* case is a case rejecting, not this property interest,

13    but a right-to-control-property theory.  So the Second Circuit

14    had a theory that a right to control assets --

15            THE COURT:  Right, right.

16            ATTORNEY VAN DE GRAAF:  -- is a property interest.

17            THE COURT:  Right.  And that's gone.

18            ATTORNEY VAN DE GRAAF:  That's gone, and I agree it's

19    gone, but that is not what I'm relying on here.  I'm not

20    relying on a right-to-control theory.  I'm relying on a

21    traditional common law notion of what property is.

22        Now, then we get the *Kelly* case, which is, you know, the

23    "Bridgegate" case, which is, you know, a highly unusual fraud

24    case.

25            THE COURT:  It's fun to talk about but doesn't help

1    us much here.

2            ATTORNEY VAN DE GRAAF:  Right.  It's a case about

3    what is incidental, which, you know, the Court could decide or

4    the jury could decide an incidental loss after the evidence,

5    but it certainly can't decide an incidental loss at indictment

6    time if the loss or the deprivation of property is described in

7    the indictment.

8            So those cases, while I agree that the Supreme Court is,

9    and the other courts, are navigating how to deal with the scope

10   of the wire fraud and mail fraud statutes, I still believe here

11   we still fall within a traditional notion of property, a

12   species of property that's been around for hundreds of years

13   according to Justice Thomas, and Justice Thomas reasoned from

14   private debt to the Canadian debt.  You know, he relied on the

15   fact that private debt was, indeed, property to say that, Oh,

16   money owing to a state is also property, because the state

17   shouldn't be less than a private person.  So, while they're

18   factually distinguishable, the reasoning of the court in

19   *Pasquantino,* we believe, supports our position.

20           THE COURT:  So we bring that back to Gac and to

21   Davis.  If I, trying to be fair to, to what you're telling me

22   is, with respect to the fraud on Gac, although he wound up with

23   more money in his bank account at the end of his dealings with

24   Davis, at least as far as the indictment says -- it's a, it's a

25   little hard to tell me the more facts I don't know.  I can only

1    deal with what you put in front of me.  According to the
2    indictment, he wound up with more money than he paid out on
3    this deal by five or ten thousand dollars, not by much, but
4    there was a time when he was out-of-pocket, and that was the
5    deprivation for him, just the cash that he had paid to Davis on
6    behalf of Gumrukcu and hadn't been refunded?

7          ATTORNEY VAN DE GRAAF:  Your Honor, if you're just
8    tallying up what's in the indictment, you may be right.

9          THE COURT:  Yeah, right.

10         ATTORNEY VAN DE GRAAF:  But what I'm saying is that
11   we're not limited to what's in the indictment for our case.
12   And so, even if you thought that we had to prove that Mr. Gac
13   was out funds at the end, that is, that he was negative, if we
14   had to prove that at trial, I think we can prove that at trial.
15   So, you know, I don't think that the fact that you can
16   calculate up the pros and cons, the minuses and pros of the
17   examples that we gave -- because we only gave some examples.
18   We didn't give everything in the indictment.

19         THE COURT:  Right.

20         ATTORNEY VAN DE GRAAF:  I don't think that's a fair
21   way to dismiss our claim that he was deprived of his funds.  At
22   trial, certainly, if the Court thought that even a temporary
23   deprivation of your money is not sufficient, then maybe you
24   could do that calculation, but I don't think you should do the
25   calculation now.  That's with respect to Mr. Gac.

1          THE COURT:  All right.  But the type of property

2     which he was defrauded of, in your view, are these payments to

3     Davis on behalf of Gumrukcu?

4          ATTORNEY VAN DE GRAAF:  Yes.

5          THE COURT:  Okay.  And I, I take your point.  I can't

6     commit a fraud, hear that the grand jury is taking testimony,

7     run and pay back the victim and say, We're done.  I see that.

8     It's just, when I did the dates and the amounts, it looked like

9     the flow of business was being described in your indictment,

10    not someone who has had second thoughts and quickly tried to

11    solve the criminal problem by paying off the victim.

12         ATTORNEY VAN DE GRAAF:  You know, the indictment

13    makes clear that part of, the largest part of Mr. Gac getting

14    repaid happened when the FBI called him to talk about his

15    relationship with Mr. Gumrukcu when Mr. Gumrukcu was facing a

16    criminal case in California.  So, if you look at Paragraph --

17         THE COURT:  14?

18         ATTORNEY VAN DE GRAAF:  -- 14.

19         THE COURT:  That's $100,000 paid in May of 2017;

20    Paragraph 15, $65,000 paid six months before November of 2017.

21         ATTORNEY VAN DE GRAAF:  Which paragraph are you on?

22    I'm sorry.  I was at 14.

23         THE COURT:  14 for the 100 K, and I thought 15 for

24    the $65,000.

25         ATTORNEY VAN DE GRAAF:  So in June Gumrukcu paid GG

1    over a hundred thousand dollars in part, in part, by the way,

2    not fully, in part to reimburse the 2016 payment to Davis after

3    learning that GG would be interviewed by law enforcement

4    investigating the potential California fraud case.

5         So, yeah, this paying somebody back to make sure they

6    don't get into trouble is, we believe, can be part of a fraud

7    scheme.  That is, that that doesn't make the payment back the

8    previous fraud, doesn't eviscerate the previous fraud.

9              THE COURT:  Right, right.  And that's the kind of

10   judgment I'm trying not to make here.

11             ATTORNEY VAN DE GRAAF:  Right.  I don't think you

12   should.

13             THE COURT:  That we agree on.  I'm only interested in

14   identifying, or not, the type of property interests that would

15   support an indictment.

16             ATTORNEY VAN DE GRAAF:  Right.  I agree.  If we

17   alleged the property interest and if the Court agrees that a,

18   that money due and owing to someone can be property and that

19   somebody paying money to another person can be a deprivation of

20   property, that's all that the Court need to decide.  If the

21   indictment says those things, then the indictment goes forward

22   to a trial where those things can be decided.

23             THE COURT:  Yeah, right, right.

24             ATTORNEY VAN DE GRAAF:  Unless the Court has anything

25   further --

 1          THE COURT:  No, no.  I wanted to make sure I

 2    understood the property that Davis was defrauded of, or at

 3    least there was an attempt to defraud him of.

 4          ATTORNEY VAN DE GRAAF:  Yes.  And, I mean, to the

 5    extent that the defense brings up the *Adler* case, which, you

 6    know, let me take a second to just mention, I think it's

 7    distinguishable and/or incorrect in a couple of ways.  First of

 8    all, *Adler* is decided after trial.  So it's not a decision made

 9    based on an indictment.  It's a decision made on trial

10    evidence.

11          THE COURT:  You'll have to remind me of it.

12          ATTORNEY VAN DE GRAAF:  *Adler* is a Fourth Circuit

13    case in which Judge Luttig -- I think it's Luttig -- wrote and

14    affirmed, I believe, a Rule 29 or a judgment after conviction

15    finding that the fraud scheme was not cognizable under the

16    fraud statutes, and that case did involve sort of a debt

17    situation.

18          Now, the government's view is that, you know, that case

19    which the defense is relying on is distinguishable in a variety

20    of ways in one of which is that it was decided after the

21    evidence, and, certainly, the government agrees here that,

22    after the evidence is presented, the defense can make an

23    argument to Your Honor that we haven't made out our proof.

24          The other thing about that case is, when I read it, I

25    believe it is inconsistent with Justice Thomas's analysis of

1    *Pasquantino.*  It's decided before *Pasquantino.*  And so I think

2    that a fair reading of the way Justice Thomas is analyzing

3    property interests and the way that the Fourth Circuit in that

4    case is analyzing property interests is not consistent with

5    each other.  In that case, the court combined or ignored the

6    actual debt and just focused on the chosen action.

7         Now, I'm not a property law expert, but, you know, a

8    chosen action that is a right to make a claim is, is only part

9    of the property package, in addition to the debt itself.  So,

10   you know, property, as I think I learned in law school many

11   years, has multiple components to it.  A chosen action can be

12   property.

13        THE COURT:  We used to say the bundle of sticks.

14   It's not a metaphor that is quite as popular anymore, but that

15   was our era.

16        ATTORNEY VAN DE GRAAF:  Right, exactly.  And so I

17   think that the Fourth Circuit just failed to acknowledge the

18   actual entitlement of funds that a debt can create, a private

19   debt can create, and I think that, I just think it's

20   inconsistent with *Pasquantino's* analysis.

21        THE COURT:  So, from your perspective, property

22   equals value?

23        ATTORNEY VAN DE GRAAF:  Yeah.  I mean, property

24   equals a right to funds.  That is, a right to money is, is

25   property.

1            THE COURT:  All right.

2            ATTORNEY VAN DE GRAAF:  Well, a right -- I'm going to

3     be even more clear.  A right to money in a contract.  So, you

4     know, if a contract creates a debt, whether it's a promissory

5     note, a bond, or the redemption agreement, it is property.

6            THE COURT:  Right.  And, if it doesn't get paid and

7     there's been a lie, then we have the elements of the, of the

8     federal fraud statute?

9            ATTORNEY VAN DE GRAAF:  Well, I mean, you know, I

10    mean, obviously, those are possible.  I mean, you know, the

11    lies may not be sufficient.  You know, there's lots of parts of

12    the wire fraud statute, and, certainly, you know, the lie --

13           THE COURT:  I mean a material lie.

14           ATTORNEY VAN DE GRAAF:  Yes, yes.

15           THE COURT:  Yeah.

16           ATTORNEY VAN DE GRAAF:  If it's a material lie to

17    avoid paying an entitlement to funds, that can, could

18    conceivably make out a wire fraud case.

19           THE COURT:  All right.  Thank you.  Why don't I give

20    Mr. Balogh a turn?

21           ATTORNEY BALOGH:  It's "bal-low", Your Honor.  Rhymes

22    with shallow.

23           THE COURT:  Thank you.  I apologize.

24           ATTORNEY BALOGH:  Oh, no, Your Honor.  You join an

25    august list of federal judges who have mispronounced my name.

1   Hence, I remind them all, "Just remember, I'm a little shallow,

2   we'll get closer to it". Par for the course. Crawford, you

3   got off easy, sir.

4            THE COURT:  Thank you.  You haven't seen my first

5   name.  That's been a cross to bear.  Spelled with a G, Geoffrey

6   with a G.

7            ATTORNEY BALOGH:  Oh, there we go.  That's the hook.

8            THE COURT:  That's the hook.

9            ATTORNEY BALOGH:  Apologies, Your Honor.  I'll make

10   three points.  I'll start with the biggest distinction, and I

11   disagree with Your Honor and them.

12            THE COURT:  Okay.

13            ATTORNEY BALOGH:  This, let's start with Gac.

14   Whether he was deprived of money or not has nothing to do with

15   it, zero.  This is a conspiracy count.  The question is, Did

16   the conspirators target Gac's money to obtain it by a scheme to

17   defraud?  Whether they achieved it or not doesn't matter.

18            THE COURT:  Correct.

19            ATTORNEY BALOGH:  They had to seek money in his hands

20   and try to take his money.

21            THE COURT:  Yeah.

22            ATTORNEY BALOGH:  The indictment doesn't allege that.

23   Everything he just said was passive voice:  Gac lost money, Gac

24   got opted to do this.  They didn't target Gac's money.  Look at

25   Paragraph 12 of the indictment.  This is how they explain it.

1    This is their indictment.  We didn't write these words.  This
2    is my colleague.
3        When they say that, "Prior to the last check being
4    returned for insufficient funds, GG sent Davis $75,000", every
5    time GG sends money, no one says that Gumrukcu and Eratay
6    directed that or requested it or targeted it.  What Gac did on
7    his own is his own problem.  It's not fraud.  It's not
8    conspiracy.  *Ianniello* says the crime here is the criminal
9    agreement, which means the indictment has to plead the
10   conspirators agreed to take Gac's money.  That's not pled, and
11   that's not what happened.  They didn't even agree.  It doesn't
12   allege that they told Gac, You pay Davis, we'll pay you back.
13   Doesn't allege that.
14       It alleges that Gac, acting on his own, took action that
15   may or may not have cost him money.  That's not the target of a
16   fraud conspiracy.  And the government tries to walk back.  They
17   said -- when you pushed and pinched them, I liked the fact when
18   you said, Well, 17, just the statutory language, is that
19   enough?  And they walked that back, and correctly so.
20       Let me quote *Pirro*.  This is the Second Circuit:
21   "The Indictment Clause of the Fifth Amendment requires that an
22   indictment contain some amount of factual particularity to
23   ensure that the prosecution will not fill in the elements of
24   its case with facts other than those considered by the grand
25   jury."

1    We have the product of that work in a successive number of

2    indictments.  The operative one is the third.  And now we look

3    at, Is that sufficient?  So they pled.  So the Gac money is out

4    because it's not targeted, and the Davis money is out because

5    here is what they miss in *Pasquantino*.  It's, they're saying

6    it's entitlement to money.  No.  It's a claim for money, and

7    there is a difference.  And here's how I'll prove it to Your

8    Honor:

9    Let's go to the day before the homicide.  Which state

10   police officers from the State of Vermont could have gone and

11   collected on that debt for Mr. Davis?  What property could they

12   have simply seized from the defendants?  Because, if there was

13   a right to collection, law enforcement can be called to aid.

14   They can take the property.  They didn't have a right to

15   property.

16   My colleague's trying to explain what *Adler* got wrong.

17   *Adler* is consistent with *Pasquantino* directly.  *Pasquantino*

18   says -- and there's certain debts which are enforceable.  We

19   have a bankruptcy court here, right?  And, when you've been a

20   judge, a debtor in a bankruptcy court, the creditors have a

21   right to collect on that debt.  They can make you sit for a

22   deposition and talk to find your funds.  We can send the

23   sheriff out because that debt's enforceable.

24           THE COURT:  Right.

25           ATTORNEY BALOGH:  This is a contract claim.  That's

1    *Adler*.  It's a chosen action.  Davis, to get a debt, had to go

2    to a court and say, Here's my valid contract.  We had an

3    agreement.  There was consideration.  The other party breached.

4    I'm owed money.  And then there's a judgment, and when that

5    judgment comes down, now you've got an enforceable debt.  Now

6    you've got a property right, and it doesn't allege that they

7    interfered with his right to sue, and it doesn't allege

8    anything that he actually ever had an enforceable, collectable

9    right.

10        He had a claim for money that remained unadjudicated until

11    his death, and a claim for money is not a right for money, and

12    sometimes in the law semantics matter, and that's what *Adler*

13    teaches us.  *Adler* is on all fours.  There was a claim under a

14    contract, and they said that's not what 1349 reaches.

15        And so that's where we are here.  They're trying to

16    litigate a contract claim, and they can't say, Your Honor,

17    well, at trial they can complain later.  No.  Under *Pirro* we're

18    allowed to complain now.  When you look at the indictment, if

19    they've not alleged a cognizable property interest -- and

20    they've admitted for Davis the only claim is that he had, was

21    owed money under the redemption agreement.  That's insufficient

22    under *Adler*.  That's insufficient under *Pasquantino*.  That's

23    not a property right that's ever been recognized.  It's a

24    contract right, and, because of that, Count Four should be

25    dismissed.

1        I don't think I have anything else, Your Honor, unless you

2    have further questions for me.

3              THE COURT:  No.  I, one of the things I've been

4    trying to sort of think through are the pragmatic questions of

5    whether this is the right time to be talking about this issue,

6    right?  Because, if, if you hadn't filed the motion, the issue

7    was still live and wasn't going away.  It was, it was going to

8    be raised at the end of the, of the government's case and

9    raised afterwards in, you know, several rules.

10        Raising it now it's, which is certainly your right under

11    the rules -- I mean no criticism -- if you're right, then there

12    will be an appeal, I'm guessing, because the government won't

13    take this lying down, and we will be back here two years later

14    either up or down on, on what you identified as the less, or

15    perhaps Mr. Sullivan did, the less, least significant of the

16    counts.  It's not really a legal problem, but it's a pragmatic

17    one that's troubled me.  I didn't know if you had reflected on

18    this.

19              ATTORNEY BALOGH:  Well, one, like the same way we

20    don't make decisions based on what the Supreme Court's going to

21    do, we apply the law now respectfully to let our

22    prognostications or their claims of what they're going to do

23    drive the bus, I don't think that would be appropriate.

24              THE COURT:  Right.

25              ATTORNEY BALOGH:  Under the statute, under Rule 12

1    we've identified a fatal flaw in Count Four.  They're not
2    allowed to proceed on it.  The Court rightly noted the other
3    pragmatic concern of, Win the day, but the trial's still going
4    to have evidence of some stripe about this.  That's the way to
5    handle it and determine what proof they can get in, but they
6    can't claim a fraud case based on a contract claim.  That's
7    black-letter, and that should end today.

8         Forcing our client to prepare a whole other case where he
9    has to meet a fraud case where they haven't pled a cognizable
10   theory is fundamentally unfair.  They can try their murder
11   case.  They can try to win it, but they can't smuggle in an
12   improper fraud theory because they want to vouch for Davis, and
13   that's the problem of the other stripe.  If you let it in for
14   motive, then it's a real question of what comes in and how it
15   comes in.

16        THE COURT:  Yeah.  I didn't mean to suggest I made a
17   ruling about it.

18        ATTORNEY BALOGH:  Oh, I know.

19        THE COURT:  We're miles from it, but I can see in
20   likelihood much of the parties' prior relationship will, in the
21   two years prior to the, to the murder, will come in.

22        ATTORNEY BALOGH:  I expect some of it's coming, for
23   sure, but I think the greater pragmatic problems in this case
24   is, if you let the government vouch for an improper fraud
25   theory, that will wash any murder conviction they'd get because

1    they're going to stand up here and vouch for Davis the whole
2    case improperly.  And that's the problem.
3            THE COURT:  What do you -- I don't know that phrase.
4    What do you mean, "vouch for Davis"?
5            ATTORNEY BALOGH:  They want to come in and say Davis
6    didn't report them because they defrauded Davis, and he was
7    right.  Davis was right.  They defrauded Davis.  They didn't
8    pay under a contract.
9            THE COURT:  Right.
10           ATTORNEY BALOGH:  That's not fraud.  That's not
11   paying under a contract.  And that puts the murder case in
12   jeopardy because they're vouching for a fraud theory which is
13   improper.  That's a different color of fish to say they didn't
14   want Davis going to the police or they didn't want Davis to do
15   X, Y, or Z, and so they murdered him because Davis was going to
16   do X, Y, and Z, and that is a horse of a different color.  I
17   think that's probably a better analogy.
18           THE COURT:  Yeah.
19           ATTORNEY BALOGH:  But to let them come up here and
20   argue a fraud case which is based on a breach of contract or
21   Gac's decision to pay money that was never an object, that's
22   just wrong, and we object to that.  I think this is the time to
23   narrow that case as far as what's a pleading.
24           THE COURT:  All right.  And you've thought through my
25   pragmatic concerns yourself?

1          ATTORNEY BALOGH:  I've had one case.  We had a RICO

2     case in Colorado where it was a fraud case, and then the judge

3     dismissed the RICO but let the fraud go over.

4          THE COURT:  Right.

5          ATTORNEY BALOGH:  And the government took an appeal,

6     and the Tenth Circuit amended it, and later the government

7     complained that the trial was delayed, and I can remember the

8     judge.  He was the one that did the *Nichols* trial.  Forgetting

9     his name at the moment.

10          THE COURT:  Yeah, right.

11          ATTORNEY BALOGH:  He always referred to the

12     government's ill-considered appeal there after that.  And I

13     don't think it necessarily delays it.  I don't think --

14     obviously, it gets dismissed.  They can take an interlocutory

15     appeal.  Our position would be to keep the trial date.  As we

16     know from a lot of litigation going on right now, high-profile

17     litigation, courts of appeals, when there's a trial scheduled,

18     tell the parties to get to it.  File your briefs.  We'll hear

19     from you soon.  We'll decide it.  We have a trial judge waiting

20     on a jury, and we're not going to delay this case.

21          So I don't know this case gets delayed for two years.  God

22     knows I don't want it.  I want to try this case in '24 like you

23     told us we should, and I'm working on that, but right now we

24     deserve the ruling, and, if they want to come back, if their

25     position is whether Mr. -- excuse me -- Mr. Van de Graaf says,

1    they want to come back with a beefed-up indictment, they think

2    they have facts they haven't alleged that will change this from

3    a breach-of-contract theory, go back to the grand jury. We're

4    on a third superseding indictment.  Maybe we'll see a fourth.

5    Maybe they'll appeal.  Maybe they won't.

6        But I don't think we can decide on maybe.  I think we have

7    an indictment that chose its language carefully.  It indicted a

8    fraud that -- it's a conspiracy to commit fraud based on a

9    conspiracy to breach a contract, and a conspiracy to breach a

10   contract is not fraud.  They don't have a case.  We've got the

11   Fourth Circuit saying we're right.  We should win the day.

12            THE COURT:  All right.  Appreciate it.  Mr. Sullivan,

13   why don't I get you up for the last word on this, and then you

14   can go right on to the remaining?  You have a second issue.

15            ATTORNEY SULLIVAN:  I have nothing further to add to

16   Mr. Balogh's argument, and we adopt them.

17            THE COURT:  Okay.

18            ATTORNEY SULLIVAN:  The remaining issue had to do

19   with the statute of limitations --

20            THE COURT:  Right.

21            ATTORNEY SULLIVAN:  -- and the duplicity.  When we

22   filed our motion, our initial filing, as I had indicated, we

23   were complaining about the inadequate specification of the

24   object of the fraud scheme.  It was really some lack of

25   understanding of what it was that was intended to be depriving

1    him, and we know just from the case law that a

2    breach-of-contract claim cannot be elevated into a fraud

3    scheme.

4        So you see in our initial filing that we made an

5    assumption based on that inadequate specification that the

6    intended deprivations in the fraud scheme were of gains arising

7    out of this venture, that they were somehow trying to trick

8    Mr. Davis or Mr. Gac out of proceeds, operational proceeds of

9    the fraud scheme, but we --

10        THE COURT:  From an actual oil sale or something like

11    that?

12        ATTORNEY SULLIVAN:  Right, an oil sale, yes, that

13    that was the purpose of the scheme at the outset.  We know from

14    the indictment that, by March 17th 2017, the defendants are

15    alleged to have agreed amongst themselves to kill Mr. Davis,

16    and the indictment further says, in November of 2017,

17    communications with Mr. Gac and Mr. Davis ceased entirely.

18        So we are not seeing in the limitations period, that is,

19    after December of 2017, any use of the wires to further a fraud

20    scheme.  The only act that we're seeing that it appears the

21    government would rely on was the murder of Mr. Davis.  We're

22    seeing nothing else in, in the indictment, and but the murder

23    doesn't extinguish the claims.  Even if you assume that the

24    claims can form, the claims, the unadjudicated claims could

25    form the basis, that doesn't extinguish the claims.  Excuse me.

1    Those claims continue to exist after the death.  They could

2    have been filed at any time by Mr. Davis's estate.  But,

3    actually, they were corporate claims.  So those still could

4    have been pursued.

5         So the analogy here is really to the *Grunewald* line of

6    cases which cite acts in concealment of a conspiracy after the

7    fact are not part of the, the core conspiracy.  Because, to do

8    otherwise, if you were to extend it that far, you would

9    eviscerate the statute of limitations.  There would be no

10   statute of limitations if you could take every act of

11   concealment or, and extend the statute of limitations that way.

12        So we're seeing no act in furtherance of an active fraud

13   scheme after November of 2017, and the indictment in this case

14   was returned in December of 2022, weeks after the expiration

15   under the statute of limitations.  And so just on the face of

16   the indictment and what the government has alleged in terms of

17   what the objects of the conspiracy were, both the fraud scheme

18   as well as the murder scheme, we say that the indictment, on

19   its face, shows that the statute of limitations had expired on

20   the fraud scheme.

21        If, in fact, this murder was part and parcel of the fraud

22   scheme, as it seems that the government is alleging in

23   Paragraph 16 of the indictment, then, really, the indictment is

24   duplicitous by alleging in one count both the murder and the

25   intended deprivation of property as objects of the conspiracy.

 1          So you're going to have the jury who is going to be

 2     instructed about the murder charges in Count One all going to

 3     spill over into the, into the fraud count in terms of, in terms

 4     of adjudication of guilt or innocence on that count, and we

 5     think there's, like, substantial risk that the jury will not,

 6     would not be unanimous or that there would be prejudicial

 7     spillover between them by virtue of the incorporation of the

 8     murder object within the fraud scheme.

 9               THE COURT:  So what's the remedy, to try them

10     separately?

11               ATTORNEY SULLIVAN:  Correct, yes.

12               THE COURT:  Yeah, okay.  Not on the statute of

13     limitations; that's a different dismissal?

14               ATTORNEY SULLIVAN:  Correct.  So it kind of rolls

15     into that.

16               THE COURT:  Okay.

17               ATTORNEY SULLIVAN:  And that's all.

18               THE COURT:  Appreciate it.  Yeah, Mr. Van de Graaf,

19     we'll give you the floor.

20               ATTORNEY VAN DE GRAAF:  So, in terms of the statute

21     of limitations, Your Honor, again, the *Sampson* case said to --

22     the Second Circuit said, you know, in a Rule 12 proceeding,

23     statute of limitations issues can't really be decided if the

24     facts depend on them.

25               THE COURT:  Right.

1          ATTORNEY VAN DE GRAAF:  Here, by the way, the

2     indictment specifically alleges that the conspiracy continued

3     until January of 2018.  And I think that, you know,

4     Mr. Sullivan is missing that, in Paragraph, in Paragraph 13 the

5     indictment alleges specifically that, "Eratay sent Gac numerous

6     fraudulent emails from the murtag Gmail account between

7     February '17 and January 2018, including emails falsely

8     claiming that Lauran Trading was obtaining funds from UBS to

9     satisfy Lauran Trading's dual obligations under the redemption

10    agreement".

11         So, you know, the indictment specifically alleges there

12    were emails after the date of the indictment return as within

13    five years of the indictment's return.  So I think Mr. Sullivan

14    is just incorrect that the indictment doesn't allege emails

15    that took place after December.  I mean, it is December of

16    2022, I guess, that the indictment was returned, this count was

17    returned.  And so, if we allege January, you know, I think

18    Mr. Sullivan was trying to say we had no emails after the

19    December indictment return date, but the indictment

20    specifically alleges that there were emails in January.

21              THE COURT:  Okay.

22              ATTORNEY VAN DE GRAAF:  But, of course, this, under

23    *Sampson* these kinds of questions about when the indictment,

24    when the conspiracy ended are for the, are for the trial, not

25    for right now.  The indictment alleges the conspiracy went to

1    2018, and that's sufficient for right now.

2        I just wanted to make one point on an earlier thing that

3    Mr. Balogh said.  I'd just ask you -- he seemed to suggest that

4    the indictment didn't allege that the money that Gac parted

5    with in 2016, in May of 2016, was connected to communications

6    with Mr. Gumrukcu, and I don't think that's a fair reading of

7    Paragraph 12.

8        If you read Paragraph 12, it says that in May Gumrukcu and

9    Eratay caused emails from the murats Gmail account to send

10   fraudulent statements to cover Lauran Trading's obligations,

11   so, again, the debts that Lauran Trading had.  GG never

12   received money from Wells Fargo.  Instead, Gumrukcu falsely

13   represented that he had access to $490,000, which he would use

14   to pay GG $300,000, some of which was due to Davis.  So, even

15   before Mr. Gac parted with the $75,000 of Mr. Davis, there, the

16   indictment alleges there were communications about this money

17   coming to pay Davis.

18       So I thought I heard Mr. Balogh say that there wasn't an

19   allegation about that here, but, certainly, the indictment, we

20   believe, alleges that Eratay and Gumrukcu were involved in

21   making false statements about funds that they knew that Gac was

22   planning to send to Davis.  And so I just wanted to make

23   reference to that part of Paragraph 12.

24           THE COURT:  Could you?  Because I had trouble

25   understanding your theory of the, of the case.  Do you have a

1    kind of -- I'm sure you do -- a theory as to why these false

2    statements and bad checks and fraudulent bank letters, what

3    they were all supposed to accomplish?  I'm not sure I

4    understand from your perspective how all this hangs together.

5         ATTORNEY VAN DE GRAAF:  Well, you know, Your Honor, I

6    think that's really -- this is an unusual case.

7         THE COURT:  Right.

8         ATTORNEY VAN DE GRAAF:  I mean, there's no doubt at

9    this trial, no matter whether Count Four is there or Count Four

10   is not there, that these interactions between 2015 and 2018

11   involving these players, it's not a straightforward situation

12   what's going on.  You know, why everybody is still doing this,

13   I have my theories.  I don't think I need to commit to them

14   today.

15        THE COURT:  Right.

16        ATTORNEY VAN DE GRAAF:  But I think there's multiple

17   things going on and there's multiple motives that different

18   people had in connection with this, and that's why we allege,

19   for example, the, you know, January 2015 event where Davis

20   catches them lying about this First Cyprus Bank.  There's a lot

21   of different issues that were happening over time.  And so I

22   don't think there is an easy answer to saying why this --

23        I can tell you that one possible theory is that, you know,

24   both Mr. Eratay and Mr. Gumrukcu were magicians and they

25   actually enjoyed, they enjoyed doing this, this was an illusion

1    that they enjoyed.  That may be something we argue to the jury,

2    which may be a permissible argument to the jury.  We can decide

3    what I can argue and what I cannot argue.

4         When you hear this, you'll be like, Why did this go on so

5    long?

6              THE COURT:  Right.

7              ATTORNEY VAN DE GRAAF:  That is definitely a reaction

8    that you may have and the jury may have, and we have to talk to

9    the jury about, but the relationship among these people, you

10   can't understand the case without understanding what was going

11   on in the relationship between Eratay and Gumrukcu, the

12   relationship between Gumrukcu and Gac -- because Gac didn't

13   even know who Eratay was -- and the relationship between Davis

14   and Gumrukcu and Gac.  These are complicated issues.  I tried,

15   maybe not very well, I tried to summarize it in a few pages,

16   but it's going to take a lot more than a few pages of time to

17   explain this to the jury.

18             THE COURT:  Okay.  That's helpful.  Thank you.

19   Everybody all talked out?

20             ATTORNEY BALOGH:  The one thing I'll add, I'll do it

21   from here if I may.

22             THE COURT:  Of course.

23             ATTORNEY BALOGH:  Paragraph 12, it's, I think what my

24   colleague just said is they were involved in false statements.

25   Read Paragraph 12.  It doesn't say that either coconspirator

1  targeted Gac's money at all.  The sentence, and I'll read the

2  first since he cut it off.  Here's Paragraph 12 as it starts:

3      "In May 2016, Gumrukcu and Eratay cause the murats Gmail

4  account to send GG fraudulent statements about Murat Gumrukcu

5  having a little over $30 million in a Wells Fargo bank account

6  to cover Lauran Trading's obligations.  GG" -- that's Greg Gac

7  -- "never received money from Wells Fargo.  Instead, Gumrukcu

8  falsely represented that he had access to $490,000 which he

9  would use to pay GG $300,000, some of which was due to Davis.

10  On or about May 13th 2016, Gumrukcu sent GG a picture of a

11  fraudulent Bank of America cashier's check.  At that same time,

12  Gumrukcu deposited into Quadrant's bank account four checks for

13  $150,000 each, all of which eventually bounced because

14  Gumrukcu's account had insufficient funds.  Prior to the last

15  check being returned for insufficient funds" -- which means, I

16  guess, three were returned before the fourth one -- "GG sent

17  Davis $75,000.  The return of funds deposited by Gumrukcu

18  caused GG to use personal funds to cover Davis's payment."

19      This is not a conspiracy to target Gac's money.  That's

20  what the allegation requires, the conspirators targeted getting

21  Gac's money.  It was the object of their scheme to defraud.

22  That's not what Paragraph 12 says.  Paragraph 12 says Gac did

23  things on his own.  That's not the object of a conspiratorial

24  agreement.  That's what they chose to charge.  They chose 1349.

25  Wasn't me.  That's what 1349 requires.

1      It doesn't suffice, that's the argument, not that there

2  weren't emails, that the chosen Count Four doesn't say the

3  defendants targeted Greg Gac's money as part of their scheme to

4  defraud.  They didn't try to steal Gac's money.  Without

5  alleging that they agreed to steal Gac's money, they haven't

6  alleged a conspiracy to steal Gac's money.  That's the

7  argument.

8           THE COURT:  All right.  Thank you.  I'll give it some

9  thought, get something out to you as quick as I can, okay?

10           ATTORNEY BALOGH:  We have another issue before we

11  leave.

12           THE COURT:  Oh, of course.

13           ATTORNEY BALOGH:  We had, we understand that one of

14  our subpoenas that we had issued was returned to the clerk.

15  The clerk provided it to the United States in error.

16           THE COURT:  You'll have to start over.  I don't know

17  what you're talking about.

18           ATTORNEY BALOGH:  We issued some subpoenas, as

19  lawyers do.

20           THE COURT:  Yeah.

21           ATTORNEY BALOGH:  The subpoena recipient complied.

22  They returned them to the clerk's office to be dispersed to

23  defense counsel, as other subpoenas have been.  On this

24  occasion, the clerk sent the subpoena returns to the United

25  States Attorney's office in mistake.  The United States

1    Attorney's office had --

2            THE COURT:  I'm sorry.  I just wanted to make sure I

3    catch up with you.  The, not the return of service, but

4    whatever was sent back by the institution?

5            ATTORNEY BALOGH:  Correct.  I would refer to that as

6    the return, their compliance.  The government has, as opposed

7    to informing the clerk that this is not our subpoena return and

8    returning it to the clerk to give it to us, the government has

9    seized and maintained that production, refuses to give it to

10   us, only told us today clearly that they have seized our

11   production.  They won't return it to the clerk, and they won't

12   give it to us.  They don't have a warrant for it.

13       I object.  When you get mail that's been mispresented to

14   you, what I do is I tell my neighbor, I have received your mail

15   in error.  Here is your mail.  I want my subpoena return.  I'd

16   like an explanation of how they got it, why they're reading my

17   materials, why they're reading mail that's not addressed to

18   them, and their legal basis to withhold from me a subpoena

19   return.  If they wanted to get court involvement, they should

20   have run to this court.  This is two weeks ago they did this,

21   and I'm just finding out about the seizure today.  I object,

22   and I'd like it to be addressed.

23           THE COURT:  It's a trial subpoena, right?

24           ATTORNEY BALOGH:  Correct, a 17(c) subpoena for some

25   phone records.  And so, obviously, we'll, if the Court wants to

1    talk to us, our view on subpoenas, I'll just tell you how me

2    and Ms. Marcus roll.  When you invoke -- obviously, we're

3    allowed to issue them.  Some judges have more hands-on, and we

4    make ex parte applications as necessary, ex parte

5    presentations, and, to the extent Your Honor wants to quiz me

6    or my trial partner on our subpoenas, we will answer questions

7    forthrightly to Your Honor.  We don't discuss subpoenas in the

8    presence of our adversary, because we're entitled to protect

9    our defense, and, if the Court needs briefing on that, we have

10   a raft of it.

11             THE COURT:  All right.

12             ATTORNEY BALOGH:  Thank you, Your Honor.

13             THE COURT:  Mr. Van de Graaf, I don't know what the

14   other side of the story is.

15             ATTORNEY VAN DE GRAAF:  So the Court will remember

16   probably from our Jay Peak case that the government believes

17   that it is illegal for the defense to issue a trial subpoena

18   returnable to their office at a date in which there is not a

19   hearing.

20             THE COURT:  Right, unauthorized --

21             ATTORNEY VAN DE GRAAF:  Unauthorized.

22             THE COURT:  -- would be a --

23             ATTORNEY VAN DE GRAAF:  Right.  And, if the Court

24   authorizes it, then the Court decides whether the documents

25   will be shared by the parties, whether it's -- I mean, in a

1    trial subpoena, the principle of a trial subpoena is somebody

2    comes to the courtroom where both parties are sitting and

3    documents are presented to both sides.

4            THE COURT:  Right.

5            ATTORNEY VAN DE GRAAF:  And, certainly, the rules

6    allow the parties to get that earlier, but judicial approval is

7    necessary for it to be required, and the decision needs to be

8    made whether it will or will not be shared by both the parties

9    as a regular subpoena would be at trial.

10       And so, you know, we litigated this issue in front of Your

11   Honor in the Jay Peak case.  We briefed it.  I believe Your

12   Honor agreed with us about this.  On Friday I learned that two

13   subpoena returns -- addressed to the clerk's office, by the

14   way, not to the defense -- were, came to the -- I don't know

15   when they exactly came to the clerk's office.  The clerk's

16   office called our office thinking they were our documents.

17           THE COURT:  Right.

18           ATTORNEY VAN DE GRAAF:  When I realized that this was

19   the kind of subpoena that I thought the Court previously had

20   ruled was not authorized unless the Court agreed to it, I wrote

21   an email to the defense on Friday and said, Maybe we should

22   discuss this with the Court.  Maybe we can talk about this.

23       Mr. Balogh responded on, during -- I don't know exactly

24   what day it was.  I think maybe I wrote on Monday.  I can't

25   remember exactly what days these emails happened.  But we've

1    had some emails pass about this issue, and I thought the best

2    thing to do was to bring the documents up, give them back to

3    the Court, because they were addressed to the Court.

4         I would ask the Court, we would like to file a motion.  If

5    the parties disagree about the process of Rule 17(c), we will

6    refile a motion soon to have the Court address how 17(c)

7    subpoenas should work for this case.  I think, back at the Jay

8    Peak time, I was possibly urging the Court to maybe have a

9    general order or a local rule about this so that everyone in

10   this court at least knew how the Court wanted to handle this

11   type of subpoenas.

12        THE COURT:  Right.  Well, we can wrestle it to the

13   ground now.  It's not terribly complicated.

14        ATTORNEY VAN DE GRAAF:  Well, I think that, you know,

15   the Court should approve these things.  If they have a motion,

16   they should file it.  If there is a reason that the government

17   shouldn't see it right now, the Court should decide that.  Not,

18   they shouldn't decide it on their own.  I think, with these two

19   responses, that they should be shared with both sides.  They

20   were produced.  A Rule 17(c) subpoena was produced.  I don't

21   know what other subpoenas have happened.  I haven't heard about

22   anything else.  This just happenstance that the clerk's office

23   called our office and told us to come get these.

24        And so what I'd ask is that the Court hold these.  We'll

25   file some paperwork.  We can litigate this issue if the defense

1   wants to litigate the issue, and this court should decide how

2   to proceed with Rule 17(c) preproduction of documents before

3   this trial.

4           THE COURT:  All right.  You're happy with -- and I

5   will explain to Mr. Balogh, who wasn't involved in the EB-5

6   case, but you were happy with the resolution then?

7           ATTORNEY VAN DE GRAAF:  Yes.

8           THE COURT:  Okay.

9           ATTORNEY VAN DE GRAAF:  The Court has discretion and

10  a fair amount of discretion about this.  I would just like the

11  Court to be involved and for documents to be shared if

12  appropriate.

13          THE COURT:  Right.  So here's what we've done before.

14          ATTORNEY BALOGH:  I read the transcript.

15          THE COURT:  From the EB-5 case?

16          ATTORNEY BALOGH:  Yes.

17          THE COURT:  Oh, okay.  So you know.  So does that

18  work for you?

19          ATTORNEY BALOGH:  No.

20          THE COURT:  Because we can't have a kind of secret

21  process where you paper the country with subpoenas and take the

22  stuff and don't have an event or an opportunity to share.

23          ATTORNEY BALOGH:  Oh, that is exactly what the law

24  is.  I have the right to prepare my defense and not share to

25  them what subpoenas I'm issuing and what I'm getting.  They get

1    the grand jury.  We get Rule 17.  Those, the Rule 17(c)(2)

2    says, if the recipient has a problem with the subpoena, if it's

3    oppressive or unreasonable, they come to the court, and the

4    court has a hearing, and they have the right to object.

5            There's plenty of case law that's saying the government

6    should, I think the quote is, "tend to its own knitting" on

7    this subject.  I have the right to prepare my defense secretly

8    and not share it with them.  Rule 16 governs my obligations on

9    discovery.  Rules 12.1, 12.2, and 12.3 govern my notice of

10   defenses.  Apart from those three limited defenses and my Rule

11   16 obligations, I have nothing to present to the government.  I

12   have nothing to share to the government.  And, respectfully,

13   sir, Your Honor, at trial, I may sit on my hands the entire

14   time, and, unless and until Your Honor denies a Rule 29 motion,

15   I need not decide anything.

16           THE COURT:  Oh, yeah, of course.

17           ATTORNEY BALOGH:  And so for me --

18           THE COURT:  The question is a bit different, though,

19   which is, Now, a year away from trial, do you have a private --

20           ATTORNEY BALOGH:  Yes.

21           THE COURT:  -- right to subpoena any document in the

22   United States that you'd like to see and leave it to the

23   recipient of the subpoena to move to quash or just give it to

24   you privately?

25           ATTORNEY BALOGH:  I, I agree that the Court's rules

1   -- and I understood local practice here.  We checked

2   beforehand, and what I learned from the Jay Peak case, as Your

3   Honor remembers, this is the government taking a new case on

4   changing local practice, and they're welcome to it.  I don't in

5   any way deride that they get to come in here and say, We've

6   been doing it wrong.  Here's how we want to do it going

7   forward.  That's appropriate, not the complaint.

8         And, if the Court, what I read in Jay Peak just last week

9   when the government gave it to me, actually, earlier this week

10  -- it was Tuesday I got their email.  And you say, Your Honor,

11  Mr. Balogh, before you issue another subpoena, I want to see an

12  ex parte application from the defense, and I will have to

13  approve them, they'll be returned to court.  I don't got truck

14  with that either.

15              THE COURT:  Right.

16              ATTORNEY BALOGH:  I have no obligation to give them

17  anything.  I will make my Rule 16 disclosures when I make my

18  Rule 16 disclosures, and what happens in these cases is the

19  government collects information.  They decide what to get and

20  what not to get.  It's intentional.  They make choices, and

21  they can't now, on the back end -- a lot of times they don't

22  get stuff they don't want to get, and the defense gets them,

23  and now they want to get it from us because they don't want to

24  be left out.  They chose what to get and what not to get.

25              THE COURT:  You mean in the grand jury setting?

1          ATTORNEY BALOGH:  Yes.

2          THE COURT:  Right.

3          ATTORNEY BALOGH:  Or even non-grand jury setting.

4    They can issue their own Rule 17 subpoenas without running them

5    through me.  I've never had the government call me up and say,

6    We're going to issue Rule 17 subpoenas; please approve them,

7    Mr. Balogh, something I've never heard in my 30 years.

8          So my point is these documents, there was a properly

9    issued subpoena.  It was noncontroversial.  The recipient

10   returned it to this courthouse.  So the concern of me getting

11   it secretly, I guess, didn't happen, right?  Because that

12   envelope that your clerk is holding came to this courthouse.

13         THE COURT:  That was just by accident?  That wasn't

14   the plan?

15         ATTORNEY BALOGH:  No, no.  Verizon sent us a letter

16   and said, This is where we're sending it.  The accident was it

17   went to their office, and, as opposed to immediately telling us

18   or alerting this court, they practiced self-help and took

19   property that isn't theirs and maintained it, and they didn't

20   tell us they were doing that.  That's my first complaint.

21         Can you imagine for a moment, Your Honor, what it would

22   look like the other way, if the clerk sent me the returns of a

23   grand jury subpoena and I decided to review it and inspect it

24   and hold it?

25         THE COURT:  Right.  We'd have a problem, right.

1              ATTORNEY BALOGH:  We'd have a big problem.  So it's a

2       two-way street.  So my position is those documents should be

3       released to me today.  To the extent the government wants to

4       make a motion for disclosure, they have this theory that Rule

5       17 are normally done, I've been doing this a long time.  That's

6       not how it works in any case I've been in, and I've tried cases

7       all over this country.  But they've got some authority that

8       says like they get it?

9              THE COURT:  Let's brief it, okay?  We'll hang on to

10      -- there's no emergency?  You don't need them next week, right?

11             ATTORNEY BALOGH:  Oh, I disagree.  Trial is set for

12      October.  We're doing our level best to be prepared for trial.

13      You read us the riot act when you gave us October, not June,

14      and you gave us the finger, We're going to be prepared.  Now

15      we're doing everything that Your Honor told --

16             THE COURT:  The index finger, he means.

17             ATTORNEY BALOGH:  The record should reflect I was

18      showing my index finger to the judge, yes, as a "tut-tut"

19      motion, not in any other way.  I forget we're not on video,

20      Your Honor.

21             THE COURT:  I understand.

22             ATTORNEY BALOGH:  The only people that could have

23      objected, the subpoena recipients, they found it

24      unobjectionable.  I ask you to release them to us today.  There

25      comes a time you want -- first, we're officers of this court --

1    that you are going to order us to produce what was there, we'll

2    produce it.  We're preparing our defense, and the fact that we

3    should be delayed because they grabbed our stuff, I object to

4    that.  That's not a basis.  Again, imagine it the other way.

5           THE COURT:  All right.  But I'd like to read your

6    cases and think about it a little bit.  You can tell me how

7    soon you'd like to brief it.  I don't want to hold you up.

8           ATTORNEY BALOGH:  Oh, I think it's the government's

9    brief.  Like, what do you want me to brief?  I issued a

10   subpoena.  Verizon complied without complaint, and now no one's

11   giving me my documents.  I'd like to know the legal basis I

12   have to overcome, because my position is I get them right now.

13   So, if anyone's saying I'm wrong about that, and you're

14   definitely saying that, then --

15          THE COURT:  I just wanted to think about it in a

16   measured way, and you stood up at the beginning and promised me

17   that you and your partner had briefed this thing all over the

18   United States, and I'd like a small taste of that before I make

19   a decision.

20          ATTORNEY BALOGH:  Right, but it's their motion.  What

21   are we fighting against?  They're the ones saying that we don't

22   get what the rule says.  My position is clear.  A validly

23   issued subpoena was returned to this clerk's office, delivered

24   to an adverse party by mistake, and the adverse party withheld

25   our documents.  I view that's improper, misconduct, and I get

1      my documents.  If they want to say I'm wrong, they need to

2      brief it.  Today's Friday.  How about next Friday?  I'll take a

3      week to reply.

4            ATTORNEY VAN DE GRAAF:  We can file by next Friday,

5      Your Honor.

6            THE COURT:  That's fair.  That's fine.

7            ATTORNEY BALOGH:  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            ATTORNEY BALOGH:  And with mine, let me give advance

10     -- with it I'm going to make an in camera submission, too, for

11     the basis of the subpoena, and we will brief why that is, but

12     we will not be providing those answers to the United States.

13     We'll give the law on why we get to do it, but the substance

14     we'll give to you behind the shield, if you will.

15           THE COURT:  Okay, all right.

16           ATTORNEY BALOGH:  Thanks, Your Honor.

17           THE COURT:  Good enough.  Thank you.  Well, that was

18     an extra issue.  I'm glad to have heard it, and I'm glad to

19     have sort of worked, heard about it early rather than in

20     September.

21           ATTORNEY BALOGH:  And one thing, too, Your Honor, if

22     I can indulge.

23           THE COURT:  Of course.

24           ATTORNEY BALOGH:  We have first -- we have

25     second-round motions.  Everything was, the schedule got delayed

1     here.  We have motions due, I believe, on February 4th or

2     February 2nd.  If we can get an extra three weeks, I can give

3     you the excuse, but we need the extra time.

4               THE COURT:  Of course, you can have it, yeah.

5               ATTORNEY BALOGH:  Thanks.  So we're going to move

6     them just three weeks.  Three days to the current due date

7     we'll get them in.  And Your Honor hasn't even set a hearing.

8     I assume you'll do either the last time, when it's all briefed,

9     you'll let us know when you're going to see us.

10              THE COURT:  Yeah, yeah.

11              ATTORNEY BALOGH:  Thank you.

12              THE COURT:  So we'll just move both dates back three

13    weeks?

14              ATTORNEY VAN DE GRAAF:  Fine, Your Honor.  Can I

15    raise another housekeeping issue?

16              THE COURT:  Of course.  I've got everybody here, and

17    it doesn't happen enough, so glad to.  All yours.

18              ATTORNEY VAN DE GRAAF:  With your plans for the

19    future, have you done any more thinking about where we're going

20    to try this case in October?

21              THE COURT:  Much depends on the Senate Judiciary

22    Committee, because I don't know if I will have some colleague

23    in Rutland or not, and I won't know, none of us will know for a

24    while.

25              ATTORNEY VAN DE GRAAF:  Even if you don't have a

1    colleague in Rutland, you do have the use of, you know, a
2    courtroom down here.  Is there any chance, if the parties ask
3    for the case to be in Burlington, is that something that the
4    Court would consider?
5              THE COURT:  I'll consider anything.  My problem is
6    it's a shared courtroom.  It's used by the bankruptcy court and
7    by Judge Sessions, and it's easy enough to work out things like
8    this, a day here, four days there, but I've heard estimates as
9    long as six weeks, which I hope is on the outside.  So I'd have
10   to have a serious conversation with them about being here for
11   six weeks, because they don't have another place to go.  It's a
12   different conversation if Rutland is empty, because then I
13   don't really have a very good reason for trying it up here,
14   other than it's convenient for all of us.
15             ATTORNEY VAN DE GRAAF:  I mean, and the witnesses, I
16   mean, I think that this case is going to have a lot of
17   witnesses from outside of Vermont.
18             THE COURT:  Yeah.  No.  I can see that.
19             ATTORNEY VAN DE GRAAF:  And travel is difficult to
20   Rutland.  But I just raise it because, you know, I think you
21   may even be senior status by the time the trial starts.
22             THE COURT:  I definitely, I'm feeling senior at the
23   moment.  I will be senior in August, and but I'll hang on.
24   Until a new person is in place, I'll keep the same duties; I'll
25   just be up here.  But I'd have to have a -- and I'm not against

1    trying it here at all.  It's a lot more convenient for the

2    reasons that you say, and it's personally easier.  But I'd have

3    to have a heart-to-heart with a couple of other judges who use

4    the room.

5         ATTORNEY VAN DE GRAAF:  I understand.  Maybe I'll

6    talk to the other parties.  I don't know if they, what they

7    feel about it so --

8         THE COURT:  Mr. Balogh is longing to get to know

9    Rutland better.

10        ATTORNEY BALOGH:  I actually am a little bit, but I

11   think sort of our view is sort of there's, it's almost six of

12   one, half dozen of another.  There's things to be said for both

13   locations, and as I learned from my old law partner, his

14   favorite expression which has helped me is, "There's a lot of

15   green between here and there.  We'll find out when we find

16   out".

17        THE COURT:  Yeah.  But I'm happy to talk about it,

18   and that's as much as I know at this point.  It's a beautiful

19   old -- I can't remember.  Did you go there before?

20        ATTORNEY BALOGH:  No, no.  That's why I've heard it's

21   a beautiful old courthouse.

22        THE COURT:  It's a beautiful old courthouse, and it

23   has more room for you to spread out than, than here, but it's,

24   you know, it's about two hours from the airport.  So it's

25   awkward for --

1              ATTORNEY BALOGH:  For witnesses?

2              THE COURT:  -- for witnesses.

3              ATTORNEY BALOGH:  For us, we're going to be, the

4     lawyers, we're going to be just working and sleeping.  So

5     wherever you have us --

6              THE COURT:  Yeah.  No.  I was less concerned about --

7     yeah, you'll be busy, but it's harder to get people in and out

8     of.

9              ATTORNEY BALOGH:  Whatever the Court decides, we're

10    sure it will work.

11             THE COURT:  We had a wonderful moment in the trial

12    of, the death penalty trial many years ago now when the witness

13    from, the statistician from LA flew first class to Boston and

14    hired a limo to get himself to, to Rutland.

15             ATTORNEY BALOGH:  Must be nice.

16             THE COURT:  It was the only voucher that I had to

17    have a conversation about.  It was right in the thick of that

18    time when some of the administrative officials were getting in

19    hot water for their --

20             ATTORNEY BALOGH:  Excessive spending?

21             THE COURT:  -- excessive spending, yeah, exactly.

22    We'll figure it out, and you guys will be the first to know.

23

24             (Whereupon at 2:35 p.m. the hearing was adjourned.)

25

1                    C E R T I F I C A T E

2            I, Sunnie Donath, RMR, Official Court Reporter

3    for the United States District Court, District of Vermont, do

4    hereby certify that the foregoing pages are a true and accurate

5    transcription of my stenographic notes of the hearing taken

6    before me in the above-titled matter on January 19, 2024 to the

7    best of my skill and ability.

8

9

10

11

12

13    _____
                *Sunnie Donath, RMR*

14            Sunnie Donath, RMR

15

16

17

18

19

20

21

22

23

24

25