UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 5:22-cr-00058-cr |
| SERHAT GUMRUKCU,<br>        Defendant. | |

**GOVERNMENT'S MOTION IN LIMINE TO ADMIT EVIDENCE EXPLAINING THE DEFENDANT'S RELATIONSHIP WITH BERK ERATAY AND HIS PROBLEMS WITH THE HOMICIDE VICTIM**

At the heart of the government's case against defendant Serhat Gumrukcu are his connections with Berk Eratay, a co-defendant, and Gregory Davis, the homicide victim. The government has developed substantial evidence that Eratay paid Aron Ethridge to locate Jerry Banks, who murdered Davis for money on January 6, 2018. The case against the defendant will turn on proof that the defendant participated in this scheme to kill Davis. In short, the defendant's personal and business relationship with Eratay and the 2017 problems posed by the defendant's business dispute with Davis will be highly relevant at the trial. In order to have the jury fairly understand the defendant's relationship with Eratay and his problems with Davis, the government should be allowed to present evidence highly probative of those matters that arguably involves uncharged wrongful conduct by the defendant.

The government files this motion to advise the court about this evidence but does not necessarily seek a pretrial ruling on admissibility. All the evidence proffered here is highly probative of issues likely to be disputed at trial, but the court may not have enough information to appropriately balance the probative nature of the evidence against the potential for unfair prejudice before the trial begins. Once the parties make opening statements and begin examining the witnesses, the court should allow the admission of this important evidence.

**Factual Background**

A. *The Course of the Investigation*

Some of the government's case will involve evidence about the course of the investigation that led to charges against the four coconspirators. That investigation began on the evening of January 7, 2018, when Gregory Davis's body was found in a snowbank several miles south of his home in Danville, Vermont. He had been shot over a dozen times. The police soon learned that a man posing as a United States Marshal had arrived at Davis's home the previous evening, supposedly to arrest him. The Vermont State Police and the FBI soon had two key leads. First, a suspicious 911 call, made just before the kidnapping from up the road from the kidnapping, was likely connected to the murder. Second, they learned from Davis's communications that he was threatening to go to law enforcement about money he was owed in connection with oil deal joint venture, Mode-Lauran. Within Mode-Lauran, Davis understood that he was dealing with two brothers, Serhat and Murat Gumrukcu, through a middleman, Greg Gac.

Following up on these leads, the investigators discovered that the phone that called 911 ("the 911 phone") was purchased in a Walmart in Clearfield, Pennsylvania, by a man driving a white Ford Explorer. The investigators also uncovered that a single phone connected with local cell towers at the time both of the 911 phone purchase and of the kidnapping. The 911 phone was purchased at a Walmart in Missouri in November 2017. No calls were made on that phone, which had a 201 area code, but it was used to transfer data as it travelled from Missouri to Vermont just before the murder. Thus, the 911 phone lead led to two more leads, the white Ford Explorer and the 201 phone.

None of the Mode-Lauran players had travelled to Vermont in early January. The murderer had travelled across the country to kill Davis; the investigators were trying to solve a murder for hire. The investigators quickly confronted Gac, who agreed to cooperate. His home was searched, and he provided significant detail about the three-year course of dealings between Davis, who hoped to engage in oil transactions, and the Gumrukcus (the defendant and an email account "signed" by his brother Murat), who were supposed to provide vital financing for the oil deals. The investigators also learned that the defendant, who spoke and texted with Gac, lived in Los Angeles, while Murat Gumrukcu lived in Turkey, though he was staying with Berk Eratay, in Las Vegas, at the time of the murder. Gac never met with, spoke with, or texted with Murat Gumrukcu; their only method of communications was through two Google email accounts. In March 2018, agents seized electronics from Murat Gumrukcu, who was interviewed. He denied communicating with Gac and spoke poor English. In April 2018, investigators interviewed the defendant in Los Angeles. By then, the investigators had learned that in 2017, the defendant had been facing multiple fraud charges in California state court while negotiating a multimillion-dollar biotech deal. In 2018, the investigators also discovered that, between June and September 2017, the defendant had sent Eratay over $300,000 from his Turkish bank account and that Eratay had withdrawn about $200,000 in cash. Murat Gumrukcu travelled back to Turkey in late March 2018. The Gumrukcus were important suspects, but they could not be charged without proof of a connection to the unknown hit man.

Between 2018 and 2021, a covert investigation focused on identifying the hit man. The link to Jerry Banks was made through a white Ford Explorer Banks acquired in Denver, Colorado in October 2017 and drove until late January 2018. Once Banks was identified as a suspect, numerous other pieces of evidence fell into place connecting him to the 201 phone, as

well as the kidnapping and murder of Gregg Davis. As the case against Banks was falling into place, investigators realized the connection between the defendant and Banks. Banks was friends with Aron Ethridge, who lived in Las Vegas. Ethridge was friends with Eratay; they had been next door neighbors in the past. Eratay was closely associated with the defendant.

The investigators arrested Banks in April 2022. He declined to cooperate. The investigators immediately contacted Ethridge and Eratay. Eratay denied knowing anything about Davis. Ethridge almost immediately confessed to his involvement in the murder plot, outlining the conspiracy, his receipt of cash from Eratay, and his knowledge that the defendant had called the shots during the murder plot.

This evidence led to charges against the defendant, Eratay, and Ethridge. The defendant and Eratay were arrested in late May 2022. After the arrests, the government obtained various pieces of electronic evidence used by Eratay. That evidence, along with the evidence seized from Murat Gumrukcu in 2018, showed that Murat Gumrukcu did not interact with Gac in the Mode-Lauran dealing. Instead, Eratay and the defendant had posed as "Murat" when using the two Google email accounts. This evidence provided part of the basis for the wire fraud conspiracy charge in Count Four.

B. *The Government's Case at Trial*

The government's case at trial can be roughly divided into three parts: the murder plot, the reasons for killing Davis, and the post-murder cover-up.

For the first part, the government will present evidence from coconspirators about their involvement in the murder plot. This aspect of the case will include testimony about Eratay recruiting Ethridge to find someone to kill Davis and Ethridge finding Banks to execute Davis. Before finding Banks, Ethridge had enlisted another man to locate Davis, who had previously

lived in New Jersey. After this mission failed, Eratay and Gumrukcu hired a private investigator to find Davis's address. Once Davis was located, Banks was enlisted. A key part of the conspiracy was the use of Threema, a highly encrypted phone messaging application, for conspiracy communications. All the 2017 communications over Threema were deleted long before investigators seized the conspirators' devices. The government will also introduce other evidence about the conspiracy, including evidence about the money the defendant sent to Eratay to pay for the hit and digital evidence connecting Eratay to the murder plot.

The second aspect of the government's case focuses on the defendant's reasons for having Davis killed and proof that Murat Gumrukcu was not involved in the Mode-Lauran communications. The government will show that the emails supposedly from Murat Gumrukcu were actually sent by Eratay and the defendant; Murat Gumrukcu had nothing to do with Gregg Davis. The defendant and Eratay were using Murat as a cover in the Mode-Lauran fraud.

The motive evidence involves several contemporaneous series of events. In 2017, the defendant hit a potential financial jackpot in connection with a claimed cure for HIV. This invention led to a potential biotech deal initially scheduled to close in late 2017 with the creation of a new company, Enochian Biosciences. Two things potentially stood in the way of the defendant's financial jackpot: pending felony charges and Davis's ongoing complaints about the defendant's conduct between 2015 and 2017. In February 2017, the defendant was arrested on multiple felony charges that involved two distinct frauds: 1) embezzling money and lying about a million-dollar real estate deal and 2) bouncing checks the defendant had written to Gac in 2016 as part of the defendant's business with Davis.  In 2017, the defendant worked to resolve the

criminal case[1] and to get rid of the Davis loose end. The biotech deal closed successfully soon afterwards.

The government's case will also include cover-up evidence -- the actions of Eratay and the defendant after law enforcement encountered them in 2018. For example, the defendant sent Eratay a bogus promissory note soon after his April 2018 law enforcement interview to cover up the true reasons for sending Eratay over $300,000 in 2017. Moreover, the defendant, who hired Eratay to work for him in 2014, began paying Eratay through Eratay's parents in Turkey after his 2018 interview, concealing his connections to Eratay. Further, the government located on Eratay's phone a Threema conversation between the defendant and Eratay that was interrupted by Eratay's arrest and had not been deleted. That conversation in Turkish reveals much about the relationship between the two conspirators as law enforcement was closing in on them.

### The Potential Rule 404(b) Evidence

The evidence proffered by the government in this motion focuses on two, key issues in the case. First, the government should be allowed to explain the personal and business relationship the defendant had with Eratay. The two were close friends, and Eratay worked for Gumrukcu for years as his assistant on a variety of matters. This relationship evidence is highly probative of the defendant's identity as a conspirator both on the murder and the fraud, as well as his knowledge and intent to lead the conspiracies. Second, the defendant got into a protracted and complicated business dispute with Gregg Davis, the murder victim. As alleged in Count Four, the defendant and Eratay conspired to defraud Davis and Gregory Gac, the financial

---

[1] On the eve of the murder, the defendant and the California prosecutor negotiated a one-count felony resolution in the state case. The agreement contemplated a plea to one count of felony commercial burglary with a probation sentence. The defendant pleaded guilty pursuant to that agreement in late January 2018. Under California law, the conviction was later modified to a misdemeanor in light of the defendant's probation supervision.

middleman in the oil business between the defendant and Davis. Davis often complained about the defendant's apparent frauds during the business dispute, but the defendant's problems with Davis intensified and gave the defendant a reason to kill Davis in 2017, when the defendant hoped to finalize a multimillion-dollar bio tech deal while trying to reach a lenient resolution to a California state criminal fraud case. The jury should be able to see all of the reasons the defendant needed to tie up the Davis loose end in 2017.

      1. *Berk Eratay's Relationship with the Defendant*

          a.  Legal Framework Regarding 404(b) and Relationship Evidence

Rule 404(b) of the Federal Rules of Evidence prohibits admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). The Rule expressly allows such evidence to be admitted, however, "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The Second Circuit has long stated that 404(b) evidence is admissible so long as it is not used to prove propensity. *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984) ("We have adopted the inclusionary or positive approach to the Rule; as long as the evidence is not offered to prove propensity, it is admissible"); *accord United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004); *see also United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011); *United States v. McCallum*, 584 F.3d 471, 474-75 (2d Cir. 2009). To determine the admissibility of other act evidence, the Court considers "whether (1) it was offered for a proper purpose; (2) it was relevant to a material issue in dispute; (3) its probative value is substantially outweighed by its prejudicial effect; and (4) the trial court gave an appropriate limiting instruction to the jury if so requested by the defendant." *LaFlam*, 369 F.3d at 156; *accord United States v. Curley*, 639 F.3d at 56-57.

Significantly, however, not all evidence of "other acts" is even subject to analysis under Rule 404(b). *See, e.g., United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); *accord United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007); *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *United States v. Baez*, 349 F.3d 90, 94 (2d Cir. 2003); *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). It is well established, for example, that "other acts" evidence is admissible as direct evidence of the crimes charged "[1] if it arose out of the same transaction or series of transactions as the charged offense, [2] if it is inextricably intertwined with the evidence regarding the charged offense, or [3] if it is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (internal quotation marks omitted). Indeed, direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Court has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*; *see also United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991).

The case law supports the conclusion that the proffered relationship evidence should be considered as direct evidence, but even if considered under Rule 404(b), it should be admitted. The Second Circuit has routinely approved the admission of evidence of prior criminal dealings between a defendant and Government witnesses that explains the relationship of trust between them or provides the jury with the complete story of the crime. *See, e.g., United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (admitting evidence of prior drug dealing under Rule 404(b) as "probative evidence of defendants' knowledge of the charged drug- and murder-related acts, their intent to engage in these acts, and the development of their relationships with each other");

8

*United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (affirming admission of evidence of prior plans to import narcotics because "it was relevant background evidence inasmuch as it corroborated the charge that Ferro and [defendant] were partners during the charged conspiracy and established" defendant's motive, and concluding that "the evidence fell outside the ambit of Rule 404(b)'s prohibition on 'other crimes' evidence"); *United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007) (affirming admission of other acts evidence to show how an "illegal relationship" between co-conspirators evolved); *United States v. Fabian*, 312 F.3d 550, 557 (2d Cir. 2002) (affirming admission of prior drug dealing convictions in a robbery case where the evidence showed the co-conspirators' "long-standing friendship" and "made the allegation that [one co-conspirator] had served as a tipster for the robbery more likely"), *abrogated on other grounds by United States v. Parkes*, 497 F.3d 220, 230 (2d Cir. 2007); *United States v. Pipola*, 83 F.3d 556, 565-66 (2d Cir. 1996) (noting that "legitimate purpose[s] for presenting evidence of extrinsic acts" under Rule 404(b) include "explain[ing] how a criminal relationship developed," and "help[ing] the jury understand the basis for the co-conspirators' relationship of mutual trust"); *United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993) ("[E]vidence of acts committed prior to the time charged in the indictment are [admissible] to prove the existence of the alleged conspiracy as well as to show its background and history."); *United States v. Rosa*, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that evidence of prior drug dealing properly admitted under Rule 404(b) to show development of illegal relationship between defendant and co-conspirator and to explain how defendant came to play important role in conspiracy).

      b.  *The Proffered Relationship Evidence*

Eratay met the defendant in 2008 when both were performing magic in Turkey. They became friends and visited socially. Eratay also worked in computers and information technology. Eratay came to the United States on education visas, eventually getting a master's degree in the IT field in 2014. While the defendant travelled in the United States on occasion before 2013, he relocated to the United States in 2013 after absconding from criminal charges in Turkey for fraud in connection with his healing practice. The defendant had attended university in Turkey beginning in 2000 in pursuit of a medical degree but never completed that degree. Instead, he turned to less traditional healing practices. In 2013, the defendant began pursuing non-health care business opportunities including commodities trading. At this point, he was introduced to Gac, posing as a wealthy prince.

After Eratay got his master's degree, he agreed to work as the defendant's assistant on various projects, as directed by the defendant. The defendant lived in Los Angeles, and Eratay lived in Las Vegas. The defendant paid Eratay handsomely, initially agreeing to pay him $7,000 a month for his services. The government's financial case includes proof that the defendant paid Eratay tens of thousands each year from 2015 to 2022. Prior to the homicide, the defendant paid Eratay directly, but after the homicide the defendant paid Eratay through Eratay's parents in Turkey, disguising their financial relationship.

Eratay's role as the defendant's operative for the Davis murder plot was part and parcel of Eratay's work as the defendant's assistant. Eratay's work on other projects for the defendant, all of which are corroborated by other witnesses and/or documents, is highly probative of not only Eratay's credibility but also the fact that the defendant knew about and directed the murder. Eratay was not merely an assistant who helped with the defendant's schedule and computer needs, but rather was a trusted operative, trusted enough to help with the defendant's criminal or

dishonest activity. Moreover, this trust and criminal connection undercuts any inference that Eratay acted on his own to kill Davis.

To explain Eratay's work for the defendant prior to the murder plot, the government will offer several important pieces of evidence. First, the jury will hear evidence about the charged conduct in Count Four, which involves Eratay helping the defendant create false persona and fraudulent documents in the defendant's business dealings with Gac and Davis. Second, the jury should be allowed to hear about Eratay's recruitment of Ethridge in May 2015 for a different job. At that point, the defendant wanted a California defense contractor to think that he was dealing with Middle Eastern royalty. A meeting was set up at a resort in Las Vegas. The defendant asked Eratay to find a person to pose as a member of a Middle Eastern royal family and a second person to pose as the royal's bodyguard. Eratay recruited his friend, Aron Ethridge, a large man, to pose as the bodyguard, and another Turkish friend to pose as the "prince," while Eratay posed as the royal's accountant. This event not only corroborates the precise kind of conduct charged in Count Four, but it also corroborates the connection between the defendant and Ethridge, a connection further corroborated by the evidence that Eratay recruited Ethridge to find cocaine for the defendant to use when he partied in Las Vegas. It was this level of trust, and mutual engagement in criminal conduct, that allowed for the creation of the murder conspiracy among the defendant, Eratay, and Ethridge. Indeed, the defendant then suggested to Eratay that he ask Ethridge to find a hit man. That evidence only makes sense when the jury understands the defendant's prior relationships with Eratay and Ethridge.

The government will offer three other examples of Eratay's employment with the defendant prior to murder, all of which corroborate Eratay's employment in the Count Four fraud scheme. First, the defendant obtained about $1.2 million dollars as a short-term loan in 2014

from Devon Archer. The defendant told Mr. Archer that he would use the money to purchase lab equipment, but instead the defendant used the money to buy a house in Los Angeles. The defendant did not repay the money in 30 days as promised. The defendant delayed repayment for months and eventually directed Eratay to help him delay and avoid the repayment, including with phony wire confirmations and bounced checks, a scheme that imitated the Count Four scheme involving Davis. This evidence is particularly probative here because Eratay and the defendant used the muratsgumrukcu@gmail.com email to pose as Murat Gumrukcu and the emre@houseofottoman email to pose as Emre Aras in holding off Archer, just as they did with Gac and Davis. Second, the defendant recruited Eratay to pose as a nurse in connection with the defendant's 2016 treatment of a Pennsylvania man with terminal colon cancer. The defendant's use of Eratay to pose as particular characters corroborates the allegations against the defendant in Count Four. Third, the defendant had Eratay use his tech skills and knowledge to increase his social media prominence, for example, by purchasing followers for the defendant's Instagram account.

The evidence about how the defendant used Eratay after the murders, while paying him secretly through Eratay's parents, provides even more compelling evidence about the defendant's relationship with his alleged coconspirator and his identity as the leader of the murder plot. The defendant turned to Eratay repeatedly to deal with problems potentially impacting Gumrukcu's new scientific prominence after the Enochian deal. As the Enochian deal was coming together in 2017, various parties asked the defendant about his educational background and credentials. The defendant had long called himself a doctor even though he didn't obtain a degree in Turkey. Between 2017 and 2019, he made various claims about his medical training and credentials, including the false claim that he received his medical degree from the Turkish university that he

attended but from which he did not receive a degree. In 2019, market researchers began poking around the defendant's background, and in November 2019, an internet investment publication claimed that the defendant's representations about his Turkish degree were false. This allegation posed problems for the defendant's ongoing scientific business opportunities including with Enochian. He turned to Eratay for help. Eratay found a connection to obtain Russian degrees for money, and between late 2019 and 2022 the defendant purchased four "degrees" as well as two dissertations supposedly written in connection with those degrees. During this period, the defendant also directed Eratay to engage in various internet tactics, such as concealing internet links that might undermine the defendant's scientific persona.

Another important problem faced by the defendant after the Enochian deal was his inability to travel internationally and his related, pending Turkish criminal case. The defendant's Turkish passport had expired, and he could not renew it without dealing with his Turkish criminal case pending since 2013. Again he relied on Eratay as his operative. Eratay worked with representatives in Turkey to resolve the Turkish case. When that proved difficult and perhaps impossible, Eratay sought to obtain a Cyprian passport for the defendant, which might allow him to travel outside the United States. The defendant faced another Turkish problem. Under Turkish law, men have a military service obligation unless they fall into several exemptions. The defendant had not satisfied either his obligation or the exemptions. Again, the defendant asked Eratay to assist.

The defendant's use of Eratay to solve these problems provides compelling evidence about the nature of their relationship and why the defendant used Eratay to solve the Davis problem. Moreover, that these actions occurred after the murder is highly probative of the murder conspiracy because the defendant used Eratay as his operative after he and Eratay were

identified as suspects in the murder plot. This use of Eratay strongly rebuts any suggestion that Eratay acted without the defendant's knowledge and direction in hiring a hit man in 2018. All of this evidence demonstrates that Gumrukcu and Eratay had a relationship involving "mutual trust" and "explains how [their] criminal relationship developed." *Pipola*, 83 F.3d at 565-66.

   2. *The California Criminal Case*

    a. *Legal Framework Regarding Motive and Modus Operandi*

  As to motive in the context of 404(b), Courts have stated that "[m]otive is a state of mind . . . showing the probability of appropriate ensuing action and it is always relevant*." United States v. Day*, 591 F.2d 861, 874 (D.C. Cir. 1978) (quoting 1 Wigmore on Evidence § 118 at 558, 561 (3d ed. 1940)); *United States v. Hill*, 643 F.3d 807, 843 (11th Cir. 2011) ("Motive is always relevant in a criminal case, even if it is not an element of the crime."); *United States v. Bradshaw*, 690 F.2d 704, 708 (9th Cir. 1982) ("Although it is true that motive need not be proved under [the charged offense], it is far from irrelevant. Motive is evidence of the commission of any crime.").

  "Rule 404(b) permits evidence of similar acts to prove a 'signature crime,' *i.e.*, a *modus operandi* where the crimes are so nearly identical in method as to earmark them as the handiwork of the accused." *United States* v. *Mills*, 895 F.2d 897, 907 (2d Cir. 1990) (citation and internal quotation marks omitted). "The similarity sufficient to admit evidence of past acts to establish a recurring *modus operandi* need not be complete; it is enough that the characteristics relied upon are sufficiently idiosyncratic to permit a fair inference of a pattern's existence." *United States* v. *Sliker*, 751 F.2d 477, 487 (2d Cir. 1984) (Friendly, J.); 2 J. Weinstein & M. Berger, *Weinstein 's Federal Evidence* § 404.22[5][c], at 404-124 ("The question for the court is whether the characteristics relied on are sufficiently idiosyncratic to permit an inference of pattern for

purposes of proof."); *see also United States* v. *Rucker*, 586 F.2d 899, 903 (2d Cir. 1978)

(sufficient parallel between charged acts and prior conviction such that prior conviction had "real

probative value"); *cf. United States* v. *Almendares*, 397 F.3d 653, 662 (8th Cir. 2005) (before

admitting identity evidence modus operandi theory, "district court must make a threshold

determination that a reasonable juror could find from comparing the acts that the same person

committed both crimes"); *United States* v. *Quinn*, 18 F.3d 1461,1466 (9th Cir. 1994) (evidence

of previous crime admissible to show identity where offenses are "so similar in their

circumstances as to guarantee a reasonable likelihood that they were committed by the same

person"). This Court has "allowed proof of prior bad acts to show identity where the defendant

used very similar methods in the charged crime and the prior bad act." *United States v. Tubol*,

191 F.3d 88, 95 (2d Cir. 1999); *see also United States* v. *Danzey*, 594 F.2d 905, 911 (2d Cir.

1979) (evidence of prior acts probative because there was "a 'close parallel' between the crime

charged and the prior act").

>    b.  *The Proffered Notice Evidence*

As described above, the defendant's arrest in February 2017 on felony fraud charges

played a key role in the defendant's silencing of Davis. The defendant shared with Gac his

concerns about the California investigators finding out about Davis's complaints. As noted in

Count Four, in June 2017, the defendant paid off the money Gac had fraudulently lost after Gac

was contacted by the California investigators. As noted above, the defendant was charged with

two frauds, one of which involved the bounced checks written to Gac's company in May 2016 to

pay Davis that are alleged in Count Four of the indictment here, showing the connection between

the defendant's California case and Count Four. Indeed, the course of the California fraud case is

charged conduct, not uncharged conduct, here.

The second fraud alleged in the California case involved a Turkish investor named Ersin Akyuz, who invested almost $1 million with the defendant in 2014 based on the defendant's representation that he could buy and flip a piece of California property. The California investigators determined that the defendant did not buy the property, used the money for other things, and then created numerous phony documents to cover up the embezzlement, including emails supposedly written by a California attorney involved in the real estate deal.

The jury should be allowed to hear about the Akyuz fraud evidence for three separate reasons. First, the significance of this evidence against the defendant establishes the seriousness of the risks posed by the California case, which did not merely involve bounced checks to Gac. The jury, which will hear about the bounced checks as charged conduct, and the pay-off to Gac after being contacted by California law enforcement, should not be left with a misunderstanding about the risks the California case posed to the defendant.  This evidence therefore offers the jury "context" and "dimension" of the Government's case. *Gonzalez*, 110 F.3d at 941. Second, prior to the criminal filing, the defendant talked with Eratay about finding a hit man for someone in Turkey. The circumstantial evidence shows that the defendant was talking about Akyuz, which is highly probative evidence that the defendant would turn to hiring a hit man to deal with his potential fraud victims and that he would ask Eratay to help. These methods are eerily similar to the hiring of Banks by the defendant to kill Greg Davis.  *Tubol*, 191 F.3d at 95. Third, the defendant's use of bogus front men and fraudulent documents when defrauding Akyuz shows a modus operandi consistent with the defendant's frauds against Gac and Davis between 2015 and 2017, helping identify the defendant as complicit, indeed managing, the fraud alleged in Count Four. Indeed, there is a "close parallel" between the conduct with regard to Gac and Davis as the conduct in the California case. *Danzey*, 594 F.2d at 911.

16

3. *Potential Prejudice is not a Concern*

The evidence described above---explaining the defendant's relationship with Eratay and his motive to kill Davis---like all evidence, must also be assessed in light of Rule 403, which sets some limits on the use of relevant evidence. In this case, however, potential prejudice does not outweigh the evidence's probative value. Even where evidence is otherwise admissible, a district court may exclude it under Rule 403 "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."' *Monsalvatge*, 850 F.3d at 494 (quoting Fed. R. Evid. 403). Under Rule 403, "evidence is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence" or "unfairly . . . excite[s] emotions against the defendant." *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (internal quotation marks omitted); *see Old Chief v. United States*, 519 U.S. 172, 180 (1997) ("The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.").

Turning first to the issue of unfair prejudice, the evidence the government seeks to introduce poses little risk of unfair prejudice. All relevant evidence introduced by the government is prejudicial to the defendant, that is making it more likely that he will be convicted. Rule 403 aims to protect the defendant against serious *unfair* prejudice, or evidence that might improperly inflame the jury. Much of the proffered evidence carries only probative value. For example, the evidence that the defendant used the muratsgumrukcu Gmail account and Eratay's help to avoid paying his debt to Devon Archer provides highly probative evidence

about two keys facts about the charged offenses: his use of Eratay and his use of "Murat" as a front.

Moreover, the Rule 403 standard favors admission over exclusion. Relevant evidence should only be excluded if the probative value is substantially outweighed by unfair prejudice. Here, the evidence is highly probative, and the danger of unfair prejudice is low. The defendant is being tried for hiring a hit man to murder someone. None of the evidence described above is likely to inflame the jury. For example, the evidence that Eratay recruited Ethridge to buy cocaine for the defendant's use is highly probative of the relationship among the three men. The jury's conclusion that the defendant was a recreational cocaine user would have little chance of causing the jury to convict him of murder. *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (testimony about the defendant's pre-existing drug dealing relationship with the witness was not unduly prejudicial because it was no "more sensational or disturbing than the crimes with which [the defendant] was charged."). Likewise, turning to Eratay to help obtain Russian degrees for money is highly probative of how he continued to rely on Eratay as a fixer even after they were under investigation for murder. As with the cocaine use, buying credentials will not inflame the jury in a murder case.

The minor risk of unfair prejudice and propensity should be addressed by limiting instructions not exclusion. The jury can be told the limited use of the evidence and directed not to consider it for potential improper uses. This course should be the default in light of the need to allow the jury access to as much highly probative evidence as possible. *See, e.g., United States v. Gilan*, 967 F.2d 776, 780 (2d Cir. 1992) ("[I]f the evidence of other acts is admitted, the district court must, if requested, provide a limiting instruction for the jury.") A jury trial is a

search for truth, and excluding highly probative evidence can and may mislead the jury about the truth.

Nor should the evidence be excluded because its admission will cause "undue delay" or be "cumulative." Most of the evidence described above will be elicited by a few questions of witnesses already on the stand and perhaps a handful of documents. None should require mini trials. Perhaps the most detailed of the matters described above involves the nature of the evidence against the defendant in connection with the alleged fraud on Akyuz, described in the California court papers. To explain the risks the defendant faced with this aspect of the California charges will require the admission of a few documents showing that the defendant obtained money from Akyuz that he used for other purposes and that he used a bogus email account in the name of a real California attorney, posing as that attorney. To do that, the government would need to call the attorney, Benjamin Kacev, to testify that he did not send the emails and that email account was not his. This evidence would not have any serious impact on the length of the trial.

The government is sensitive to the court's concerns about trial length. It is working diligently to hone and focus its evidence to present the case as concisely as possible. Indeed, the government is not asking to admit all the Rule 404(b) evidence it has uncovered with this motion. The evidence described above is not complicated. The potentially complicated aspects of the case are the dealings between the defendant and Gregory Gac and the defendant's biotech conduct that led to his becoming a wealthy man. The government will try to limit this complexity at trial, but this challenge should not affect the jury's consideration of significant, highly probative evidence about the defendant's relationship with Eratay and his concerns about Davis.

Finally, as noted at the beginning of this memo, the court is likely not in a position now to make a final assessment about admissibility. As the trial begins, the critical issues will come into clearer focus and the court can better assess the probative nature of the proffered evidence.[2] Indeed, during the trial, the defense may open the door to factual issues, making certain evidence even more probative. For this reason, while the government believes the Court should admit the proffered evidence, it will not seek a ruling on the admissibility of this evidence until the trial begins.

---

[2] Where Rule 404(b) evidence would otherwise be admissible to prove knowledge and intent, a defendant "may forestall" the admission of such evidence by "mak[ing] some statement to the court of sufficient clarity to indicate that the issue will not be disputed," thereby rendering the evidence irrelevant. *United States v. Colon*, 880 F.2d 650, 659 (2d Cir. 1989); *accord United States v. Tarricone*, 996 F.2d 1414, 1421-22 (2d Cir. 1993); *United States v. Figueroa*, 618 F.2d 934, 942 (2d Cir. 1980). To do so, a defendant must speak "with sufficient clarity that the trial court will be justified (a) in sustaining objection to any subsequent cross-examination or jury argument that seeks to raise the issue *and* (b) in charging the jury that if they find all the other elements established beyond a reasonable doubt, they can resolve the issue against the defendant because it is not disputed." *Figueroa*, 618 F.2d at 942 (emphasis added); *see also McCallum*, 584 F.3d at 475-76. In some circumstances, "the very nature of a defense put forward by the defendant may itself remove an issue from a case." *Tarricone*, 996 F.2d at 1421. Specifically, "[w]here a defendant claims that he did not commit the charged acts, as opposed to claiming that he acted innocently or mistakenly, '[k]nowledge and intent, while technically at issue, [are] not really in dispute.'" *Id.* (quoting *United States v. Benedetto*, 571 F.2d 1246, 1249 (2d Cir. 1978)). To remove the issue of intent from a case in such a manner, however, the defendant must "unequivocally" rely on such a defense. *Tarricone*, 996 F.2d at 1422 (internal quotation marks omitted). "A defendant may not purposely use ambiguity tactically, seeking to gain the one advantage of barring admission of prior acts evidence by proffering a particular defense theory, only to later seek the additional advantages stemming from arguing lack of intent to the jury." *United States v. Colon*, 880 F.2d at 659; *accord United States v. Paulino*, 445 F.3d 211, 222 (2d Cir. 2006).

**Conclusion**

For the foregoing reasons, the Court should admit the government's 404(b) evidence at trial.

Dated at Burlington, in the District of Vermont, July 16, 2024.

Respectfully  Submitted,

UNITED STATES OF AMERICA
NIKOLAS P. KEREST
United States Attorney

By:    */s/ Paul J. Van de Graaf*
PAUL J. VAN DE GRAAF
ZACHARY B. STENDIG
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725