U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED
2024 AUG 16 PM 4:19
BY CLERK
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:22-cr-00058
)
SERHAT GUMRUKCU )

**OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS COUNT FOUR**
(Doc. 184)

Defendant Serhat Gumrukcu is charged in a four-count Third Superseding Indictment (the "TSI") with knowingly and intentionally conspiring to commit murder for hire in violation of 18 U.S.C. § 1958 (Count One), committing murder for hire in violation of 18 U.S.C. § 1958 as a principal pursuant to 18 U.S.C. § 2 (Count Two), and conspiring to commit wire fraud in violation of 18 U.S.C. § 1343 pursuant to 18 U.S.C. § 1349 (Count Four). (Doc. 69.) Pending before the court is Mr. Gumrukcu's July 16, 2024 motion to dismiss Count Four. (Doc. 184.) The government opposed Mr. Gumrukcu's motion on July 26, 2024. (Doc. 189.) On July 29, 2024, the court held a hearing, at which point it took the motion under advisement.

The government is represented by Assistant United States Attorneys Paul J. Van de Graaf and Zachary B. Stendig. Mr. Gumrukcu is represented by Ethan A. Balogh, Esq., Lisa B. Shelkrot, Esq., and Susan K. Marcus, Esq.

## I. The Factual Allegations in Count Four.

Count Four states as follows:

> 1. Between 2013 and 2018, [Greg Gac] operated Quadrant Financial Group, LLC ("Quadrant"), which participated as a principal and broker for various business transactions, including commodities trading.
>
> 2. In 2013, the defendant, SERHAT GUMRUKCU, began corresponding with [Mr. Gac] about potential business opportunities. Prior to January 2015, GUMRUKCU represented to [Mr. Gac] that

he had access to substantial funds and owned a controlling interest in Lauran Trading, LLC, a business alleged to be organized in Oman, to be used for oil trading.

3. The defendant, BERK ERATAY, who had information technology (IT) work experience, served as an assistant to GUMRUKCU.

4. Between 2015 and January 2018, Gregory Davis operated Mode Commodities, LLC ("Mode"), which sought to engage in oil trading.

5. In late January 2015, Quadrant organized an oil trading deal designed to yield millions of dollars in profits. Quadrant would purchase oil from Mode and sell the oil to a different group at a higher price. GUMRUKCU agreed to participate in the deal as Quadrant's partner. As part of the transaction, Quadrant needed to provide a "bank comfort letter" showing that Quadrant had access to €22 million. GUMRUKCU represented to [Mr. Gac] that he had access to such funds and that he would obtain the bank comfort letter.

6. On or about January 28, 2015, GUMRUKCU and ERATAY caused the email transmission of a fraudulent letter signed by "Constantine Poryalis" of "Cyprus First Bank" to [Mr. Gac] and Davis. The Cyprus First Bank letter falsely claimed that €22.5 million was immediately available to Quadrant for the oil deal with Mode. Davis and [Mr. Gac] almost immediately determined that the bank comfort letter was fraudulent, in part because Cyprus First Bank did not exist. These and other issues undermined the planned oil deal.

7. In early February 2015, in the aftermath of the Cyprus First Bank letter and the failure of the Mode deal, [Mr. Gac] helped GUMRUKCU and Davis form Mode Lauran, a partnership between Davis's and GUMRUKCU's businesses designed to engage in future oil deals. Under the partnership agreement, Lauran Trading was obligated to obtain financing for future oil deals, through banking arrangements such as stand-by letters of credit, while Mode would execute the oil transactions.

8. Between February 2015 and April 2015, GUMRUKCU and ERATAY caused the transmission of various emails falsely representing that Lauran Trading had found financing for Mode Lauran through Sekerbank, a Turkish Bank. During the course of these communications, GUMRUKCU represented to [Mr. Gac] and Davis that his brother, Murat Gumrukcu, was assisting in Mode Lauran's business. Beginning in February 2015, GUMRUKCU and ERATAY used a Google account, muratsgumrukcu@gmail.com

(hereafter "the murats Gmail account"), to further the scheme to defraud and to falsely represent Murat Gumrukcu's involvement in the fraud. When the funding was not forthcoming, GUMRUKCU promised to pay Davis $30,000 because of the funding delays. In light of this promise, [Mr. Gac] paid Davis $30,000 in the first half of 2015 without receiving any repayment from GUMRUKCU until later in 2015.

9. By May 2015, Lauran Trading had not successfully obtained financing. Davis complained to [Mr. Gac] and GUMRUKCU about Lauran Trading's failure to perform and about potential fraud. Beginning in May 2015, [Mr. Gac] helped negotiate a buy-out of Mode's interest in the Mode Lauran partnership. These negotiations were not resolved until November 2015, when Lauran Trading and Mode entered into a "Redemption Agreement." The Redemption Agreement required payments to Mode to buy out Mode's interest in the partnership. Under the Redemption Agreement, Lauran Trading owed Mode $5 million to be paid over time, based on future oil deals taking place. The Redemption Agreement stated that Quadrant would act as escrow agent for the $5 million. It also obligated Lauran Trading to pay Mode $950,000 if Lauran Trading terminated the Redemption Agreement. The Redemption Agreement contemplated that the parties would participate in future oil deals, still obligating Lauran Trading to obtain financing for those future oil deals. In November 2015, GUMRUKCU and ERATAY caused the murats Gmail account to send [Mr. Gac] four fraudulent bank confirmations, each for €50,000, as the first payments under the Redemption Agreement.

10. During the Redemption Agreement negotiations, GUMRUKCU and ERATAY caused the sending of emails from the murats Gmail account reflecting that Murat Gumrukcu had bought out GUMRUKCU's interest in Lauran Trading. As a result, the Redemption Agreement contained what appeared to be Murat Gumrukcu's signature. In fact, ERATAY supplied the signature to the Redemption Agreement for transmission to [Mr. Gac] and Davis.

11. Between December 2015 and May 2016, GUMRUKCU and ERATAY caused the transmission of various wire communications falsely representing that Lauran Trading was performing on its two obligations under the Redemption Agreement: that funds for the Mode buy out would be sent to Quadrant to fund the escrow account and that Lauran Trading had $30 million available at the National Bank of Abu Dhabi to fund future oil deals. In addition, GUMRUKCU and ERATAY caused wire communications to [Mr.

Gac] from false and fictitious third parties, including "Emre Aras," who was supposedly Murat Gumrukcu's personal assistant with an office in Hong Kong, and "Mohammed Salem," who was supposedly working with the Washington, D.C. branch of the National Bank of Abu Dhabi. [Mr. Gac] never received money from the National Bank of Abu Dhabi. During this period, Davis continued to complain to [Mr. Gac] about Lauran Trading's failure to pay him funds due to Mode under the Redemption Agreement and GUMRUKCU's false claims.

12. In May 2016, GUMRUKCU and ERATAY caused the murats Gmail account to send [Mr. Gac] fraudulent statements about Murat Gumrukcu having over $30 million in a Wells Fargo bank account to cover Lauran Trading's obligations. [Mr. Gac] never received money from Wells Fargo. Instead, GUMRUKCU falsely represented that he had access to $490,000, which he would use to pay [Mr. Gac] $300,000, some of which was due to Davis. On or about May 13, 2016, GUMRUKCU sent [Mr. Gac] a picture of a fraudulent Bank of America cashier's check. At that same time, GUMRUKCU deposited into Quadrant's bank account four checks for $150,000 each, all of which eventually bounced because GUMRUKCU's account had insufficient funds. Prior to the last check being returned for insufficient funds, [Mr. Gac] sent Davis $75,000. The return of funds deposited by GUMRUKCU caused [Mr. Gac] to use personal funds to cover the Davis payment. After the bounced check incident, GUMRUKCU and ERATAY caused the murats Gmail account to send [Mr. Gac] two false bank confirmation statements for $600,000, falsely representing that GUMRUKCU's father was wiring Quadrant to fund Lauran Trading's obligations to Mode. GUMRUKCU did not pay [Mr. Gac] any funds during 2016. By the end of 2016, [Mr. Gac] had lost over $100,000 from the Mode Lauran transactions. Throughout this period, GUMRUKCU and ERATAY caused the murats Gmail account to make a variety of false claims to delay Lauran Trading's obligations, including false statements about Murat Gumrukcu's travel. On or about December 13, 2016, GUMRUKCU and ERATAY caused the murats Gmail account to send a fraudulent bank confirmation for $500,000 supposedly from UBS, a Swiss bank.

13. On February 9, 2017, GUMRUKCU was arrested on state fraud charges in California, including charges related to the bounced checks deposited in Quadrant's account in May 2016. That same day, ERATAY deleted the murats Gmail account. Three days later, ERATAY began using a new Google email to pose as Murat

Gumrukcu, murtagumrukcu@gmail ("the murtag Gmail account"). ERATAY sent [Mr. Gac] numerous fraudulent emails from the murtag Gmail account between February 2017 and January 2018, including emails falsely claiming that Lauran Trading was obtaining funds from UBS to satisfy Lauran Trading's dual obligations under the Redemption Agreement and falsely documenting Murat Gumrukcu's travel and illnesses.

14. By May 2017, GUMRUKCU was involved in negotiating a multimillion-dollar biotech merger relating in part to GUMRUKCU's alleged discovery of a cure for human immunodeficiency virus (HIV). GUMRUKCU discussed these negotiations with [Mr. Gac] At this time, Davis was actively complaining to [Mr. Gac] about the fraudulent representations made to [Mr. Gac], suggesting that criminal charges against GUMRUKCU should be pursued. [Mr. Gac] relayed Davis's claims to GUMRUKCU and noted that GUMRU[KC]U had exposure from the events over the past two years. Davis agreed to "stand down" from legal proceedings in exchange for $20,000 in early May and another $20,000 in late May, paid by GUMRUKCU through [Mr. Gac]. In June, GUMRUKCU paid [Mr. Gac] over $100,000, in part to reimburse [Mr. Gac]'s 2016 payment to Davis, after learning that [Mr. Gac] would be interviewed by law enforcement investigating the pending California fraud case.

15. Later in 2017, Davis continued making fraud allegations to [Mr. Gac], who passed the allegations on to GUMRUKCU. Throughout their relationship, [Mr. Gac] relayed certain information he received from GUMRUKCU to Davis and from Davis to GUMRUKCU, in his role as middleman. By mid-November, ERATAY, using the murtag Gmail account, proposed further partial payments to Davis to continue to hold off his fraud claims from going public. GUMRUKCU paid [Mr. Gac] $65,000 in November, and [Mr. Gac] in turn paid Davis $50,000.

16. After these payments, GUMRUKCU and ERATAY avoided further communications with [Mr. Gac]. By late December, Davis was again threatening legal action, threats [Mr. Gac] passed on to GUMRUKCU. On January 6, 2018, Davis was murdered in Vermont.

17. Between January 2015 and January 2018, in the District of Vermont and elsewhere, the defendants, SERHAT GUMRUKCU and BERK ERATAY, knowingly and willfully conspired to commit wire fraud, in violation of 18 U.S.C. § 1343, by devising and executing a

> scheme to defraud [Mr. Gac] and Gregory Davis by attempting to deceive them about funds available to GUMRUKCU and Lauran Trading, about the identity of individuals involved with GUMRUKCU and his business activities, and about past and future financial transactions related to Mode Lauran.

(Doc. 69 at 4-9.)

## II. The Procedural History.

On October 6, 2023, Mr. Gumrukcu moved to dismiss Count Four of the TSI for failure to state a claim. (Doc. 110.) He argued that the federal wire fraud and mail fraud statutes only criminalize schemes designed to deprive people of traditional property interests. Mr. Gumrukcu further asserted that the government is required to prove that the defendant "engaged in deception" and that the purported victims' money or property was "an object of their fraud[.]" *Kelly v. United States*, 590 U.S. 391, 398 (2020) (alteration adopted) (internal quotation marks and citation omitted). Because the TSI does not allege that the object of the charged conspiracy was the victims' property or money, he sought dismissal of Count Four.

The government opposed the motion, arguing that Count Four alleges a scheme to defraud the victims of property because Mr. Gumrukcu's scheme sought to deprive the victims of money owed under a contract. (Doc. 112.) It asserted that "[t]he right to be paid money" is "a species of property." *Id.* at 8 (quoting *Pasquantino v. United States*, 544 U.S. 349, 356 (2005)) (internal quotation marks omitted).

Judge Crawford held a hearing on the motion on January 19, 2024, and issued an Order denying the motion on January 24, 2024, (Doc. 136), noting that an insufficient indictment may be dismissed pursuant to Fed. R. Crim. P. 7(c)(1) but that "'the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.'" *Id.* at 3 (quoting *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998)). He concluded that the TSI's allegation that Mr. Gumrukcu and Mr. Eratay engaged in a fraudulent scheme to induce Mr. Gac to send his own money to Mr. Davis on behalf of Mr. Gumrukcu was sufficient to state a claim that money or property was the object of the scheme to defraud Mr. Gac.

Turning to the scheme to defraud Mr. Davis, Judge Crawford observed:

> Answering the question of whether inducing [Mr.] Davis to enter into business with Lauran Trading and then stringing him along with lies and bounced checks amounts to defrauding him of his property is a central issue necessary to the resolution of Count [Four], but it is not an issue that the court can resolve at this stage of the case. . . .
>
> The court is content to postpone answering the question of whether a breach of the [R]edemption [A]greement amounts to a loss of property until the [g]overnment has introduced its evidence at trial or, at a minimum, provided a full proffer in response to a motion in limine directed at issues of relevance and admissibility.

*Id.* at 8-9.

## III. Conclusions of Law and Analysis.

Mr. Gumrukcu renews his motion to dismiss, arguing that Judge Crawford's decision "didn't directly address whether the alleged conspirators agreed to obtain [Mr.] Davis's money, . . . [n]or did the [c]ourt tackle the heart of the issue: . . . whether the [g]overnment may proceed on a theory that 'breach of contract' is a property right." (Doc. 184 at 3.) The government counters that Mr. Gumrukcu seeks to relitigate his prior motion without citing new case law or identifying a change in circumstances since Judge Crawford's decision. It points out that Judge Crawford specifically deferred ruling until the evidence was presented at trial or following a complete proffer at a pre-trial hearing.

### A. Standard of Review.

Fed. R. Crim. P. 7(c)(1) requires an indictment to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007) (internal quotation marks omitted). The indictment must contain "the elements of the offense charged and fairly infor[m] a defendant of the charge against which he must defend," and must "enabl[e] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* at 102 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)) (alterations in original). Detailed allegations "are not contemplated by Rule 7(c)(1)," *id.* at 110, and an indictment generally need only "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. LaSpina*, 299 F.3d

165, 177 (2d Cir. 2002) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)); *see also United States v. Dawkins*, 999 F.3d 767, 779-80 (2d Cir. 2021) (concluding that indictment that provided "more than enough background to inform the defendants of when and where the offense conduct took place[]" was sufficient). "Where there are several ways to violate a criminal statute, . . . '[f]ederal pleading requires . . . that an indictment charge in the conjunctive to inform the accused fully of the charges.'" *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) (quoting *United States v. McGinnis*, 783 F.2d 755, 757 (8th Cir. 1986)) (internal citation omitted) (alterations in original).

If an indictment fails "to allege an essential element expressly[,]" it is not fatally defective so long as "a reading of the indictment in its entirety allowed inference of the [missing] element." *United States v. Gonzalez*, 686 F.3d 122, 130 (2d Cir. 2012) (internal quotation marks and citation omitted). A defendant who objects to an indictment before trial "is entitled to a more exacting review[.]" *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

Under Federal Rule of Criminal Procedure 12(b), a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). "[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012). Generally, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *Alfonso*, 143 F.3d at 777.

**B. Whether the Law of the Case Doctrine Applies.**

The government asserts the court should treat Judge Crawford's decision as the law of the case which is a "doctrine [that] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (citation and internal quotation marks omitted). Mr. Gumrukcu contends the law of the case doctrine does not apply because Judge Crawford's decision on the motion to dismiss

was "without prejudice[.]" (Doc. 184 at 3.)

The law of the case doctrine directs a court, having previously ruled on an issue, to adhere to its decision in subsequent stages of the same case "unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (internal quotation marks and citation omitted). The Second Circuit has noted, however, that the doctrine "does not rigidly bind a court to its former decisions, but is only addressed to its good sense." *Id.* (internal quotation marks omitted); *see also Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 219 (2d Cir. 2002) ("'Law of the case' is a discretionary doctrine."). Because Judge Crawford denied Mr. Gumrukcu's motion to dismiss without prejudice and did not address the issue of whether a breach of contract is "property" for a claim for conspiracy to commit wire fraud, the law of the case doctrine does not bar consideration of the pending motion. *See Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979) ("The doctrine of law of the case comes into play only with respect to issues previously determined.").

**C. Whether the Court Should Dismiss Count Four.**

"To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012) (internal quotation marks and citation omitted).

To prove mail or wire fraud, the government must establish "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (internal quotation marks omitted). "[P]roperty must play more than some bit part in a scheme: It must be an object of the fraud." *Kelly*, 590 U.S. at 402 (internal quotation marks and citation omitted). The government must prove that the defendant's alleged scheme "contemplated some actual harm or injury to [his or her] victims[.]" *United States v. Calderon*, 944 F.3d 72, 88 (2d Cir. 2019) (internal quotation marks and citation omitted).

In support of his motion to dismiss, Mr. Gumrukcu relies on *United States v. Adler*, 186 F.3d 574 (4th Cir. 1999), a wire fraud case in which the victim provided the defendants with shirts on credit and the defendants fraudulently schemed to avoid paying the victim the money owed under their contract. *Id.* at 575. The Fourth Circuit observed that two types of property were alleged as the object of the scheme: the victim's "chose in action on [the defendant's company's] debt or the particular money itself" that the defendant had in his possession that he avoided paying to the victim. *Id.* at 576.[1] For purposes of the wire fraud statute, it concluded that a victim can have "a property interest in [a] chose in action," but that the defendant had not deprived the victim of this property right because the victim "exercised its right to sue on that interest and secured a default judgment in a court of law." *Id.*. Mr. Gumrukcu contends that the TSI alleges, at most, a chose in action of which Mr. Davis was never deprived.[2]

**1. Whether the TSI Alleges a Conspiracy to Defraud Mr. Gac.**

The court agrees with Judge Crawford's well-reasoned conclusion that the TSI sufficiently alleges a conspiracy to defraud Mr. Gac of his money by causing him to pay Mr. Gumrukcu's debt to Mr. Davis. Mr. Gumrukcu's motion to dismiss Count Four as it pertains to Mr. Gac is therefore DENIED.

**2. Whether the TSI Alleges a Conspiracy to Defraud Mr. Davis.**

Whether the TSI alleges a conspiracy to defraud Mr. Davis presents a closer question. "[T]he federal fraud statutes criminalize only schemes to deprive people of *traditional* property interests." *Ciminelli v. United States*, 598 U.S. 306, 309 (2023)

---

[1] "A chose in action is an interest in property not immediately reducible to possession[,]" including "a financial interest such as a debt, a legal claim for money, or a contractual right." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 407 n.6 (2d Cir. 2018).

[2] It is unclear whether the Second Circuit would recognize that all choses in action are a property interest for purposes of the wire fraud statute. *Compare United States v. Porcelli*, 865 F.2d 1352, 1361 (2d Cir. 1989) (recognizing "choses in action represented generally in the state tax law" as property), *with United States v. Miller*, 997 F.2d 1010, 1022 (2d Cir. 1993) (rejecting government's "chose in action" theory under wire fraud statute which amounted to "a never-pursued lawsuit premised upon an entitlement that we have found to be without legal foundation[]").

(emphasis supplied). In *Ciminelli*, the United States Supreme Court rejected the "right to control" theory for establishing a property right in a wire fraud case. The "right to control" theory provides that "a defendant is guilty of wire fraud if he schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions." *Id.* (internal quotation marks and citation omitted). The Court concluded the "right to control" theory is not a valid basis for liability for wire fraud because "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest." *Id.* at 316.

Mr. Gumrukcu argues that *Ciminelli* bars the government's breach of contract theory because "monies owed under an alleged breach of contract do not sound in fraud[,]" (Doc. 184 at 11) (emphasis omitted), and because Mr. Davis was not deprived of his "chose in action" to sue to recover this money. *Ciminelli*, however, does not foreclose all wire fraud cases predicated on the existence of a contract. Following *Ciminelli*, the Third Circuit held that "disputed contracts themselves do indeed constitute 'property.'" *United States v. Kousisis*, 82 F.4th 230, 242 (3d Cir. 2023), *cert. granted*, 2024 WL 3014475 (U.S. June 17, 2024). In reaching this conclusion, the Third Circuit reasoned that "the privilege of contracting is a property right, without which there cannot be full and free use and enjoyment of property." *Id.* (internal quotation marks and citation omitted). Post-*Ciminelli*, other courts have also held that fraud in the inducement of a contract that pertains to the material terms of the bargain may support a wire fraud case where the object of the fraud is a traditional property interest, such as money.[3]

---

[3] *See, e.g.*, *United States v. Bolos*, 104 F.4th 562, 570 (6th Cir. 2024) (stating *Ciminelli* did not foreclose wire fraud charge for scheme that concealed nature of business operations from pharmacy benefit managers with whom defendant had contracts in order to obtain millions of dollars pursuant to those contracts because government was "not charging [defendant] with fraud to obtain the *contracts*" but "with fraud to obtain the *money*" from the victims) (emphasis in original); *United States v. An*, 2024 WL 2010017, at *8 (E.D.N.Y. May 7, 2024) ("*Ciminelli* did not reject the premise that depriving a victim of information in order to induce the victim to part with traditional property can be fraud. *Ciminelli* simply rejected the notion that information itself can be property."); *United States v. Venkata*, 2024 WL 86287, at *10 (D.D.C. Jan. 3, 2024) (concluding that *Ciminelli* did not prevent government from charging defendant with wire fraud for scheme to obtain lucrative contract using material misrepresentations or omissions because

The Supreme Court has also recognized that a victim of wire fraud may have a traditional property interest in "money to which it [is] entitled by law." *Pasquantino*, 544 U.S. at 357. In *Pasquantino*, the Court considered "whether a plot to defraud a foreign government of tax revenue violates the federal wire fraud statute" and concluded that it does. *Id.* at 353. The defendants were indicted for "carrying out a scheme to smuggle large quantities of liquor into Canada from the United States . . . without paying the required excise tax[]" owed to Canada under Canadian law. *Id.* The Court concluded that "Canada's right to uncollected excise taxes on the liquor [the defendants] imported into Canada is 'property' in its hands." *Id.* at 355. Because "[t]he object of [the defendants'] scheme was to deprive Canada of money legally due, . . . their scheme thereby had as its object the deprivation of Canada's 'property.'" *Id.* at 356. The Court further observed that "[t]he right to be paid money has long been thought to be a species of property[,]" noting "the economic equivalence between money in hand and money legally due." *Id.*

In *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), the Second Circuit addressed the government's allegations that the defendant engaged in wire fraud by fraudulently representing to manufacturers with whom he had contracts that he would sell their products "in a manner that would render the sales excise-tax-free[.]" *Id.* at 87. Under his contract with the manufacturers, the defendant owed the victim "the amount of any federal excise tax imposed on the sale of [the product] which is not anticipated by Seller at the time of contract execution." *Id.* at 109 (internal quotation marks omitted). The indictment alleged that the defendant "induced [the victim] to continue to sell the product to [his corporation] without paying the excise tax to the Internal Revenue Service, or including the tax in the price it charged[.]" *Id.* Although the defendant argued that the taxes were not property, the Second Circuit disagreed, stating the victim "*did not receive the money due it under the agreement, property that was owed to it.*" *Id.*

---

object of scheme was "to obtain a traditional form of money or property—about $150,000 in the first year and roughly $40,000 a year after[]") (internal quotation marks omitted); *United States v. Tuchinsky*, 2023 WL 8188423, at *4 (D. Utah Nov. 27, 2023) (concluding that scheme to obtain contracts and money targeted traditional property interests).

(emphasis supplied). In so ruling, it observed that, although the "money was destined to be passed on to the government[,]" this was "not relevant[,]" because the victim "had a right to the property and [the defendant's] scheme was intended to deprive [the victim] of it." *Id.*

In light of controlling precedent, the government is correct that in certain circumstances, a contractual right to money may be "money or property" for purposes of the wire fraud statute. Here, however, Count Four fails to allege that Mr. Davis was entitled to payment under the Redemption Agreement or was deprived of his contractual right to obtain that money.

The TSI does not specifically identify any property or rights Mr. Davis was forced to give up or pay as the object of the fraud. It also does not allege that Mr. Davis possessed a contractual right to immediate payment under the Redemption Agreement. Rather, it alleges that "[u]nder the Redemption Agreement, Lauran Trading owed Mode $5 million to be paid over time," and Mr. Gumrukcu and Mr. Eratay sent "four fraudulent bank confirmations, each for €50,000, as the first payments under the Redemption Agreement[]" and "caused the transmission of various wire communications falsely representing that Lauran Trading was performing on its two obligations under the Redemption Agreement[.]" (Doc. 69 at 6, ¶¶ 9, 11.) The TSI does not allege that Mr. Davis and Mode are interchangeable or even that Mr. Davis controls Mode as his alter ego.

Although the TSI partially tracks the wire fraud statute in paragraph 17, that paragraph does not allege Mr. Davis was deprived of money or property as "an object of the fraud." *Kelly*, 590 U.S. at 402 (internal quotation marks and citation omitted); *see also Weaver*, 860 F.3d at 94 (stating wire fraud statute requires "money or property as the object of the scheme[]"). As a result, the government's argument that it will be able to prove this at trial does not cure the absence of this allegation in the TSI. *See Pirro*, 212 F.3d at 92 ("If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, or that the grand jury acted properly in indicting him.") (citation omitted); *Gonzalez*,

686 F.3d at 127 ("'The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment.'") (quoting *United States v. Miller*, 471 U.S. 130, 139 (1985)).

"[F]or an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to *describe a particular criminal act, rather than a type of crime*." *Pirro*, 212 F.3d at 93 (emphasis supplied). Although "it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of [a] conspiracy[,]" an indictment charging a conspiracy must "apprise the grand jury in essential terms of the object of the conspiracy." *United States v. Wydermyer*, 51 F.3d 319, 325-26 (2d Cir. 1995) (internal quotation marks and citation omitted). In the absence of an allegation that the object of the alleged conspiracy to commit wire fraud was *Mr. Davis's* money or property, the TSI fails to state an essential element of wire fraud and is defective in that respect. *See United States v. Dupree*, 870 F.3d 62, 70 (2d Cir. 2017) ("An indictment that does not set out all of the essential elements of the offense charged is defective.") (internal quotation marks and citation omitted). Mr. Gumrukcu's motion to dismiss Count Four as it pertains to Mr. Davis is thus GRANTED. Dismissal of this portion of the charge is WITHOUT PREJUDICE.

**CONCLUSION**

For the foregoing reasons, Mr. Gumrukcu's motion to dismiss Count Four of the TSI is GRANTED IN PART AND DENIED IN PART. (Doc. 184.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 16th day of August, 2024.

Christina Reiss, Chief Judge
United States District Court