U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 AUG 29 PM 3: 16

CLERK
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.    )<br>)<br>SERHAT GUMRUKCU,    )<br>Defendant    )<br>) | No. 5:22-cr-58 |

# FOURTH SUPERSEDING INDICTMENT

The Grand Jury charges:

## Count One

Between in or about May 2017 and in or about February 2018, within the District of Vermont and elsewhere, the defendant, SERHAT GUMRUKCU, knowingly and intentionally conspired with others including Berk Eratay, Aron Ethridge, and Jerry Banks to cause Jerry Banks to travel in interstate commerce, and to use facilities of interstate commerce, with the intent that the murder of Gregory Davis be committed, in violation of the laws of Vermont, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Gregory Davis resulted.

(18 U.S.C. § 1958)

1

## Count Two

Between on or about January 1, 2018 and on or about January 6, 2018, in the District of Vermont and elsewhere, the defendant, SERHAT GUMRUKCU and others, caused Jerry Banks to travel in interstate commerce, from Colorado to Vermont, with the intent that the murder of Gregory Davis be committed, in violation of the laws of the State of Vermont, as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Gregory Davis resulted.

(18 U.S.C. §§ 1958 & 2)

## Count Three

1.  Between 2013 and 2018, G.G. owned and operated Quadrant Financial Group, LLC ("Quadrant"), which participated as a principal and broker for various business transactions, including commodities trading. G.G. handled and controlled Quadrant's funds and received any of its profits or losses.

2.  In 2013, the defendant, SERHAT GUMRUKCU, began corresponding with G.G. about potential business opportunities. Prior to January 2015, GUMRUKCU represented to G.G. that he had access to substantial funds and owned a controlling interest in Lauran Trading, LLC, a business alleged to be organized in Oman, to be used for oil trading. Between 2015 and 2018, GUMRUKCU controlled Lauran Trading and was responsible for funds due from Lauran Trading. GUMRUKCU falsely described himself as a wealthy Turkish prince.

3.  Between at least 2015 and 2022, Berk Eratay, who had information technology (IT) work experience, served as a paid assistant to GUMRUKCU.

4.  Between 2015 and January 2018, Gregory Davis owned and operated Mode Commodities, LLC ("Mode"), which sought to engage in oil trading. Davis handled and controlled Mode's funds and received any of its profits or losses.

5.  In late January 2015, Quadrant organized an oil trading deal designed to yield millions of dollars in profits. Quadrant would purchase oil from Mode and sell the oil to a different group at a higher price. GUMRUKCU agreed to participate in the deal as Quadrant's partner. As part of the transaction, Quadrant needed to provide a "bank comfort letter" showing that Quadrant had access to €22 million. GUMRUKCU represented to G.G. that he had access to such funds and that he would obtain the bank comfort letter.

6. On or about January 28, 2015, GUMRUKCU and Eratay caused the email transmission of a fraudulent letter signed by "Constantine Poryalis" of "Cyprus First Bank" to G.G. and Davis. The Cyprus First Bank letter falsely claimed that €22.5 million was immediately available to Quadrant for the oil deal with Mode. Davis and G.G. almost immediately determined that the bank comfort letter was fraudulent, in part because Cyprus First Bank did not exist. These and other issues undermined the planned oil deal.

7. In early February 2015, in the aftermath of the Cyprus First Bank letter and the failure of the January 2015 Mode deal, G.G. helped GUMRUKCU and Davis form Mode Lauran, a partnership between Davis's and GUMRUKCU's businesses designed to engage in future oil deals. Under the partnership agreement, Lauran Trading was obligated to obtain financing for future oil deals, through banking arrangements such as stand-by letters of credit, while Mode would execute the oil transactions. GUMRUKCU agreed to form the Mode Lauran partnership in part to compensate Davis for his losses on the January 2015 Mode deal that failed because of the fraudulent Cyprus First Bank letter.

8. Between February 2015 and April 2015, GUMRUKCU and Eratay caused the transmission of various emails falsely representing that Lauran Trading had found financing for Mode Lauran through Sekerbank, a Turkish bank. During the course of these communications, GUMRUKCU represented to G.G. and Davis that his brother, Murat Gumrukcu, was assisting in Mode Lauran's business. Beginning in February 2015, GUMRUKCU and Eratay used a Google account, muratsgumrukcu@gmail.com (hereafter "the murats Gmail account") to further the scheme to defraud and to falsely represent Murat Gumrukcu's involvement in the business dealings. When the funding was not forthcoming, GUMRUKCU promised to pay Davis $30,000

because of the funding delays. In light of this promise, G.G. paid Davis $30,000 in the first half of 2015 without receiving any repayment from GUMRUKCU until later in 2015.

9.  By May 2015, Lauran Trading had not successfully obtained financing. Davis complained to G.G. and GUMRUKCU about Lauran Trading's failure to perform and about potential fraud. Beginning in May 2015, G.G. helped negotiate a buy-out of Mode's interest in the Mode Lauran partnership. These negotiations were not resolved until November 2015, when Lauran Trading and Mode entered into a "Redemption Agreement." The Redemption Agreement (which included an amendment signed at the same time) required payments to Mode to buy out Mode's interest in the Mode Lauran partnership for a potential total value of $5 million. The Redemption Agreement created an obligation that Lauran Trading pay Mode $225,000 based solely on the execution of the Redemption Agreement. The Redemption Agreement also created obligations to pay Mode additional funds over time based on future events. The Redemption Agreement stated that Quadrant would act as escrow agent for the $5 million. The Redemption Agreement further stated that the parties would participate in future oil deals, obligating Lauran Trading to obtain financing for those future oil deals. The Redemption Agreement created a separate obligation that Lauran Trading pay Mode a $75,000 per month late fee for every month that Lauran Trading failed to obtain financing. Finally, it also obligated Lauran Trading to pay Mode $950,000 if Lauran Trading terminated the Redemption Agreement. Thus, Mode and Davis had a property interest in the funds due to them under the Redemption Agreement.

10. In November 2015 soon after the execution of the Redemption Agreement, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. four fraudulent bank confirmations, each for €50,000. These emails purported to show that Lauran Trading was

transferring to Quadrant initial installments due under the Redemption Agreement to Mode and Davis.

11. During the Redemption Agreement negotiations, GUMRUKCU and Eratay caused the sending of emails from the murats Gmail account reflecting that Murat Gumrukcu had bought out GUMRUKCU's interest in Lauran Trading. As a result, the Redemption Agreement contained what appeared to be Murat Gumrukcu's signature. In truth, GUMRUKCU continued to control Lauran Trading and interacted with G.G. and Davis through the false and fraudulent communications from the murats Gmail account.

12. Between November 2015 and May 2016, GUMRUKCU and Eratay caused the transmission of various wire communications falsely representing that Lauran Trading was performing on two of its obligations under the Redemption Agreement: that funds for the Mode buyout would be sent to Quadrant to fund the escrow account, including to cover the debt due and owed to Mode and Davis, and that Lauran Trading had $30 million available at the National Bank of Abu Dhabi to fund future oil deals. During this period, GUMRUKCU and Eratay caused wire communications to G.G. from false and fictitious third parties, including "Emre Aras," who was supposedly Murat Gumrukcu's personal assistant with an office in Hong Kong, and "Mohammed Salem," who was supposedly working with the Washington, D.C. branch of the National Bank of Abu Dhabi. Nevertheless, G.G. did not receive money from the National Bank of Abu Dhabi. During this period, Davis complained to G.G. about Lauran Trading's failure to pay him funds due to Mode under the Redemption Agreement, as described above, and GUMRUKCU's suspectedly false claims.

13. In May 2016, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. fraudulent statements about Murat Gumrukcu having over $30 million in a Wells Fargo

bank account to cover Lauran Trading's obligations. G.G., however, did not receive money from Wells Fargo. Instead, GUMRUKCU falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, and which G.G. could in turn use to pay Mode and Davis. By this point in time, Mode and Davis were owed over $500,000 under the Redemption Agreement. On or about May 13, 2016, GUMRUKCU sent G.G. a picture of a fraudulent Bank of America cashier's check in the amount of $490,000. At that same time, GUMRUKCU deposited into Quadrant's bank account four checks for $150,000 each, all of which described GUMRUKCU as a Turkish prince. These checks eventually bounced because GUMRUKCU's account had insufficient funds. Prior to the last check being returned for insufficient funds, G.G. sent Davis $75,000 as partial payment of Lauran Trading's obligation to pay Mode and Davis. The return of GUMRUKCU's bad checks caused G.G. to use personal funds to cover the $75,000 Lauran Trading payment to Mode and Davis. After the bounced check incident, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. two false bank confirmation statements purporting to show that GUMRUKCU's father was wiring $600,000 to Quadrant to fund Lauran Trading's obligations to pay funds to Mode and Davis. G.G., however, did not receive any funds from GUMRUCKU or his father during 2016. By the end of 2016, G.G. had paid out over $100,000 from his personal funds to cover Lauran Trading's obligations to pay Mode and Davis under the Redemption Agreement.

    14. During the second half of 2016, GUMRUKCU and Eratay caused the murats Gmail account to make a variety of false claims to delay Lauran Trading's obligations, including false statements about Murat Gumrukcu's travel and payments to G.G. For example, on or about December 13, 2016, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. a

fraudulent bank confirmation for $500,000 supposedly from UBS, a Swiss bank. G.G., never received any funds from UBS.

15. On February 9, 2017, GUMRUKCU was arrested on state fraud charges in California, including charges related to the bounced checks deposited in Quadrant's account in May 2016. That same day, Eratay deleted the murats Gmail account. Three days later, Eratay began using a new Google email to help GUMRUKCU pose as Murat Gumrukcu, murtagumrukcu@gmail ("the murtag Gmail account"). Eratay, at GUMRUKCU's direction, sent G.G. numerous fraudulent emails from the murtag Gmail account between February 2017 and January 2018, including emails falsely claiming that Lauran Trading was obtaining funds from UBS to satisfy Lauran Trading's obligations to fund the escrow account and pay Mode and Davis money due under the Redemption Agreement as well as provide financing for future oil deals. These funds would also repay G.G. the money he extended on Lauran Trading's behalf which was due to Davis and Mode. Eratay, at GUMRUKCU's direction, also sent G.G. numerous emails from the murtag Gmail account falsely documenting Murat Gumrukcu's travel and illnesses.

16. By May 2017, GUMRUKCU was involved in negotiating a multimillion-dollar biotech merger relating in part to GUMRUKCU's alleged discovery of a cure for human immunodeficiency virus (HIV). GUMRUKCU discussed these negotiations with G.G. At this time, Davis was actively complaining to G.G. about the fraudulent representations made to G.G., suggesting that criminal charges against GUMRUKCU should be pursued. G.G. relayed Davis's claims to GUMRUKCU and noted that GUMRUKCU had exposure from the events over the past two years. Davis agreed to "stand down" from legal proceedings in exchange for $20,000 in early May and another $20,000 in late May, paid by GUMRUKCU through G.G. In June 2017,

after learning that G.G. would be interviewed by law enforcement investigating the pending California fraud case, GUMRUKCU paid G.G. over $100,000, in part to reimburse G.G.'s 2016 payment to Mode and Davis on behalf of Lauran Trading.

17. Later in 2017, Davis continued making fraud allegations to G.G., who passed the allegations on to GUMRUKCU. Throughout their relationship, G.G. relayed certain information he received from GUMRUKCU to Davis and from Davis to GUMRUKCU, in his role as middleman. By mid-November 2017, GUMRUKCU and Eratay, using the murtag Gmail account, proposed further partial payments to Davis to keep him from going public with his fraud claims. GUMRUKCU paid G.G. $65,000 in November, and G.G. in turn paid Davis $50,000. Nevertheless, Davis never received all of the money due to him under the Redemption Agreement. Thus, Davis was deprived of his right to obtain money.

18. After these payments, GUMRUKCU and Eratay avoided further communications with G.G as Murat Gumrukcu. By late December 2017, Davis was again threatening legal action, threats G.G. passed on to GUMRUKCU. On January 6, 2018, Davis was murdered in Vermont.

19. Between January 2015 and January 2018, in the District of Vermont and elsewhere, the defendant, SERHAT GUMRUKCU, knowingly and willfully conspired with others including Berk Eratay to commit wire fraud, in violation of 18 U.S.C. § 1343, by devising and executing a scheme to defraud. The dual objects of the scheme to defraud were to deprive G.G. of his personal funds expended on behalf of Lauran Trading and to deprive Gregory Davis of the funds due to him through Mode under the Redemption Agreement by attempting to deceive G.G. and Davis about various matters, including about funds available to GUMRUKCU and Lauran Trading, about the identity of individuals involved with GUMRUKCU and his

business activities, and about past and future financial transactions related to Lauran Trading and Mode Lauran.

(18 U.S.C. § 1349)

A TRUE BILL

███████████
FOREPERSON

Nikolas P. Kerest (PJV/ZBS)
United States Attorney
Burlington, Vermont
August 29, 2024