# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 5:22-cr-58 |
| Plaintiff, | |
| v. | |
| SERHAT GUMRUKCU, | |
| Defendant. | |

## SERHAT GUMRUKCU'S MOTION TO DISMISS COUNT THREE

Defendant Serhat Gumrukcu, by and through his attorneys of record, respectfully moves to dismiss Count Three of the Fourth Superseding Indictment ("FSI") filed at ECF 209 (August 29, 2024).[1]  Defendant contends that the FSI fails to state a claim for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.  This is defendant's first challenge to Count III as alleged in the FSI.  Defendant Gumrukcu requests oral argument at the February 4, 2025 hearing currently scheduled.

## MEMORANDUM OF LAW

### Statement of the Case

On October 6, 2023, Gumrukcu moved to dismiss Count Four of the Third Superseding Indictment ("FSI")— for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349—for failure to state a claim.  ECF 110.  He argued the federal wire and mail fraud statutes criminalize only schemes to deprive people of traditional property interests.  *See Ciminelli v. United States*, 143

---

[1] ECF refers to the docket entries generated by the Electronic Court Filing system. We pin-cite to the ECF-generated page numbers atop each filing.

S.Ct. 1121, 1123 (2023). As a result, the Government must prove not only that the wire fraud defendants "engaged in deception," but also the purported victim's money or property the "an object of their fraud." *Kelly v. United States*, 590 U.S. 391, 398; 140 S. Ct. 1565, 1571 (2020) ("The wire fraud statute thus prohibits only deceptive schemes to deprive the victim of money or property") (internal quotation, bracket, and citation omitted.) Because the FSI failed to allege that the charged conspiracy targeted Greg Davis's or Greg Gac's "property or money," Gumrukcu argued it was insufficient as a matter of law. He accordingly urged for dismissal of Count Four.

On the merits, the Government revealed that it was proceeding under a breach of contract theory pursuant to *Pasquantino v. United States*, 544 U.S. 349 (2005). *See* ECF at 7-8. [2] It also claimed the alleged conspiracy targeted Greg Gac's money and property as well. *See id.*, at 9-10.

Gumrukcu replied that the Government misread *Pasquantino* by confusing established tax debt with a claim for contract damages. *See* 544 U.S. at 352-57; *United States v. Adler*, 186 F.3d 574 (1999) (confirming the important distinction between "claims for money," which present a "chose in action," versus an established entitlement to money).

On January 19, 2024, the district court—the Honorable George Crawford, United States District Judge—held a hearing on the motion. One week later, "Judge Crawford denied Mr. Gumrukcu's motion to dismiss without prejudice and did not address the issue of whether a breach of contract is 'property' for a claim for conspiracy to commit wire fraud[.]" ECF 202 at 9 (Order addressing scope of Court's January 24, 2024 Order); *see also* ECF 136 (January 24, 2024 Order denying motion to dismiss without prejudice).[3]

---

[2] The Government also offered the baseless procedural argument that Gumrukcu's motion requires an evaluation of the trial evidence. Not so. *See* ECF 184 at 8-10; *see also* ECF 120 at 1-3.

[3] The Court's Order recognized that "[t]he indictment does not allege that Davis was deceived into paying anything[,]" but didn't directly address whether the alleged conspirators

On July 16, 2024, Gumrukcu brought his renewed motion to dismiss Count Four.  ECF 184.  After briefing and argument, on August 16, the Court issued an Order granting the motion in part and denying it in part.  ECF 202.  But like the Court's previous Order addressing Gumrukcu's motion to dismiss, *see* ECF 136, the Court's August 24 Order didn't resolve the *Pasquantino* or *Adler* issue, and did not rule definitively on whether the Government may proceed on a theory that "breach of contract" to pay money as a property right.  *See* ECF 202.  Nor did it address the Supreme Court's command in *Cleveland v. United States*, 531 U.S. 12, 26 (2000) (the fraud statutes "require[] the object of the fraud to be "'property' in the victim's hands[.]").

The Court instead observed "[i]t is unclear whether the Second Circuit would recognize that all choses in action[4] are a property interest for purposes of the wire fraud statute."  *Id.* at 10 n.2.[5]  But even accepting *arguendo* that Davis possessed a chose in action cognizable under section 1349, *viz.*, he could have sued to collect payment pursuant to the contract, Davis's alleged contract right to obtain money is by definition not property in his possession, and only an

---

agreed to obtain Davis's money, whether they succeeded or not.  Nor did the Court tackle the heart of the issue: it didn't address *Pasquantino* or *Adler* or *Cleveland*, and it did not decide whether the Government may proceed on a theory that "breach of contract" to pay money as a property right.  It instead left the issue unresolved.  *See* ECF 136 at 8-9.

[4] "A chose in action is an interest in property *not immediately reducible to possession*[,]" including "a financial interest such as a debt, a legal claim for money, or a contractual right." *John Wiley & Sons, Inc. v. DRK Photo,* 882 F.3d 394,407 n.6 (2d Cir. 2018) (emphasis added).

[5] "*Compare United States v. Porcelli,* 865 F.2d 1352, 1361 (2d Cir. 1989) (recognizing 'choses in action represented generally in the state tax law' as property), *with United States v. Miller,* 997 F.2d 1010, 1022 (2d Cir. 1993) (rejecting government's 'chose in action' theory under wire fraud statute which amounted to 'a never pursued lawsuit premised upon an entitlement that we have found to be without legal foundation[]')." *Id.*

alleged right to pursue through litigation. Under *Cleveland* and *Pasquantino* and *Adler*, that interest does not qualify as a property right within the ambit of the federal fraud statutes.

The Court then adopted Judge Crawford's prior ruling, *i.e.*, the TSI alleged sufficiently a section 1349 wire fraud conspiracy with respect to purported victim Greg Gac,[6] before holding that the TSI failed to do so with respect to Davis. The Court dismissed that portion of Count IV based on its failure to "allege that Mr. Davis was entitled to payment under the Redemption Agreement or was deprived of his contractual right to obtain that money." *Id*. at 13. Most succinctly, because the FSI failed to allege "that the object of the alleged conspiracy to commit wire fraud was *Mr. Davis's* money or property, the FSI fail[ed] to state an essential element of wire fraud and [was] defective in that respect. *See United States v. Dupree,* 870 F .3d 62, 70 (2d Cir. 2017) ("An indictment that does not set out all of the essential elements of the offense charged is defective.") (internal quotation marks and citation omitted)." ECF 202 at 14. Accordingly, the Court granted Gumrukcu's motion to dismiss Count Four as it pertained to Davis, but without prejudice to the return of a different indictment. *Id*.

Two weeks later, the Government obtained a Fourth Superseding Indictment which re-alleged, now as Count III, a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. ECF 209. It suffers similar defects as the previously-dismissed Count IV.

---

[6] As shall be shown *infra.*, at 22-23 Judge Crawford premised his finding with respect to Gac, which the Court later adopted, on an errant reading of the TSI: that "Gumrukcu and Eratay engaged in deceit *in order to persuade* [Gac] to send his own money to Davis." ECF 136 at 7 emphases added). But the TSI did not make that claim.

In any case, the amended allegations now presented in Count III do not allege that Gumrukcu or Eratay tried to persuade Gac to send Davis money, or even knew about Gac's decision to send the money before Gac sent it. *See* ECF 209 at 3-10 (setting forth Count III). As a result, that finding of "alleged persuasion" is absent from Count III, and may not be relied upon to identify Gac as a victim of the alleged conspiracy to obtain money through wire fraud.

Defendant Serhat Gumrukcu now respectfully moves to dismiss Count III as realleged in the Fourth Superseding Indictment. Count III as realleged does not allege that Davis "was deprived of his contractual right to obtain" payment under the contract, and thus doesn't address the Court's stated reason for dismissing that count previously. *See* ECF 202 at 10. Nor does Count III allege that Davis "was entitled to payment under the Redemption Agreement" *from Gumrukcu,* and thus fails to address the Court's other stated basis for dismissal. Moreover, as set forth below, *Cleveland*, *Pasquantino*, and *Adler* demonstrate that Davis's purported right to payment under a contract (for which he didn't perform, *i.e.*, Davis didn't *do* or *provide* anything to obtain his purported right to payment) does not qualify as a "property right" cognizable under section 1349. The fact that no Sheriff could have been ordered to seize any monies Gumrukcu then held proves as much. Unlike a tax obligation—which vests immediately in the State— Gumrukcu's alleged contractual obligations "to raise funds" for Mode did not provide Davis a property interest in *any* money in Gumrukcu's possession. Most succinctly, it was "at best, ordinary debt; *i.e.*, potential [claims for breach damages]." *Miller*, 997 F.2d at 1021. Or as the Government ultimately confesses in Count III: it alleges "Davis was deprived of his right to obtain money." ECF 209 ¶ 17. But that is not a cognizable property interest in Gumrukcu's (or any other person's or entity's) money. Davis had the right to sue for breach; he didn't.

Gumrukcu is aware of the Court's comments suggesting that he must present cause to present a Rule 12 challenge to a Count never previously challenged before, although he may be misreading the colloquy. *See* September 27, 2024 Reporter's Transcript at 14:12-25. In any event, he respectfully contends that Rule 12 provides criminal defendants the opportunity to challenge the sufficiency of any charge presented by grand jury indictment. Fed. R. Crim. P. 12; *see also* ECF 202 at 8 (Order addressing Rule 12 standard).

In response to the Court's Order dismissing Count IV in part, *see* ECF 202, the Government thereafter sought and obtained a new indictment which included new allegations that purport to set forth a cognizable claim of conspiracy to commit wire fraud in Count III. ECF 209. Gumrukcu has never had an opportunity to challenge the sufficiency of that re-alleged count, and he respectfully contends that Rule 12 provides him that very opportunity. Fed. R. Crim. P. 12(b)(3)((B)(v); *see* Fed. R. Crim. P. 51(b); *see also* ECF 202 at 8 (Order setting forth Rule 12 standard).

## ARGUMENT

### A. The allegations.

The FSI alleges as Count III a conspiracy to commit wire fraud. ECF 209 at 3-10. The Government therein contends that Count III sets forth sufficient facts that, if believed, would support the charge that Gumrukcu "knowingly and willfully conspired with others including Berk Eratay to commit wire fraud, in violation of 18 U.S.C. § 1343." ECF 209 at 9 (¶ 19). The Government claims that the "dual objects of the scheme to defraud were to deprive [Gac] of his personal funds expended on behalf of Lauran Trading and to deprive Gregory Davis of the funds due to him through Mode under the Redemption Agreement" (which it omits from the indictment). *Id*.

Gumrukcu, as he must, accepts the indictment's allegations as true for the purposes of this motion. Nothing presented herein, however, should be considered his agreement with those allegations in any respect. Gumrukcu has denied the allegations and entered a not guilty plea. *See* September 27, 2024 Reporter's Transcript at 3:16-19. In the FSI, the Government details alleged conversations between Gumrukcu, Berk Eratay, Greg Gac, Gregory Davis, and others. Despite multiple pages detailing alleged communications and transactions, Count III of the FSI fails to allege the essential elements of the crime charged.

**B. Legal standards.**

The Fifth Amendment requires that an indictment set forth the elements of the offense, charged with sufficient precision to protect against prosecution for crimes based on evidence not presented to the grand jury, and informs the defendant of the charges he must meet with enough detail that he may plead double jeopardy in a future prosecution. *Hamling v. United States,* 418 U.S. 87, 117 (1974). Accordingly, a motion to dismiss a count in an indictment must be granted where the indictment "fails to allege the essential elements of the crime charged." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000); *see United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (dismissal required where conduct alleged is not prohibited by language of statute); *United States v. Heicklen*, 858 F.Supp 2d 256, 262 (S.D.N.Y. 2012) (where "the facts alleged [in an Indictment] do not constitute an offense as a matter of law," dismissal is appropriate). In addition, "[t]he Indictment Clause of the Fifth Amendment requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (citation omitted). Or as the Supreme Court instructed long ago:

> 'Undoubtedly the language of the statute may be used in the general description of an offence, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.' *United States v. Hess*, 124 U.S. 483, 487 (1888).

*Hamling*, 418 U.S. at 117-18 (parallel citations omitted). Congress included this constitutional requirement in the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 7(c)(1). In considering a motion to dismiss, the court will "examine the indictment as a whole, accept as

true the facts alleged, and determine only whether the indictment is valid on its face." *United States v. Elliott*, 363 F. Supp. 2d 439, 450 (N.D.N.Y. 2005).

As for the substantive counts, the law is likewise well established. The essential elements of a wire fraud violation are: (1) "a scheme to defraud"; (2) "money or property as the object of the scheme"; and (3) "use of the wires to further the scheme." *Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (citation omitted). The Government must prove not only that the wire fraud defendants "engaged in deception," but also the purported victim's money or property was "an object of their fraud." *Ciminelli v. United States*, 143 S.Ct. at 1126 (citing *Kelly*, 140 S.Ct. at 1571; *see also Kelly, id.* ("The wire fraud statute thus prohibits only deceptive schemes to deprive the victim of money or property") (internal quotation, bracket, and citation omitted). "The original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *Cleveland v. United States*, 531 U.S. 12, 18-19 (2000) (citing *McNally v. United States*, 483 U.S. 350, 360 (1987)).

Most succinct is the wire fraud statute, section 1343. It proscribes schemes "*for obtaining money or property* by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "The gravamen of the [wire fraud] . . . the 'intent to obtain money or property from the victim of the deceit.'" *United States v. Bunn*, 26 Fed.Appx. 139, 142 (4th Cir. 2001) quoting *United States v. Utz*, 886 F.2d 1148, 1151 (9th Cir. 1989) (per curiam). Nowhere does the indictment allege that the conspirators tried to obtain Davis's money, which is necessary. As set forth below, every case cited to the Court involves defendants who sought (and mostly obtained) money *from* the victim; in this case, the alleged scheme involved Gumrukcu giving Davis hundreds of thousands of dollars for nothing in return. ECF 209 at 8-9.

This is by definition not a scheme to obtain money or property *from* Davis. Indeed, the Court made the same observation about the TSI at the prior hearing:

> It talks about the fraud, but it does not address what property was
> given up by GG and Gregory Davis in response to the wire fraud.

July 29, 2024 Reporter's Transcript at 24:19-21.

In addition, and consistent with the text of section 1343, the fraud statutes "require[] the object of the fraud to be "'property' in the victim's hands[.]" *Cleveland*, 531 U.S. at 26. "It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id*. at 15.

The Government must also show "that some actual harm or injury was contemplated by the schemer. Because the defendant must intend to harm the fraud's victims, misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir. 1994) (quotations, citations, and brackets omitted).

With respect to conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, that statute proscribes conspiring to commit a predicate fraud offense and is "subject to the same penalties as those prescribed for the offense." 18 U.S.C. § 1349. "To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; [and] that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy." *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012) (quoting *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999)). Thus, the section 1349 conspiracy requires allegations that Gumrukcu and Eratay agreed, *inter alia*, to target Gac's and/or Davis's money or property through deception. Deceit through the wires does not suffice;

the prosecution must allege and prove that the defendants lied to obtain Gac's and Davis's money and property.

**C. Argument.**

The FSI fails to state a claim for section 1349 conspiracy to commit section 1343 wire fraud. The FSI does not allege that Davis had any oil to sell or any money to target, or that either defendant targeted *any* property or money he possessed. Rather, the FSI alleges the opposite: that the money at issue was money Gumrukcu possessed and would in the future *provide to* Davis and Gac. *See* ECF 202 at 3-9 (¶¶ 2, 5, 6, 7, 8, 9, 12, 13, 14, 15). The FSI alleges that Gumrucku, Berk Eratay and others associated with Lauran Trading provided fraudulent proof of funds letters. But nowhere in the seven pages of the FSI detailing the communications and transactions does the Government allege that there was an attempt to take any money or property *from* Mr. Davis or Mr. Gac. As such, the FSI does not meet the requirements of section 1343 or section 1349.

This fatal flaw merits dismissal of Count III. Like the Government did in *Kelly*, the FSI focuses on allegations of deceit; but to prosecute an alleged violation of sections 1343 and 1349, "the deceit must also have had the 'object' of obtaining [the victim's] money or property." *Kelly*, 140 S.Ct. at 1572. This necessary element, however, is nowhere pleaded in FSI, likely because at no point did Gumrukcu target Davis's or Gac's money or property.

The FSI instead transmutes Davis's purported contract rights under the Redemption Agreement to property rights, as if the money purportedly owed under the contract was already Davis's money. *See* ECF 202 at 6-8 (¶¶ 13-14). The FSI makes much of the alleged fraudulent communications allegedly sent by Gumrukcu or Eratay. The allegations in the FSI set forth contract claims, not evidence of criminal wrongdoing. The Government's attempt to criminalize

this conduct is at the heart of the Supreme Court's concern in *Ciminelli* and *Kelly*: making "a federal crime of an almost limitless variety of deceptive actions traditionally left to state contract and tort law—in flat contradiction with our caution that, '[a]bsent [a] clear statement by Congress,' courts should 'not read the mail [and wire] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States.'" *Ciminelli*, 143 S.Ct. at 1128 (citing *Cleveland v. United States*, 531 U.S. at 27).

### 1. The Government's prior response to Gumrukcu's motion lacked merit.

The Government defended Gumrukcu's initial motion to dismiss by arguing for the sufficiency of the indictment based on a breach of contract theory: "the defendants' scheme sought to deprive Gregory Davis of money he was owed under the Redemption Agreement," which was executed in November 2015.  ECF 112 at 5 (citation omitted).[7]  The Government then confirmed its breach of contract theory as follows:

> Gumrukcu and G.G. recognized Davis's financial interest in Mode Lauran and, after the problems getting Mode Lauran off the ground, Gumrukcu agreed to buy out Davis's interest. The buyout of Davis's property interest in Mode Lauran was agreed to in the Redemption Agreement. *Id.* ¶ 9.  A principal object of the charged scheme was avoiding paying that debt to Davis. In that contract, Gumrukcu's company, Lauran Trading, agreed to pay money to Mode in consideration for the lost business opportunities in 2015. The indictment identifies the Redemption Agreement[8] but does not describe all its terms. Count Four, however, makes clear that the Redemption Agreement addressed two issues: the buyout of

---

[7] The Government next argued that Gac "was deprived of monies he paid Davis and others[,]" ECF 112 at 5, 9-10.  We address that argument in the next section.  Suffice it to say for now, the Count Three doesn't allege that Gumrukcu and Mr. Eratay "agreed" to target Gac or his money or his property, nor that they persuaded him in any way to provide any money to Davis, which is fatal to its sufficiency.

[8] The so-called Redemption Agreement is titled a "Summary of Terms" for "Redemption of Mode Interests, Commencement of Mode Management Agreement."  We refer to it as either the Term Sheet or the so-called Redemption Agreement.

> Mode's interest in the Joint Venture, creating a debt to Mode and
> Davis, and plans for additional oil trading financed by Lauran
> Trading. *Id.* But after November 2015, Lauran Trading owed Davis
> at least $950,000. *Id.* Count Four thus makes clear that the
> defendants deceived G.G. and Davis to avoid paying Davis money
> that he was owed.

ECF 112 at 7.

But monies owed under an alleged breach of contract do *not* sound in fraud. The

Government thus errs in its reliance on *Pasquantino v. United States*, 544 U.S. 349 (2005),

because it confuses established tax debt with a claim for contract damages. "The question

presented in th[at] case [was] whether a plot to defraud a foreign government of tax revenue

violates the federal wire fraud statute, 18 U.S.C. § 1343 (2000 ed., Supp. II)." 544 U.S. at 352-

53. The Court addressed the common law revenue rule that "barred courts from enforcing the

tax laws of foreign sovereigns[,]" and held that the scheme alleged by the Government not

contravene the common law rule. *Id.*

On its way to its decision, the Court emphasized that Canada's entitlement to tax

payments arose when the defendants imported liquor into Canada but failed to pay the required

excise taxes. *Id.*, at 353-54. Critical to the Court's decision was Canada's established and

uncontested legal right to the tax revenue upon importation. *Id.* Or as the Court succinctly

explained the property element: "the Government alleged and proved that petitioners' scheme

aimed at depriving Canada of money to which it was ***entitled by law***." *Id.*, at 357 (emphasis

added).

More simply, the Court held that "the right to uncollected taxes is an 'entitlement *to*

*collect* money ..., the possession of which is "something of value."'" *Hemi Group, LLC v. City*

*of New York, N.Y.*, 559 U.S. 1, 30 (Breyer, J., joined by Stevens and Kennedy, JJ., dissenting)

(quoting *Pasquantino*, 554 U.S. at 355 (quoting *McNally v. United States,* 483 U.S. 350, 358, (1987)) (parallel citations omitted). But Davis had no entitlement to collect money. [9]

Whatever the merits of Davis's purported claim for breach of contract—and there is none—the indictment does not (because it cannot) allege that Davis was "entitled by law" to any money from Lauran Trading. Rather, his claim for monies owed remains today unadjudicated, and the indictment fails to allege that the defendants sought to take money or property that Davis actually possessed. *Cleveland v. United States*, 531 U.S. 12, 15 (2000) ("It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for the purposes of the mail fraud statute, the thing obtained *must be property in the hands of the victim.*") (emphasis added); *see also Pasquantino*, 544 U.S. at 355 (quoting same). In sum, the indictment fails to allege that the alleged conspiracy conspired to take Davis's property or money; it only alleges that Davis had a claim for breach of contract that he never pursued, and which defendants didn't target in the scheme alleged. [10]

---

[9] To the extent that the Government contends that the FSI alleges the Redemption Agreement establishes a breach of contract requiring immediate payment, that argument fails out of the gate. Assuming Vermont law governs the alleged Redemption Agreement—a proposition that's far from clear as alleged in Count III—the Government would still need to allege the breach of a valid contract mandating immediate payment, *viz.*, an agreement between two parties, supported by consideration, and performance by the party demanding payment. *See e.g.*, *Lloyd's Credit Corp. v. Marlin Mgmt. Servs., Inc.*, 158 Vt. 594, 598–99, 614 A.2d 812, 814–15 (1992). In any case, the FSI comes nothing close to even alleging a valid, enforceable contract, which is necessary even under *its* breach-of-contract theory.

[10] *Pasquantino* compels the result in *Shellef*, two years later. After rejecting the Government's right-to-control and barring its use at retrial, *Shellef* considered a tax liability theory of wire fraud and found that depriving the victim of tax funds *due and owing* as a matter of law, constituted property under section 1343. 507 F.3d at 109-10. That tax liability of the victims arose as a matter of law, just like *Pasquantino*. This "ordinary debt" does provide a property interest in the alleged payor's assets. Most simply, a tax liability established by law is nothing like Count III's claim for a never-litigated breach of contract allegation based on Davis's demand for Gumrukcu's money.

The Fourth Circuit's decision in *United States v. Adler*, 186 F.3d 574 (1999), confirms this important distinction between "claims for money," which present a "chose in action" versus an entitlement to money, which is a different property right. The case concerned Adler, who through his company Adler Industries, contracted with House of Blues to produce merchandise, and then contracted with Printgear to obtain the blank shirts Adler would use to fulfill the House of Blues order. *Id.*, at 575. Adler claimed that House of Blues breached the parties' contract, and House of Blues settled that claim for more than $800,000. *Id.* It was uncontested that Adler continued to owe Printgear nearly $500,000 under their subcontract. *Id.*[11] But Adler didn't pay it, and instead, "sent Printgear by facsimile an intentionally false list of payments from the settlement. Among other things, the list did not disclose the payments to Adler and Kennedy." *Id.* Printgear subsequently obtained a default judgment against both men. *Id.*[12]

The Government then charged Adler with wire fraud based on Adler's deceptions about the House of Blues settlement monies, and the jury convicted. But the District Court entered a judgment of acquittal, and the Fourth Circuit rejected the Government's appeal and affirmed.

Like here, the Court recognized that "there are only two kinds of property of which Printgear could have been deprived—its chose in action on Adler Industries' debt or the particular money itself that Adler Industries received from the House of Blues settlement."[13] *Id.* at 576.

---

[11] Here, of course, Gumrukcu contests that he or Lauran Trading owed money to Davis or Gac.

[12] *Adler* had also absconded to Costa Rica after taking as a "bonus" half of the funds in his company, with his business partner Kennedy taking the other half. *Id.*

[13] Because the indictment does not allege that Davis had a claim to any particular money in Lauran Trading's possession, we will not address the Court's treatment of such a claim in *Adler*. Suffice it to say, the Court *in Adler* rejected the Government's arguments because like Davis, the only property right Printgear ever possessed was a chose in action against Adler, and

As for its "chose in action"—the breach of contract claim—Printgear had a property interest. But the indictment there did not allege, and the facts did not support, a finding that the defendant deprived Printgear of his chose in action. *Id*. at 576. Indeed, Printgear ultimately sued and won.

Or as a district court recently summarized when reversing wire fraud convictions pursuant to Rule 29:

> The *Adler* court noted a distinction between property and a right to that property for purposes of a wire fraud violation, in which the court concluded a creditor-victim's interest in funds to satisfy an unsecured debt — in which the funds were directed to another recipient through deceit by the debtor-defendant — did not have a sufficient interest to meet a wire fraud violation. *Id.* at 577.

*United States v. Barringer*, 481 F.Supp.3d 596, 603 (W.D. Va. 2020); *see also United States v. Vought*, 2006 WL 1662882 (D. Conn. Jun. 15, 2006) (summarizing *Adler* as "affirming dismissal of wire fraud conviction where defendant had been charged with failing to pay a subcontractor the balance of the contract price upon receiving settlement funds for breach of contract by a second subcontractor, reasoning that whatever interest the subcontractor had in the 'particular settlement proceeds received [by defendant]' did not constitute a property right sufficient for fraud prosecution, finding that the subcontractor's 'claim on debt is distinct from a claim to particular funds to satisfy that debt and [ ] the mere existence of the former does not give rise to the latter').

The same is true here. While Davis claimed to have a chose in action to sue Lauran Trading for breach of contract—Gac was not a party to the Redemption Agreement—the

---

the scheme did not deprive Printgear of its ability to sue. The same is true of the scheme alleged in the indictment.

indictment does not allege (nor could it properly) that Davis maintained a "property interest" in funds within (or not within) Gumrukcu's possession, even if he was owed money from Gumrukcu under a contract. Davis didn't have a "property interest" in that money, plain and simple.

So too, Count III fails to allege anything to deprive either Davis or Gac of that claimed right, or that the defendants sought to deprive them of a right to sue. In short, they perhaps could have sued, but didn't. *Adler* makes plain that a claim for breach of contract is not a cognizable property interest unless the object of the scheme is to deprive the contracting party of that right. The indictment makes no such allegations.

The Second Circuit's decision in *Miller* is similar to *Adler*, and likewise supports Gumrukcu's position. There, the Government charged defendants with depriving an investment group of a "'chose in action,' *i.e.*, its right to bring a lawsuit to recover the profits from the sale of" apartments the Group wanted to invest in. *Miller*, 997 F.2d at 1921. The Government urged affirmance based on a tax cases that imposed "direct and immediate obligation[s]" to pay sales taxes, presaging the distinction the Supreme Court would announce in *Pasquantino*. But the Second Circuit found this distinction critical: "sales taxes are just that—a tax obligation—and not ordinary debt." *Miller*, 997 F.2d at 1021.

It then observed that *Miller* presented "at best, ordinary debt; *i.e.*, potential [claims for breach damages]." *Id.* In reversing the fraud convictions, *Miller* ruled that "the upshot of extending the 'chose in action' rationale to such situations would be to convert every breach of a fiduciary duty that is not openly confessed into a deprivation of § 1341 'property.' Such an extension is plainly inconsistent with the dictates of *McNally* and *Carpenter*." So too here.

Without *any* authority, the Government nonetheless claims that Davis's chose in action itself establishes a <u>right</u> to money, which it most certainly does not: as *Miller* made plain, it's an ordinary debt.  Davis could not have "assigned, traded, bought, and otherwise disposed of" Lauran Trading's alleged debt to him; rather, he only could have assigned or traded or sold his chose in action.  *See United States v. Mancuso*, 42 F.3d 836, 845 (4th Cir. 1994) (property is anything in which one has a "right that could be assigned, traded, bought, *and* otherwise disposed of.") (emphasis added); *see also supra.*, at 3, n.4.  But that is not the scheme alleged.  In sum, *Adler* establishes the right to seek recompense through the Courts by pursuing a chose in action does not establish a right to money or property other than the chose in action.  *See also United States v. Handakas,* 286 F.3d 92 (2d Cir.2002), *overruled on other grounds by United States v. Rybicki,* 354 F.3d 124 (2d Cir.2003) ("Even someone fully familiar with §§ 1341 and 1346, and our cases, would lack any comprehensible notice that federal law has criminalized breaches of contract.").

The indictment does not allege that defendants tried to deprive Davis or Gac or that limited right.  Accordingly, the indictment fails to allege a cognizable claim of conspiracy to commit wire fraud, and the Court should dismiss it.

### 2. The Court's Order dismissing Count IV (in part), now realleged as Count III, supports Gumrukcu's challenge.

The Court resolved Gumrukcu's prior challenge to Count IV without resolving the *Pasquantino/Cleveland/Adler* challenge directly.  *See* ECF 202 at 10-14.  It suggested that the Third Circuit's now vacated decision[14] in *United States v. Kousisis*, 82 F.4th 230, 242 (3d Cir. 2023) supported the Government's contract theory.  ECF 202 at 11 ("disputed contracts

---

[14] *See Kousisis v. United States*, 144 S.Ct. 2655 (June 17, 2024).

themselves to indeed constitute 'property.'").  But that observation, even putting aside that lack of authority in that now-vacated opinion, doesn't affect Gumrukcu's challenge at all.  This is true because nowhere does Count III allege that Gumrukcu conspired with any person to defraud Davis (or Gac) of any "chose in action" to pursue contract damages, *viz.*, the FSI doesn't not allege that Gumrukcu targeted that "property interest" 'in the contract.  *Kousisis* didn't address this issue.  Moreover, it focused on the defendant's undisputed *pursuit and receipt of money from* the Department of Transportation based on fraudulent statements.  Count III alleges no such thing, *viz.*, it does not identify any money from Davis or Gac that Gumrukcu pursued, much less received, from Davis or Gac.  Rather, those parties sought money *from* Gumrukcu.

The Court's citations to *United States v. Bolos*, 104 F.4th 562, 50 (6th Cir. 2004), *United States v. An*, 2024 WL 2010017, at *8 (E.D.N.Y. May 7, 2024), *United States v. Venkata*, 2024 WL 86287, at *10 (D.D.C. Jan. 3, 2024), and *United States v. Tuchinsky*, 2023 WL 8188423, at *4 (D. Utah Nov. 27, 2023) further support Gumrukcu's analysis.  *Bolos* addressed a property right: the defendant's pursuit and receipt of money from the victim Pharmacy Benefit Managers ("PBMs").  104 F.4th at 565.  And *Bolos* made plain that the federal fraud statutes "only criminalize[] one kind of scheme: 'schemes intended to deprive people of *their* money or property.'" *Id*. quoting *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) (emphasis added).  Again, Count III alleges the opposite: that Gumrukcu schemed *not* to *give* Davis Gumrukcu's money.  Or as the *Bolos* Court made even plainer: "The government is not charging [Bolos] with fraud to obtain the *contracts* with PBMs, but with fraud to obtain the *money* from them."  *Id*. at 570; *see also* ECF 202 at 11 n.3 (citing and quoting same).  No such facts are alleged here, much less that Gumrukcu sought to obtain Davis's alleged oil or money through fraud.  That failure shows the insufficiency of the allegations in Count III.

*An* is similar: the indictment alleged as the object of the fraud money held in victim

banks. *An*, 2024 WL 2010017, at *7 ("the Indictment in this case frames the harm to the banks

as the *Ans' deprivation of deposited funds in accounts held by the victim banks*.") (emphasis

added). This case alleges the opposite, and never identifies any money or property *possessed* by

Davis and targeted by Gumrukcu. This failure is fatal under settled Supreme Court precedent:

the fraud statutes "require[] the object of the fraud to be "'property' in the victim's hands[.]"

*Cleveland*, 531 U.S. at 26. "It does not suffice, we clarify, that the object of the fraud may

become property in the recipient's hands; for purposes of the mail fraud statute, the thing

obtained must be property in the hands of the victim." *Id*. at 15. Count III's failure to make any

such allegation—that Gumrukcu schemed to obtain money already "in the hands of" Davis—

renders it fatally defective.

And nothing in Count III alleges that Gumrukcu sought to defraud Davis or Gac out of

the contract; they could have sued for contract damages at any time. *See also Ciminelli*, 598

U.S. at 317–18, 143 S.Ct. 1121 (Alito, J., concurring) (the Government did not attempt to

convict the defendant for defrauding the state out of "a traditional form of property, *viz.*, valuable

contracts.")

These allegations are the same as those the Fourth Circuit rejected in *Adler*: nothing in

the alleged scheme affected the sole property right Davis allegedly possessed: a chose in action.

*An* made this very point when citing to *Venkata*:

>     one district court, in a decision this Court finds persuasive, recently
>     rejected a post-trial *Ciminelli* challenge where the court had
>     instructed the jury that it "needed to find that the defendants
>     'intended to deprive' the victim ... 'of money or property or [to]
>     bring about some financial gain to the person engaged in the
>     scheme' " and there was "sufficient evidence for the jury to find
>     beyond a reasonable doubt that the 'object of the fraud' was an

> unduly lucrative contract." *See United States v. Venkata*, No. 20-cr-66 (RDM), 709 F.Supp.3d 9, 28-29 (D.D.C. Jan. 3, 2024). As the Supreme Court explained in *Shaw v. United States*, 580 U.S. 63, 72, 137 S.Ct. 462, 196 L.Ed.2d 373 (2016), a "plan to deprive a bank of money in a customer's deposit account" similarly implicates a property interest.

*An*, 2024 WL 2010017, at *8. In other words, the Government well can allege that the object of a fraud is to obtain monies under a contract obtained through deception, but that is not what it alleges here.

*Venkata* shows the same problem with the indictment here. There, the defendant participated in a scheme to obtain money *from* the United States through deception. *Venkata*, 709 F.Supp.3d 9, 28-29 (2024); *see also* ECF 202 at 11(-12) n.3 ("the object of the scheme [alleged in *Venkata*] was 'to obtain a traditional form of money or property—about $150,000 in the first year and roughly $40,000 a year after" (quoting *Venkata*). Here, the indictment alleges no such thing, such as Gumrukcu tried to defraud Davis of the oil he was purportedly bringing to the table under the Redemption Agreement. Nor does it allege he tried to take money or property *from* Davis. It claims Gumrukcu didn't give Davis Gumrukcu's money. That's not a property interest cognizable under the federal fraud statutes.

Last, *Tuchinsky* proves the same permissible approach: the Government can prosecute wire fraud that identifies the victim's money as the object of the fraud, *viz.*, the property the defendant sought to obtain from the victim. 703 F.Supp.3d at 4. Most bluntly: Count III does not allege that Gumrukcu sought to obtain anything property or any money *from* Davis, which is required under the fraud statutes. Because the alleged scheme did not target any money Davis *possessed*, it does not state a section 1349 conspiracy.

The Court should thus dismiss Count III.

3.  **The Government's allegations regarding Greg Gac's conduct do not save Count III from its deficiencies.**

Last, the Government's allegation that Gac decided, on his own, "to pay Davis . . .

$30,000 in the first half of 2015 without receiving any repayment from Gumrukcu until later in

2015[,]" ECF 209 at 4-5 (¶ 8), does not state a section 1349 claim.

Simply put, this allegation cannot rescue Count Three. The Government's phrasing alone

gives it away when it argues "[t]he indictment outlines how the scheme deprived G.G. of his own

money." ECF 112 at 9; *see also id.*, at 10 (Claiming that "G.G. lost money based on defendant's

fraud scheme." But that's not the question because this is not a civil case addressing reasonably

foreseeable damages.

Rather, the question at bar is: where does the indictment allege that the allege

conspirators *agreed*, as part of their scheme, to target Gac's money? The answer is nowhere.

The indictment alleges that Gac decided, on his own and not as part of Gumrukcu's alleged

scheme, to front money to Davis. This proves fatal to this theory to resurrect Count Three. *See*

*United States v. Mahaffy*, 693 F.3d 113,123 (2d Cir. 2012).

> What distinguishes the offense of conspiracy from a substantive
> offense, is that "agreement is the essential evil at which the crime
> of conspiracy is directed." *Iannelli v. United States,* 420 U.S. 770,
> 777 n. 10 (1975). The agreement itself "remains the essential
> element of the crime." *Id.* Thus the government must prove the
> existence of an *agreement* to achieve an unlawful objective and the
> defendant's *knowing* participation in that agreement. *United States*
> *v. Adkinson,* 158 F.3d 1147, 1155 (11th Cir.1998).

*United States v. Chandler*, 388 F.3d 796, 806 (11th Cir. 2004) (parallel citation and footnote

omitted). *See also Kelly v. United States*, 140 S.Ct. 1565, 1572 ("the deceit must also have had

the 'object' of obtaining [the victim's] money or property."); *United States v. Lew,* 875 F.2d 219,

221 (9th Cir.1989), (for mail fraud, "the intent must be to obtain money or property from the one who is deceived.").

Gumrukcu acknowledges that the Court entertained this argument about Gac before adopting Judge Crawford's prior ruling.  ECF 202 at 10.  Respectfully, Judge Crawford based his decision on an errant reading of the TSI: that "Gumrukcu and Eratay engaged in deceit in order to persuade [Gac] to send his own money to Davis."  ECF 136 at 7.  This Court understood this finding to be the linchpin of Judge Crawford's ruling:

> I read, obviously, Judge Crawford's order, and he found that there were sufficient grounds and sufficient notice in Count 4 of the third superseding indictment to alert a reasonable person that the person who was the victim of the fraud was Mr. Gac, *he was allegedly defrauded into providing his own money to pay a debt that he did not have by the defendant.*

July 29, 2024 Reporter's Transcript at 3:4-10 (emphasis added).

Now we look to the FSI: Count III does not allege that Gumrukcu requested or otherwise sought to persuade Gac to pay Davis anything.  It instead alleges that Gac volunteered his money to Davis without persuasion by or request from Gumrukcu that he do so. Nor does the indictment allege that there was an agreement by Gumrukcu and Eratay to do so, a necessary element of the crime of the conspiracy. To impose criminal liability for fraud, an indictment must allege that the defendant had as his object to obtain the money or property of another. There is nothing in the indictment to suggest that Gumrukcu and Eratay's agreement was to obtain Gac's money.

Further, the claim against Gac fails for the same reason it fails against Davis. The government presupposes that the money was owed to Davis by Gumrukcu, and that Eratay and Gumrukcu conspired to steal Gac's money to pay the debt owed to Davis.  But of course, as argued above, the indictment does not allege that Gumrukcu owed any money to Davis (this was

also before the Redemption Agreement was signed, so at this time, all that was in place was an agreement for Gumrukcu to find financing for future oil deals). The indictment alleges only that "Gumrukcu promised to pay Davis $30,000 because of the funding delays. In light of this promise, G.G. paid Davis $30,000 in the first half of 2015" and received "repayment from Gumrukcu … later in 2015." ECF 209 at 5, ¶ 5. The next allegation regarding money spent by Gac similarly describes Gac sending money on his own; not that Gumrukcu and Eratay agreed to a scheme to deprive Gac of any money. The indictment alleges that in May 2016, Gumrukcu deposited four checks for $150,000 into G.G.'s account. These checks bounced for insufficient funds. The indictment alleges that the return of Gumrukcu's bad checks "caused" G.G. to use personal funds. ECF 209 at  7. It says nothing that this was an agreed upon target or scheme by Gumrukcu and Eratay.  The indictment also concedes that Gumrukcu paid G.G. over $100,000 in June 2017, "in part to reimburse G.G.'s 2016 payment to Mode and Davis on behalf of Lauran Trading*." Id*. at 9.  In summary, the indictment alleges that Gac and Davis attempted to get Gumrukcu's money; Gumrukcu attempted to give it to them; at the time his account has insufficient funds, and then Gac, on his own, decided to give money to Davis. The indictment then concedes that Gumrukcu ultimately reimbursed Gac. This hardly alleges a scheme by Eratay and Gumrukcu to steal Gac's money.

Because the Court has never addressed this argument, Gumrukcu contends that the Court should resolve this challenge now pursuant to Rule 12.  Upon doing so, it should dismiss Count III in full.

**CONCLUSION**

This motion is important. While the Government may be permitted to argue that the conspirators sought to murder Davis to stop him reporting their conduct to the authorities, it should not be permitted to vouch for Davis's errant claims of fraud. Allowing this count to proceed to trial is highly prejudicial to the defense. Whether Davis even had a breach of contract claim is in dispute; allowing it to be called fraud, when it is not as a matter of law, will allow the Government to vouch for its victim, and unfairly and improperly so. A breach of contract is not fraud, and the Government's indictment falls short. Worse, it disregards the Supreme Court's recent and consistent admonishments that federal prosecutors must stop trying to stretch the federal fraud statutes to address all manner of purported misconduct. *See Kelly*, 140 S.Ct. at 1572-72; *Cimenelli*, 143 S.Ct. 1121, 1126-27 (2023); *see also Cleveland*, 531 U.S. at 27.

So too, to permit a trial on a deficient indictment threatens the fairness of the trial with respect to the murder allegations based on prejudicial spillover. *See United States v. Hamilton*, 334 F.3d 170 (2d. Cir. 2003). No party should want to try this case twice, and application of settled law demonstrates the insufficiency of Count Three. The Fourth Superseding Indictment fails to state a claim for conspiracy to commit wire fraud, and the Court should dismiss it.

Dated this 13th day of January 2025.

Respectfully submitted,


*/s/ Susan K. Marcus*
SUSAN K. MARCUS
Law Firm of Susan K Marcus LLC
29 Broadway, Suite 1412
New York, NY 10006
(212) 792-5131
susan@skmarcuslaw.com

*/s/ Ethan A. Balogh*
ETHAN A. BALOGH
Balogh & Co., APC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 391-0441
eab@balcolaw.com

Attorneys for Defendant
SERHAT GUMRUKCU