UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA

v.                                                    Docket No. 22-CR-58

SERHAT GUMRUKCU,
        Defendant.

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS COUNT THREE

I.    Introduction

In his third attempt to dismiss the wire fraud conspiracy charges against him, Serhat Gumrukcu claims the Fourth Superseding Indictment (FSI) fails to allege the elements of a wire fraud conspiracy. This Court previously held that an entitlement to money is a traditional property interest protected by the wire fraud statute. The Court also previously held that the charges in the FSI alleged a cognizable fraud against Gregory Gac. Because the FSI properly articulates Gumrukcu's fraudulent attempts to deprive Gregory Gac and Gregory Davis of property, the Court should deny the motion.

II.    Background

        A. The First and Second Motions to Dismiss

Pending before the Court is the defendant's third attempt to dismiss the wire fraud conspiracy now pending against him. The defendant's first motion to dismiss was filed on October 6, 2023. Doc. 110. In that motion, the defendant argued that the government failed to allege traditional property interests in the wire fraud conspiracy count of the Third Superseding Indictment. *Id.* The defendant further argued that the government failed to allege that the victim's money or property was an object of the charged scheme to defraud. *Id.* The government

1

responded, opposing the defendant's claims. Doc. 112. Judge Geoffrey W. Crawford presided over a motions hearing on January 19, 2024, before denying the defendant's motion to dismiss in a January 24, 2024, opinion. Doc. 136. The Court found the indictment sufficiently alleged a scheme to defraud Gregory Gac and Gregory Davis and therefore denied the motion. *Id.* As to Gac, Judge Crawford determined, "[t]hat he later received repayment, especially after he passed along Davis's threats of exposure to criminal prosecution, does not alter the allegation that Gumrukcu and Eratay engaged in deceit in order to persuade him to send his own money to Davis." Doc. 136 at 7. As to Davis, the Court explained that "[a]nswering the question of whether inducing Davis to enter into business with Lauran Trading and then stringing him along with lies and bounced checks amounts to defrauding him of his property is a central issue necessary to the resolution of Count IV, but it is not an issue that the court can resolve at this stage of the case." *Id.* at 8. Judge Crawford further explained that "[t]he court is content to postpone answering the question of whether a breach of the redemption agreement amounts to a loss of property until the Government has introduced its evidence at trial or, at a minimum, provided a full proffer in response to a motion in limine directed at issues of relevance and admissibility." *Id.* at 9.

The defendant renewed his motion on July 16, 2024, repeating the same arguments. Doc. 184 *cf.* Doc. 110. The government responded on July 26, 2024 (Doc. 189), urging the Court to adhere to Judge Crawford's prior decision pursuant to the law-of-the-case doctrine. *Id.*

### B. The Court's August 16, 2024 Opinion Denying in Part and Dismissing in Part Defendant's Motion to Dismiss the Wire Fraud Conspiracy Count

At the outset, the Court rejected the government's argument that the Law of the Case Doctrine applied. Doc. 202 at 9-10. The Court then considered the merits of the wire fraud conspiracy count. The Court adopted Judge Crawford's prior decision that the government

properly alleged a wire fraud conspiracy as to Gac, "by causing him to pay Mr. Gumrukcu's debt to Mr. Davis." *Id.* at 10. As to Gregory Davis, however, the Court granted the defendant's motion. *Id.* at 14. The Court explained as follows:

> The [wire fraud conspiracy count] does not specifically identify any property or rights Mr. Davis was forced to give up or pay as the object of the fraud. It also does not allege that Mr. Davis possessed a contractual right to immediate payment under the Redemption Agreement. Rather, it alleges that "[u]nder the Redemption Agreement, Lauran Trading owed Mode $5 million to be paid over time," and Mr. Gumrukcu and Mr. Eratay sent "four fraudulent bank confirmations, each for €50,000, as the first payments under the Redemption Agreement[]" and "caused the transmission of various wire communications falsely representing that Lauran Trading was performing on its two obligations under the Redemption Agreement[.]" (Doc. 69 at 6, ¶¶ 9, 11.) The TSI does not allege that Mr. Davis and Mode are interchangeable or even that Mr. Davis controls Mode as his alter ego.

*Id.* at 13. The Court further stated that although the wire fraud conspiracy charge "partially tracks the wire fraud statute…that paragraph does not allege Mr. Davis was deprived of money or property as 'an object of the fraud.'" *Id.* Accordingly, the Court reasoned, "[i]n the absence of an allegation that the object of the alleged conspiracy to commit wire fraud was *Mr. Davis's* money or property, the [wire fraud conspiracy count] fails to state an essential element of wire fraud and is defective in that respect." *Id.* at 14. However, the Court stopped short of rejecting the government's theory that a right to money pursuant to a contract is property under the wire fraud statute. Indeed, the Court wrote that *United States v. Ciminelli*, 586 U.S. 306, 308 (2023), "does not foreclose all wire fraud cases predicated on the existence of a contract." Doc. 202 at 11. The Court ultimately held that: "[i]n light of controlling precedent, the government is correct that in certain circumstances, a contractual right to money may be 'money or property' for purposes of the wire fraud statute." Doc. 202 at 13. Still, the Court granted the July 2024 motion to dismiss in part, finding the Third Superseding Indictment failed to specifically allege "that Mr. Davis was entitled to payment under the Redemption Agreement." *Id.* The Court found the indictment's

description of Davis's rights under the Redemption Agreement too unclear. "[The indictment] does not allege that Mr. Davis possessed a contractual right to immediate payment under the Redemption Agreement." *Id.* The dismissal as to the wire fraud conspiracy count was granted without prejudice. *Id.*

### C. The Fourth Superseding Indictment

Five months ago, on August 29, 2024, a District of Vermont grand jury returned a Fourth Superseding Indictment. Doc. 209. This indictment charged the defendant with: Count One-conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958; Count Two- murder for hire, in violation of 18 U.S.C. §§ 1958 and 2; and Count Three- conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. *Id.*[1]

The FSI seeks to remedy the ambiguities the Court found in the earlier charge. Count Three clearly alleges that Gumrukcu conspired to obtain money from Gac and property from Davis. The count first alleges that Gac owned and operated Quadrant Financial Group between 2013 and 2018. Doc. 209 ¶ 1. Count Three alleges, for the first time, that Gac "handled and controlled Quadrant's funds and received any of its profits or losses." *Id.* The indictment then explains that the defendant and Gac began corresponding in 2013 about business dealings. *Id.* ¶ 2. Before January 2015, the defendant made certain representations to Gac that substantial funds were accessible to the defendant and that he owned and controlled Lauran Trading, LLC. *Id.* Lauran was based in Oman and used to trade oil. *Id.* More specifically, and in contrast to prior Count Four (Doc. 69 ¶ 2), Count Three alleges that "[b]etween 2015 and 2018, GUMRUKCU

---

[1] The wire fraud conspiracy count of the FSI ("Count Three"), like the government's prior accusatory instruments, is a speaking count. Docs. 69, 209.

controlled Lauran Trading and was responsible for funds due from Lauran Trading." *Id.* The indictment then explains that Berk Eratay was the defendant's paid assistant between 2015 and 2022. *Id.* ¶ 3.

Next, the indictment re-introduces Gregory Davis, the victim of the defendant's murder-for-hire conspiracy. Doc. 209 at 1; ¶ 4. Count Three alleges that "[b]etween 2015 and January 2018, Gregory Davis owned and operated Mode Commodities, LLC ("Mode"), which sought to engage in oil trading. Davis handled and controlled Mode's funds and received any of its profits or losses." *Id.* ¶ 4; *cf.* Doc. 69 ¶ 4 (not including the language about controlling Mode's profits or losses).

The allegations in paragraphs 5 and 6 of Count Three are the same as the allegations in the prior Count Four. Doc. 209 *cf.* Doc. 69. In summary, those paragraphs alleged that in January 2015, Quadrant and Mode struck a deal to sell oil to a third party for a substantial profit. Doc. 209 ¶ 5. The defendant was a partner to Quadrant and promised to provide a "bank comfort letter" showing he—and therefore Quadrant—had access to millions of euros to finance the deal. *Id.* The defendant indicated that he could access those funds and represented to Gac that he would get the letter. *Id.*

Later that same month, the defendant and Eratay sent Gac and Davis an email attaching a phony letter purporting to come from Cyprus First Bank representing that more than twenty million euros were available to Quadrant (via Gumrukcu) for an oil deal with Mode. Doc. 209 ¶ 6. However, Cyprus First Bank was not a real bank, and Davis and Gac figured out that the letter was not real. *Id.*

In February 2015, the defendant and Davis, with the help of Gac, formed a partnership called Mode Lauran to facilitate future oil deals. Doc. 209 ¶ 7. Under the partnership agreement,

"Lauran Trading [Gumrukcu] was obligated to obtain financing for future oil deals, through banking arrangements such as stand-by letters of credit, while Mode [Davis] would execute the oil transactions." *Id.* Count Three then alleges, unlike the prior wire fraud conspiracy count, that "GUMRUKCU agreed to form the Mode Lauran partnership in part to compensate Davis for his losses on the January 2015 Mode deal that failed because of the fraudulent Cyprus First Bank letter." *Id.*

Over the next three months, the defendant and Eratay sent numerous emails to Gac and Davis stating that Lauran Trading found new financing for Mode Lauran via Sekerbank. Doc. 209 ¶ 8. Those representations, designed to keep Davis and Gac on the hook for the new deal, were not true. *Id.* It was also between February 2015 and April 2015 that the defendant purported to introduce Davis and Gac to Murat Gumrukcu, the defendant's brother. *Id.* Starting in February of that year, Eratay used an email account (the murats Gmail account) in furtherance of the scheme to defraud. *Id.* Gumrukcu and Eratay used the murats Gmail account to represent Murat Gumrukcu's role in the business dealings of Lauran. *Id.* During this same period, the defendant promised to compensate Davis in the amount of $30,000 due to the "funding delays". *Id.* In an effort to keep the deal he believed in alive, Gac ultimately sent that money to Davis, relying on Gumrukcu's promise in the first half of 2015 to fund the payments. *Id.* The defendant, however, did not repay Gac until later in 2015. *Id.*

The indictment then alleges certain events from May 2015. Doc. 209 ¶ 9. Here, Count Three differs significantly from the prior wire fraud conspiracy count. At this point, Lauran Trading had not yet obtained money for the joint venture, and Davis had begun to complain to Gac and Gumrukcu about Lauran's failure to perform under the deal. Doc. 209 ¶ 9. Davis also complained about potential fraud in connection with Lauran Trading. *Id.* From May 2015 to

November 2015, Gac assisted in negotiations for a buyout of Mode's [Davis's] interest in Mode Lauran that culminated in a "Redemption Agreement" between the parties. *Id.* The "Redemption Agreement" required certain payments totaling as much as $5 million in exchange for Mode's interest in Mode Lauran with Quadrant acting as the escrow agent. *Id.* As Count Three alleges, "[t]he Redemption Agreement created an obligation that Lauran Trading pay Mode $225,000 based solely on the execution of the Redemption Agreement. The Redemption Agreement also created obligations to pay Mode additional funds over time, based on future events." *Id.* This new allegation set forth Gumrukcu's clear and immediate obligation to pay Davis. Paragraph 9 further alleged that, pursuant to the Redemption Agreement, Lauran Trading was obligated to participate in future oil deals with Mode, and Lauran would obtain the financing for the deals. *Id.* Separately, the Redemption Agreement required Lauran Trading to pay a $75,000 per month late fee to Mode for each month that Lauran Trading failed to appropriately obtain funding for the oil deals. *Id.* In the event that Lauran Trading terminated the Redemption Agreement, Lauran owed $950,000 to Mode. *Id.* The indictment summarizes this obligation, stating that, "Davis had a property interest in the funds due to [him] under the Redemption Agreement." *Id.*

During the negotiations toward the final Redemption Agreement, Eratay and the defendant sent emails from the murats Gmail account that indicated that Murat Gumrukcu had bought out the defendant's Lauran Trading interests. Doc. 209 ¶ 11. This also wasn't true. Doc. 209 ¶ 11. To the contrary, Gumrukcu "continued to control Lauran Trading and interacted with Gac and Davis through the false and fraudulent communications from the murats Gmail account." *Id.*

After executing the Redemption Agreement in November 2015, the defendant and Eratay used the murats Gmail account to send Gac four fake bank confirmations each purportedly for

€50,000. Doc. 209 ¶ 10. The defendant and Eratay's emails represented that Lauran Trading transferred to Quadrant the initial installments due to Mode and Davis pursuant to the Redemption Agreement. Doc. 209 ¶ 10. These false emails strove to convince Gac that Gumrukcu had money available to meet the obligations to Davis under the Redemption Agreement so that Gac would use his own funds to pay Davis.

In the seven months that followed, between November 2015 and May 2016, the defendant and Eratay sent even more false wire communications. Doc. 209 ¶ 12. Specifically, false emails claimed Lauran Trading was performing on two of the Redemption Agreement obligations: (1) "that funds for the Mode buyout would be sent to Quadrant to fund the escrow account, including to cover the debt due and owed to Mode and Davis," and (2) "that Lauran Trading had $30 million available at the National Bank of Abu Dhabi to fund future oil deals." Doc. 209 ¶ 12. The defendant and Eratay also sent wire communications from fake individuals including "Emre Aras," who they maintained was Murat Gumrukcu's Hong Kong-based personal assistant, and "Mohammed Salem," who purportedly worked with the National Bank of Abu Dhabi in Washington, D.C. These communications were designed to lull Gac and Davis into 1) using Gac's own money to cover Gumrukcu's obligations and 2) refraining from complaining about Gumrukcu's failures to meet his obligations Doc. 209 ¶ 12. Despite the email representations by the defendant and Eratay, Gac never received money from the National Bank of Abu Dhabi. *Id.* During this seven-month period, and despite Gumrukcu's attempts to quiet him, Davis "complained to Gac about Lauran Trading's failure to pay him funds due to Mode under the Redemption Agreement…and GUMRUKCU's suspectedly false claims." *Id.*

The FSI explains that fraudulent wire communications continued in May 2016, as the defendant and Eratay used the murats Gmail account to disseminate false statements intended to

convince Gac that Gumrukcu would provide money to meet Lauran Trading's obligations, such as that Murat Gumrukcu had over $30 million in a Wells Fargo Bank account. Doc. 209 ¶ 13. Gac never received any of the purported $30 million from the Wells Fargo Account. *Id.* The defendant next "falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, and which G.G. could in turn use to pay Mode and Davis. By this point in time, Mode and Davis were owed over $500,000 under the Redemption Agreement."[2] *Id.* On May 13, 2016, the defendant sent Gac a picture of a phony $490,000 cashier's check allegedly from Bank of America. *Id.* Gumrukcu then deposited four $150,000 checks that described him as a Turkish prince, totaling $600,000, into Quadrant's bank account. *Id.* Those four checks all bounced because the defendant did not have sufficient funds in his account to cover them. *Id.* Before the return of that last check, however, Gac provided $75,000 from his personal funds to Davis, "as partial payment of Lauran Trading's obligation to pay Mode and Davis." *Id.* The defendant and Eratay then told Gac that the defendant's father would wire $600,000 to Quadrant to cover Lauran Trading's obligations, pursuant to the Redemption Agreement, to pay Mode and Davis. *Id.* Gac never received any money from the defendant or his father during the year 2016. *Id.* The indictment alleges that by the end of 2016, Gac had used $100,000 of his own funds to pay Lauran Trading's obligations to Mode and Davis. *Id.* Gumrukcu's false statements successfully deprived Gac of money and deprived Davis of money due to him.

As Count Three alleges, the fraud continued even after these payments. The false statements pertaining to Lauran Trading's Redemption Agreement obligations continued in the

---

[2] This figure included both the $225,000 due immediately as partial payment to redeem the joint venture, as well as several months of late payments.

second half of 2016, including wire communications from the murats Gmail account about a phony $500,000 bank confirmation from the Swiss Bank, UBS. Doc. 209 ¶ 14.

The defendant was arrested on February 9, 2017, on California state fraud charges that were, among other things, related to the May 2016 bounced checks that the defendant deposited into Quadrant's account. Doc. 209 ¶ 15. Following the defendant's arrest, Eratay immediately deleted the murats Gmail account and, on February 12, 2017, created a new "Murat Gumrukcu" email account, (the murtag Gmail). *Id.* Eratay then used the murtag Gmail account to send numerous fraudulent emails between February 2017 and January 2018 to perpetuate the fraud depriving Gac of his money and to avoid paying money Davis was entitled to, including phony wire transmissions that claimed Lauran Trading obtained funds from UBS to satisfy its Redemption Agreement obligations to pay Mode and Davis. *Id.*

> In May of 2017, Davis was actively complaining to G.G. about the fraudulent representations made to G.G., suggesting that criminal charges against GUMRUKCU should be pursued. G.G. relayed Davis's claims to GUMRUKCU and noted that GUMRUKCU had exposure from the events over the past two years. Davis agreed to "stand down" from legal proceedings in exchange for $20,000 in early May and another $20,000 in late May, paid by GUMRUKCU through G.G.

Doc. 209 ¶ 16.

In June of 2017, the defendant learned that Gac would be interviewed by investigators about the defendant's pending California criminal case. *Id.* The defendant then paid $100,000 to Gac, "in part to reimburse G.G.'s 2016 payment to Mode and Davis on behalf of Lauran Trading." *Id.* Gac did not reveal his suspicions of fraud to the investigators.

Count Three further alleges that despite the payments from Gac, Davis continued to complain to Gac about the defendant's fraud. Doc. 209 ¶ 17. Gac passed this information to the defendant. Using the murtag Gmail account, the defendant and Eratay "proposed further partial

payments to Davis to keep him from going public with his fraud claims." *Id.* The defendant

ultimately paid Davis $50,000 via Gac. *Id.* As alleged in Count Three, "Davis never received all

of the money due to him under the Redemption Agreement. Thus, Davis was deprived of his

right to obtain money." *Id.*

Tracking the statutory language of 18 U.S.C. § 1349, the final paragraph of the

indictment alleges the following:

> Between January 2015 and January 2018, in the District of Vermont and
> elsewhere, the defendant, SERHAT GUMRUKCU, knowingly and willfully
> conspired with others including Berk Eratay to commit wire fraud, in violation of
> 18 U.S.C. § 1343, by devising and executing a scheme to defraud. The dual
> objects of the scheme to defraud were to deprive G.G. of his personal funds
> expended on behalf of Lauran Trading and to deprive Gregory Davis of the funds
> due to him through Mode under the Redemption Agreement by attempting to
> deceive G.G. and Davis about various matters, including about funds available to
> GUMRUKCU and Lauran Trading, about the identity of individuals involved
> with GUMRUKCU and his business activities, and about past and future financial
> transactions related to Lauran Trading and Mode Lauran.

Doc. 209 ¶ 19; *see also* 18 U.S.C. § 1349.

In this way, Count Three adequately identifies money and property of Davis and Gac as

objects of the defendant's scheme to defraud.

III.    <u>The FSI Properly Alleges Wire Fraud Conspiracy.</u>

A. Legal Standard for Motion to Dismiss an Indictment

The dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely

limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d

157, 165 (2d Cir. 2001) (citation omitted). Indeed, it is well settled that "[a]n indictment returned

by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial

of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). To be valid on

its face, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and

fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."' *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also* Fed. R. Crim. P. 7(c); *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021). In general, to satisfy the pleading requirements of Federal Rule of Criminal Procedure 7(c), "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted); *see also United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)). When determining whether a count sufficiently alleges a violation, the indictment should be read "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and "must be read to include facts which are necessarily implied by the specific allegations made," *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted).

When "a defense raises 'evidentiary questions,' a district court must defer resolving those questions until trial." *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018) (citing *United States v. Knox*, 396 U.S. 77, 83 (1969)). "Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *United States v. Pope*, 613 F.3d 1255, 1260-61 (10th Cir. 2010) (quoting *United States v. Covington,* 395 U.S. 57, 60 (1969)).[3]

---

[3] Gumrukcu's motions do not fall within the "extraordinarily narrow" exception to this rule articulated in *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981), and limited in *United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998). In *Mennuti*, the government made a full proffer of the evidence it intended to present at trial, which allowed the Court to assess the government's

Indeed, it is well settled that a facially valid indictment is not subject to challenge based on the quality or quantity of evidence. *See United States v. Williams*, 540 U.S. 36, 54 (1992). A defendant seeking to challenge the sufficiency of the evidence must wait until after the close of the government's case-in-chief at trial or after the jury's verdict. *See* Fed. R. Crim. P. 29; *see also United States v. Elson*, 968 F. Supp. 900, 905 (S.D.N.Y. 1997). Indeed, because a post-trial motion is the proper avenue for challenging the accuracy or sufficiency of the government's factual allegations, on a pretrial motion to dismiss, the allegations as set forth in the indictment must be taken as true, and read in the light most favorable to the government. *See Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952); *United States v. White*, 7 F.4th 90, 102-03 (2d Cir. 2021); *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991).

To survive a motion to dismiss, therefore, Count Three need only track the statute and contain the elements of the charged conspiracy to commit wire fraud: "Proof of such a conspiracy requires a showing that [1] the defendant agreed with another to commit wire fraud and [2] knowingly engaged in the conspiracy with the intent to commit that offense. *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024). The elements of the underlying wire fraud, in turn, are: "'(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3)

---

trial evidence without a trial. In *Alfonso* and *United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018), the government had not offered such a proffer of its evidence. The *Sampson* court noted that a district court cannot "require the government, before trial, to make such a presentation," and concluded the court could not—and should not—rule before trial without it. *Id.* at 282. Here, the government has not made a full proffer of the evidence it intends to present at trial about the wire fraud conspiracy. The Court should find the FSI's allegation sufficient to meet Rule 12's standard and should hold any challenges to the sufficiency of the evidence to prove the charges to the conclusion of the government's case.

use of the wires to further the scheme.'" *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021)

(quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)).

### B. The Scheme to  Deprive Gregory Davis of Property

1.  *The Entitlement to Money is Property Under the Wire Fraud Statute.*

The wire fraud statute protects "traditional property interests." *Ciminelli v. United States*,

598 U.S. 306, 308 (2023). Though the government cannot find wire fraud case law on the topic,

common sense and common law make evident that bonds and promissory notes are "traditional

property interests." A corporate bond is a promise by the corporation to repay the bond holder's

money, with a set interest payment, at a point in the future. The bond, or obligation to make that

future payment, is the bondholder's traditional property. A promissory note similarly constitutes

traditional property of the note holder, the person or entity entitled to be paid. Indeed, a one-

hundred-dollar bill is nothing more than the federal government's promise to pay the holder

$100. Debt, or money, owed by the defendant to the victim of the scheme to defraud is likewise

property under the wire fraud statute.[4]

The Supreme Court recognized the entitlement to money as protected property in

*Pasquantino v. United States*, 544 U.S. 349 (2005). There the Court addressed money due to

Canadian authorities for Canadian tax obligations. The Court reasoned from the more traditional

property concept of a private entitlement to funds, presupposing that a private entitlement to

money is property. The Court wrote that "[v]aluable entitlements like [the entitlement to collect

money] are property as that term ordinarily is employed." *Id.* at 355. "The right to be paid money

---

[4] All kinds of debt can and are bought and sold, some traded in established markets. Even private debt can be bought and sold. These rights to collect money are based on written agreements.

has long been thought to be a species of property." *Id.* at 356. "Consistent with that understanding, fraud at common law included a scheme to deprive a victim of his entitlement to money. For instance, a debtor who concealed his assets when settling debts with his creditors thereby committed common-law fraud." *Id.* In short, the Court relied on the idea that a legal entitlement to money constitutes property of the person or entity entitled to the money regardless of the source of law establishing that entitlement to money.

The Second Circuit likewise has repeatedly held that an entitlement to money is property that can be the object of a wire fraud scheme. *See e.g. United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997) (Canadian tax revenue); *United States v. Paccione*, 949 F.2d 1183, 1194 (2d Cir. 1991) (fees due to City for dumping waste are property); *United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) (right to collect state sales tax is property). While these cases involved government victims, *Pasquantino* analogized government rights to property to private rights, not the other way around. "The fact that the victim of the fraud happens to be the government, rather than a private party, does not lessen the injury." *Pasquantino*, 544 U.S. at 356.[5]

In fact, *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007), confirms that an entitlement to money under a contract constitutes protected property. *Id.* There, the contract between the defendant and a solvent seller obliged the defendant/buyer to pay any required excise taxes required by their deal. The defendant misrepresented to the seller that the defendant's company need not pay the high excise tax, because the solvent would be exported triggering an exemption

---

[5] In a discussion of *Pasquantino*, the Third Circuit recently opined, " we recently held that the right to the uncollected fines and costs associated with unadjudicated traffic tickets — claims that a motor-vehicle-code violation has taken place — constituted 'a property interest.' *United States v. Hird*, 913 F.3d 332, 339-45 (3d Cir. 2019)." *United States v. Neff*, 787 F. App'x 81, 91 (3d Cir. 2019) (citing *Pasquantino v. United States*, 544 U.S. at 355-56).

from the tax. *Id.* at 89. When the defendant did not export the solvent, the excise tax was owed

under the contract. The defendant challenged the wire fraud charge claiming that the taxes owed

under the contract were not protected property. The court held otherwise:

> Allied [the seller] therefore did not receive the money due it under the agreement,
> property that was owed to it. To be sure, that money was destined to be passed on to the
> government. But that is not relevant to our inquiry. Allied had a right to the property and
> [defendant's] scheme was intended to deprive Allied of it. It was therefore a scheme to
> deprive within the meaning of the wire fraud statute.

*Id*. at 109.

Moreover, within the past six months, the Second Circuit summarized the status of wire

fraud property and entitlements to money in *United States v. Sullivan*, 118 F.4th 170 (2d Cir.

2024). The court held that "an enforceable right to payment created by contract" was a traditional

property right. *Id.* at 209. "Unlike the 'right-to-control' property interest that the Court rejected

in *Ciminelli*, such contractual rights to payment have long been recognized as valuable property,

even if the payment has not occurred." *Id.* "[C]ourts interpreting the mail and wire fraud statutes

have repeatedly concluded that enforceable rights to payment are 'property' that, when

wrongfully thwarted by a defendant, may underlie a criminal prosecution." *Id.* (relying on

*Pasquantino*); *see also United States v. Ali*, 620 F.3d 1062, 1067-68 & n.3 (9th Cir. 2010) ("A

right to payment is 'money or property' under 18 U.S.C. §§ 1341 and 1343).

This Court reached the same conclusion, holding that a private entitlement to money is

protected property in its previous ruling dismissing the wire fraud conspiracy charge in part.

Doc. 202 at 13 ("In light of controlling precedent, the government is correct that in certain

circumstances, a contractual right to money may be 'money or property' for purposes of the wire

fraud statute."). The Court should not disturb that ruling. It should find Count Three alleges a

scheme to deprive Davis of property.

2.  *Davis's Entitlement to Money was a Property Interest Protected by the Wire Fraud Statute.*

Count Three in the FSI resolves any ambiguity as to whether Gregory Davis possessed a right to payment of money under the Redemption Agreement. Count Three alleges, as an object of the conspiracy, the deprivation of Mode Commodities' (Davis's) right to collect money from Lauran Trading (Gumrukcu). Count Three specifically alleges that under the Redemption Agreement Mode/Davis were entitled to be paid money, at least $225,000, in exchange for transferring Mode's share of the Mode Lauran Joint Venture to Lauran Trading. Lauran Trading immediately owed Mode/Davis money, without regard to future contract performance, as payment for Mode "redeeming" its interest in the Mode Lauran Joint Venture entered into by Davis and the defendant in February 2015.

After Davis discovered that the defendant's January 2015 First Cyprus Bank comfort letter was fraudulent and the pending oil deal stalled, Davis and the defendant entered into the Mode Lauran Joint Venture, a new entity, to consummate the pending oil deal, and perhaps to enter future deals. Mode and Davis's interest in the Joint Venture was traditional property; a share in a business, such as stock or a partnership share, or a share, has supported a wire fraud conviction. *See United States v. Abdullah*, 528 Fed. Appx. 79, 83 (2d Cir. 2013) (stock shares); *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (interest in partnership). Because the defendant and Lauran Trading failed to deliver on their obligations under the Joint Venture agreement, in November 2015 Gumrukcu and Davis entered into the Redemption Agreement. Under that agreement, Lauran Trading agreed to pay Mode money to buy out or "redeem" Mode's interest in the Joint Venture, turning Davis's share in a business into an entitlement to

collect money.[6] Mode/Davis was entitled to either $225,000 immediately, with further payments based on contemplated future business (up to a maximum of $5 million), or $950,000 if no future business took place. In other words, Mode and Davis were entitled to money under the Redemption Agreement *regardless* of any future business.

The defendant now appears to accept that a legal entitlement to be paid money, even if based on a written agreement,[7] constitutes property under the wire fraud statute. Doc. 222 at 13 & n.10. The defendant instead now argues that "Davis had no entitlement to collect money." Doc. 222 at 13. Allegations in the indictment, however, must be accepted when considering a motion to dismiss, and the indictment alleges Davis was entitled to payment. Moreover, defendant argues Davis was not entitled to money because his claim only arose if Gumrukcu breached their contract. Count Three, however, does not rely on a general breach of contract claim as property. It relies on Mode/ Davis's immediate right to collect money without regard to a breach of the Redemption Agreement, explaining clearly that money was due to Davis under the Agreement whether or not Gumrukcu and Davis engaged in further deals.

The defendant also claims that the Redemption Agreement was not "a valid, enforceable contract," challenging not the language of the indictment but the sufficiency of the indictment's description of the evidence to support the charge. Doc. 222 at 13 n.9. In essence, the defendant demands that the indictment somehow prove or explain Davis's entitlement to collect money in

_____

[6] Count Three also alleges that Mode was entitled to $75,000 per month under the Redemption Agreement if Lauran Trading delayed providing financing for the contemplated oil deals.

[7] In his previous motions to dismiss, the defendant attempted to undercut this conclusion by distinguishing between the right to collect money based on a government regulatory scheme, such as taxes, not a right to collect money based on a private monetary obligation.

greater detail. This argument is premature. So long as the indictment alleges the wire fraud at the heart of the charged conspiracy had, as its object, a valid property interest, the indictment should not be dismissed. *Yannotti*, 541 F.3d at 127. The Court must accept the indictment's allegation that Mode/Davis[8] were entitled to payment without regard to future performance—and that their resulting property interest in that payment was the object of the conspiracy.[9]

### 3. Defendant's Discussion of Other Types of Contract Rights is Irrelevant.

In seeking to dismiss Count Three, the defendant refers often to contract rights and choses in action. These terms have broad meaning. The entitlement to be paid on a corporate bond constitutes a contract right, and a failure to pay, a breach of the contract. On the other end of the spectrum, an obligation to deliver goods within contracted specifications constitutes a contract right, and a failure to deliver would be a breach of the contract. "Chose in action" is a broad, traditional legal term with multiple meanings according to Black's Law Dictionary: "1. A proprietary right in personam, such as a debt owed by another person, a share in a joint-stock

---

[8] In its prior decision, the Court also questioned the connections between Davis and Mode Commodities and between Lauran Trading and the defendant. Doc. 222 at 13. Count Three now clarifies that the entities are alter egos of the victim and the defendant. The defendant does not attack Count Three on this basis.

[9] The defendant also suggests that an "unadjudicated" "claim for monies" is not protected property. He cites no controlling precedent to support this limitation, relying on *Cleveland v. United States*, 531 U.S. 12, 15 (2000), which has nothing to do with contract interests like the ones at issue here. Simply put, adjudication is not a determining factor to the creation of a property interest. Canada's entitlement to money in *Pasquantino* was not adjudicated, for example, even though Canada's right to collect taxes could not be enforced without a judgment or some other legal action. Allied's right to be paid excise taxes, in *Shellef*, also was unadjudicated. A promissory note cannot be enforced without a lawsuit, but it can be sold. An entitlement to be paid need not be enforced or adjudicated to be the basis for a property interest under the wire fraud statute. Defendant's argument is meritless and has no bearing on the sufficiency of Count Three.

company, or a claim for damages in tort. 2. The right to bring an action to recover a debt, money, or thing. 3. Personal property that one person owns but another person possesses, the owner being able to regain possession through a lawsuit." Black's Law Dictionary (12th ed. 2024). Count Three focuses on a narrow, traditional property right. It does not rely on a deprivation of Davis's right to sue or the defendant's failure to provide financing as promised, though these are contract rights. Rather, it alleges that the object of the conspiracy was "to deprive Gregory Davis of the funds due to him through Mode under the Redemption Agreement," funds that Count Three alleges were due as consideration for the redemption of Davis's share of the Mode Lauran Joint Venture.

This Court need not reach the issue of whether every contract breach or every chose in action gives rise to a property interest protected by the wire fraud statute. To be sure, the Supreme Court has expressed concerns about allowing every contractual breach to trigger federal criminal liability. *Ciminelli*, 598 U.S. at 316. This case, however, does not require the Court to go beyond the narrow issue that it has already decided, namely that a contractual entitlement to be paid is a protected property interest. The allegations in the indictment are sufficient and the Court should deny the motion to dismiss Count Three.[10]

---

[10] Gumrukcu also suggests that several cases cited by the Court in its prior decision, Doc. 202 at 11-12, support his argument. To the contrary, these cases support the Court's prior decision that an entitlement to money in a written agreement is traditional property. The Supreme Court's anticipated decision in *Kousisis v. United States*, No. 23-909, argued on December 9, 2024, may provide more insight into the Court's thinking about contract rights and wire fraud property, but given its factual posture, it will not overrule this Court's conclusion that an entitlement to funds under a written agreement is protected property. The issue in *Kousisis* is the validity of a scheme based on fraudulent inducement without financial injury. It differs from the defendant's challenge to Count Three, namely the validity of a scheme aimed at depriving a victim of money due and owing under a written agreement. *Kousisis* does not address whether a contract entitlement to funds is property or whether a contract right can be property.

The defendant's reliance on *United States v. Adler*, 186 F.3d 574 (4th Cir. 1999), misses the mark because the charged scheme there did not allege as property the deprivation of the victim's entitlement to money from the defendant. *Adler* involved a three-party deal. The defendant's company had a contract to produce merchandise to one company, House of Blues, and a separate contract with another company, Printgear, to buy shirts to be used for the House of Blues contract. After a contract dispute, House of Blues paid Adler $800,000. At the same time, Printgear asserted a contract damage claim from Adler for $500,000. Adler fraudulently hid the House of Blues payment from Printgear, which got a default judgment against Adler. *Id.* at 575-76. After recognizing that contract rights can be protected property, the Fourth Circuit analyzed Printgear's purported property interest relied on by the government at trial, the $800,000 Adler received from House of Blues. The court of appeals found that the $800,000 was not the victim's (Printgear's) property. *Id.* at 577-78.[11]

Because this case does not involve similar facts, *Adler* is inapposite. Count Three does not describe a three-party transaction like the one in *Alder*.[12] Here, the government is not alleging that Mode (and Davis) had a property right to money paid to the defendant by a third-party. Instead, Count Three alleges that Davis was entitled to money from the defendant under

---

[11] The Fourth Circuit also recognized that contract rights can be protected property. 186 F.3d at 578. On appeal, the government argued that Printgear's contract claim was protected property. The court found that, while the contract claim could be protected property, the indictment did not allege a deprivation of that property interest. *Id.* at 579.

[12] The defendant mentions Gac as another participant in the Mode Lauran events. Under the Redemption Agreement, Gac was to be the trustee for $5 million that might be used to pay Mode (and Davis), but the agreement states that Lauran owed money directly to Mode. Gac was not entitled to money from Lauran that was in turn owed by Gac to Mode.

the Redemption Agreement and that Gumrukcu's conspiracy was aimed at depriving Davis of those funds.

The Second Circuit's decision in *United States v. Miller*, 997 F.2d 1010 (2d Cir. 1993), is also irrelevant to Count Three's allegations. In *Miller*, an attorney, who represented an investor in a condominium conversion deal and who had a resulting fiduciary duty to the investor client, used his position to buy a few apartments in a nominee name to make personal profit on the side. *Id.* at 1012-14. The court found that, while a contract right can be property under the federal fraud laws, the attorney did not breach his contract with the investor. *Id.* at 1017-18.[13] *Miller* provides no guidance here, other than support for the proposition that contract rights can be protected property in some circumstances.[14]

### C. The Indictment Alleges a Scheme the Object of Which was Depriving Gac of Money.

Count Three also alleges a scheme to deprive Gac of money. While both this Court and Judge Crawford ruled the previous—and unchanged—portion of the wire fraud conspiracy count adequately alleged Gac's money as an object of the wire fraud scheme, the defendant again challenges it in his current dismissal motion.

The defendant asserts that Count Three alleges, "Gac decided, on his own and not as part of Gumrukcu's alleged scheme, to front money to Davis." *Id.* at 21. The very nature of fraud,

---

[13] The Second Circuit also rejected the government's property theory based on a constructive trust held by the attorney and due to the investor. 997 F.2d at 1018-22.

[14] The defendant cites two district court cases, neither of which turn on the claims raised here. *United States v. Barringer*, 481 F. Supp. 3d 596, 603 (W.D. Va. 2020) (rejecting a wire fraud scheme where defendant obtained her own funds from her 401k by false statements); *United States v. Vought*, 2006 WL 1662882 (D. Conn. June 15, 2006) (accepting a wire fraud scheme based on causing potential shareholders to conceal true owner of future shares). In both cases, the district courts summarized the third-party holding in *Adler* as relative there. Here, the indictment alleges a direct property link between the victim (Davis) and the defendant.

however, involves convincing a victim to lose money through deceit, not force. Count Three alleges a conspiracy to do just that with regard to Gac's money. The indictment describes two different events during which Gac was convinced by fraud to use his own funds to pay debts Gumrukcu owed to Davis. Count Three properly alleges that in both events Gac was deprived of money because of the defendant's false statements.

With regard to the $30,000 Gac paid to Davis in 2015, Count Three alleges that "Gumrukcu promised to pay Davis $30,000 because of funding delays." Doc. 209 ¶ 8. Count Three then alleges that "[i]n light of this promise, G.G. paid Davis $30,000 in the first half of 2015 without receiving any repayment from GUMRUKCU until later in 2015." *Id.* Count Three further alleges that the conspirators misrepresented their financial capacity to Gac, and alleges specifically in paragraph 19 that the defendant conspired with others including Berk Eratay, to devise and execute "a scheme to defraud" one of the objects of which was "to deprive G.G. of his personal funds expended on behalf of Lauran Trading . . . by attempting to deceive G.G. . . . about various matters, including funds available to GUMRUKCU and Lauran Trading, about the identity of individuals involved with GUMRUKCU and his business activities, and about past and future financial transactions related to Lauren Trading and Mode Lauran." Doc. 209 ¶ 19. Thus, the indictment alleges that the defendant's promise to pay Davis induced Gac to cover the promised payment.[15]

---

[15] While, as the defendant notes, the Redemption Agreement was not in place in early 2015 when Gac paid Davis $30,000, the indictment properly alleges that Gac was induced to part with his own money based on the defendant's fraudulent representations. Whether Davis had a property interest in the payments at that time is irrelevant to Gac's loss of funds.

23

The indictment also alleges that in May 2016, Gumrukcu convinced Gac to spend $75,000 of his own money to cover the debt the defendant (through Lauran Trading) owed Davis (through Mode). As Count Three alleges, prior to May, "Davis complained to G.G. about Lauran Trading's failure to pay him funds due to Mode under the Redemption Agreement." Gac, through Quadrant, was Trustee for Lauran Trading's payments on this debt. "GUMRUKCU falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, and which G.G. could in turn use to pay Mode and Davis." Doc. 209 ¶ 13 Count Three next alleges that the defendant sent Gac a picture of a fraudulent cashier's check for $490,000 and deposited "four checks for $150,000 each," describing the defendant as a "Turkish prince," all of which bounced. *Id.* Gumrukcu's fraudulent statements, made directly and through the fraudulent checks, led Gac to send $75,000 "as partial payment of Lauran Trading's obligation to pay Mode and Davis." When the checks bounced, as Gumrukcu knew they would, Gac lost the personal funds he had been convinced to use to cover the money sent to Davis. These allegations make out a fraud to obtain money from Gac.

Gumrukcu argues Gac's money is not a proper object of a fraud conspiracy because Gumrukcu did not receive it. Doc. 222 at 22. As noted above, however, the wire fraud statute criminalizes schemes aimed at depriving the victim of property. It does not require that the defendant actually obtain property. *See United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021) ("As to the "object of the scheme" element, a defendant need not literally obtain money or property -- in the sense of putting money into his own pocket -- to violate the wire fraud statute."). Neither does defendant's repayment in 2017 change the fraud. As Judge Crawford correctly found, Gumrukcu's "cover-up payment" to keep Gac from reporting fraud did not undo

Gumrukcu's crime. The Court need not revisit the prior holdings as to Gac; Gumrukcu's challenge fails.

IV.    The Mode Lauran Evidence is Admissible Even Without Count Three.

While Count Three properly alleges a conspiracy to commit a wire fraud aimed at depriving Davis and Gac of property, even if the Court granted the motion to dismiss, the evidence in support of the wire fraud conspiracy would still be admissible as evidence of Gumrukcu's motive and the relationship among the conspirators and the victim underlying the first two counts. Defendant's claim that the risk of prejudicial spillover justifies dismissal of Count Three therefore also fails. *See United States v. Rooney*, 37 F.3d 847, 855-56 (2d Cir. 1994) (spillover prejudiced only likely to occur if, *inter alia*, evidence on invalidated count is inadmissible on remaining counts and was presented in an inflammatory way). Indeed, the defendant has conceded that much of the wire fraud conspiracy evidence would be admissible in a trial on Counts One and Two.

> THE COURT: Let me stop you there. I was thinking about the same thing. Had the government not brought this fraud count, it seemed to me that all of the conduct described in Count Four would be admissible on motive and kind of described the relationship between the alleged murderers and the victim, and, I mean, all of it is -- nothing in there would have been inadmissible, right?
>
> ATTORNEY BALOGH: Well, I think all of it might be a bridge too far. I think, when they plead something, they have greater rights to prove it up. But, to your general idea, Your Honor, that is some –
>
> THE COURT: Yeah, yeah.
>
> ATTORNEY BALOGH: -- is, you know, what is excluded under 403, or what are the limits of 404(b), those are worthy discussions so there can be some limitation.
>
> THE COURT: Yeah. I'm not trying to trap you on a detail.
>
> ATTORNEY BALOGH: Right. But that theory you're expressing is correct, which is, can the government say this guy was murdered because of this? Well, yeah, that's generally permitted in homicide trials...

25

Doc. 142 at 7-8.

Further, the two conspiracies charged in Counts One and Three factually overlap. *See United States v. Bonventre*, 646 F. App'x 78, 80 (2d. Cir. 2016) (joinder is appropriate "when one scheme stemmed from the other, such that proof of one is indispensable for a full understanding of the other"); *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989) (affirming joinder of defendants in separate conspiracies where they "shared a common purpose" and had "an overlap of participants and acts"). The conspiracies overlapped temporally and involved three of the same individuals: the defendant, Berk Eratay and Gregory Davis. *See e.g. United States v. Rittweger*, 524 F.3d 171, 176-77 (2d Cir. 2008) (joinder appropriate where two of four individuals were "key participants in both schemes"). In fact, the murder for hire conspiracy stemmed from the wire fraud conspiracy as Davis, a target of the defendant's wire fraud scheme, ultimately became the victim of the defendant's murder for hire conspiracy. The jury cannot understand the murder for hire without understanding the complaints of fraud Davis made over the years and the risks Gumrukcu faced if Davis went to the authorities or even brought a fraud civil suit. Thus, "proof of one is indispensable for a full understanding of the other," as the defendant partially conceded before both Judge Crawford and this Court. *Bonventre*, 646 F. App'x at 80; Doc. 142 at 7-8. Accordingly, the wire fraud count is properly joined with Counts One and Two and the Court should admit evidence of the wire fraud conspiracy even if it grants the motion to dismiss Count Three.

V.    <u>Conclusion</u>

Because the FSI properly alleges a wire fraud conspiracy designed to obtain property from Greg Davis and money from Gregory Gac, and for the other foregoing reasons, the Court should deny the defendant's motion.

Dated at Burlington, in the District of Vermont, 29th day of January, 2025.

Respectfully submitted,

MICHAEL P. DRESCHER
Acting United States Attorney

By: _/s/ Zachary B. Stendig__
PAUL J. VAN DE GRAAF
ZACHARY B. STENDIG
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725