```
                                                      U.S. DISTRICT COURT
                                                     DISTRICT OF VERMONT
                                                            FILED
              UNITED STATES DISTRICT COURT
                        FOR THE                      2025 FEB 27 PM 1: 24
                 DISTRICT OF VERMONT
                                                            CLERK
UNITED STATES OF AMERICA        )                    BY    [signature]
                                )                        DEPUTY CLERK
     v.                         )        Case No. 5:22-cr-00058
                                )
SERHAT GUMRUKCU                 )
```

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO DISMISS COUNT THREE**
(Doc. 222)

On August 29, 2024, a grand jury returned a Fourth Superseding Indictment ("FSI"), charging Serhat Gumrukcu with knowingly and intentionally conspiring to commit murder for hire in violation of 18 U.S.C. § 1958 (Count One), committing murder for hire in violation of 18 U.S.C. § 1958 as a principal pursuant to 18 U.S.C. § 2 (Count Two), and conspiring to commit wire fraud in violation of 18 U.S.C. § 1343 pursuant to 18 U.S.C. § 1349 (Count Three). (Doc. 209.)

Pending before the court is Mr. Gumrukcu's January 13, 2025 motion to dismiss Count Three. (Doc. 222.) The government opposed Mr. Gumrukcu's motion on January 29, 2025, (Doc. 226), at which point the court took the motion under advisement.

The government is represented by Assistant United States Attorneys Paul J. Van de Graaf and Zachary B. Stendig. Mr. Gumrukcu is represented by Ethan A. Balogh, Esq., and Susan K. Marcus, Esq.

### I.      Factual and Procedural Background.

####     A.      Count Three.

Count Three of the FSI alleges as follows:

1.  Between 2013 and 2018, G.G. owned and operated Quadrant Financial Group, LLC ("Quadrant"), which participated as a principal and broker for various business transactions, including commodities trading. G.G. handled and controlled Quadrant's funds and received any of its profits or losses.

2.  In 2013, the defendant, SERHAT GUMRUKCU, began corresponding with G.G. about potential business opportunities. Prior to January 2015, GUMRUKCU represented to G.G. that he had access to substantial funds and owned a controlling interest in Lauran Trading, LLC, a business alleged to be organized in Oman, to be used for oil trading. Between 2015 and 2018, GUMRUKCU controlled Lauran Trading and was responsible for funds due from Lauran Trading. GUMRUKCU falsely described himself as a wealthy Turkish prince.

3.  Between at least 2015 and 2022, Berk Eratay, who had information technology (IT) work experience, served as a paid assistant to GUMRUKCU.

4.  Between 2015 and January 2018, Gregory Davis owned and operated Mode Commodities, LLC ("Mode"), which sought to engage in oil trading. Davis handled and controlled Mode's funds and received any of its profits or losses.

5.  In late January 2015, Quadrant organized an oil trading deal designed to yield millions of dollars in profits. Quadrant would purchase oil from Mode and sell the oil to a different group at a higher price. GUMRUKCU agreed to participate in the deal as Quadrant's partner. As part of the transaction, Quadrant needed to provide a "bank comfort letter" showing that Quadrant had access to €22 million. GUMRUKCU represented to G.G. that he had access to such funds and that he would obtain the bank comfort letter.

6.  On or about January 28, 2015, GUMRUKCU and Eratay caused the email transmission of a fraudulent letter signed by "Constantine Poryalis" of "Cyprus First Bank" to G.G. and Davis. The Cyprus First Bank letter falsely claimed that €22.5 million was immediately available to Quadrant for the oil deal with Mode. Davis and G.G. almost immediately determined that the bank comfort letter was fraudulent, in part because Cyprus First Bank did not exist. These and other issues undermined the planned oil deal.

7.  In early February 2015, in the aftermath of the Cyprus First Bank letter and the failure of the January 2015 Mode deal, G.G. helped GUMRUKCU and Davis form Mode Lauran, a partnership between Davis's and GUMRUKCU's businesses designed to engage in future oil deals. Under the partnership agreement, Lauran Trading was obligated to obtain financing for future oil deals, through banking

2

arrangements such as stand-by letters of credit, while Mode would execute the oil transactions. GUMRUKCU agreed to form the Mode Lauran partnership in part to compensate Davis for his losses on the January 2015 Mode deal that failed because of the fraudulent Cyprus First Bank letter.

8. Between February 2015 and April 2015, GUMRUKCU and Eratay caused the transmission of various emails falsely representing that Lauran Trading had found financing for Mode Lauran through Sekerbank, a Turkish bank. During the course of these communications, GUMRUKCU represented to G.G. and Davis that his brother, Murat Gumrukcu, was assisting in Mode Lauran's business. Beginning in February 2015, GUMRUKCU and Eratay used a Google account, muratsgumrukcu@gmail.com (hereafter "the murats Gmail account") to further the scheme to defraud and to falsely represent Murat Gumrukcu's involvement in the business dealings. When the funding was not forthcoming, GUMRUKCU promised to pay Davis $30,000 because of the funding delays. In light of this promise, G.G. paid Davis $30,000 in the first half of 2015 without receiving any repayment from GUMRUKCU until later in 2015.

9. By May 2015, Lauran Trading had not successfully obtained financing. Davis complained to G.G. and GUMRUKCU about Lauran Trading's failure to perform and about potential fraud. Beginning in May 2015, G.G. helped negotiate a buy-out of Mode's interest in the Mode Lauran partnership. These negotiations were not resolved until November 2015, when Lauran Trading and Mode entered into a "Redemption Agreement." The Redemption Agreement (which included an amendment signed at the same time) required payments to Mode to buy out Mode's interest in the Mode Lauran partnership for a potential total value of $5 million. The Redemption Agreement created an obligation that Lauran Trading pay Mode $225,000 based solely on the execution of the Redemption Agreement. The Redemption Agreement also created obligations to pay Mode additional funds over time based on future events. The Redemption Agreement stated that Quadrant would act as escrow agent for the $5 million. The Redemption Agreement further stated that the parties would participate in future oil deals, obligating Lauran Trading to obtain financing for those future oil deals. The Redemption Agreement created a separate obligation that Lauran Trading pay Mode a $75,000 per month late fee for every month that Lauran Trading failed to obtain financing. Finally, it also

3

obligated Lauran Trading to pay Mode $950,000 if Lauran Trading terminated the Redemption Agreement. Thus, Mode and Davis had a property interest in the funds due to them under the Redemption Agreement.

10. In November 2015 soon after the execution of the Redemption Agreement, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. four fraudulent bank confirmations, each for €50,000. These emails purported to show that Lauran Trading was transferring to Quadrant initial installments due under the Redemption Agreement to Mode and Davis.

11. During the Redemption Agreement negotiations, GUMRUKCU and Eratay caused the sending of emails from the murats Gmail account reflecting that Murat Gumrukcu had bought out GUMRUKCU's interest in Lauran Trading. As a result, the Redemption Agreement contained what appeared to be Murat Gumrukcu's signature. In truth, GUMRUKCU continued to control Lauran Trading and interacted with G.G. and Davis through the false and fraudulent communications from the murats Gmail account.

12. Between November 2015 and May 2016, Gumrukcu and Eratay caused the transmission of various wire communications falsely representing that Lauran Trading was performing on two of its obligations under the Redemption Agreement: that funds for the Mode buyout would be sent to Quadrant to fund the escrow account, including to cover the debt due and owed to Mode and Davis, and that Lauran Trading had $30 million available at the National Bank of Abu Dhabi to fund future oil deals. During this period, GUMRUKCU and Eratay caused wire communications to G.G. from false and fictitious third parties, including "Emre Aras," who was supposedly Murat Gumrukcu's personal assistant with an office in Hong Kong, and "Mohammed Salem," who was supposedly working with the Washington, D.C. branch of the National Bank of Abu Dhabi. Nevertheless, G.G. did not receive money from the National Bank of Abu Dhabi. During this period, Davis complained to G.G. about Lauran Trading's failure to pay him funds due to Mode under the Redemption Agreement, as described above, and GUMRUKCU's suspectedly false claims.

13. In May 2016, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. fraudulent statements about Murat Gumrukcu having over $30 million in a Wells Fargo bank account to cover

4

Lauran Trading's obligations. G.G., however, did not receive money from Wells Fargo. Instead, GUMRUKCU falsely represented that he had access to $490,000, which he would use to pay G.G. $300,000, and which G.G. could in turn use to pay Mode and Davis. By this point in time, Mode and Davis were owed over $500,000 under the Redemption Agreement. On or about May 13, 2016, GUMRUKCU sent G.G. a picture of a fraudulent Bank of America cashier's check in the amount of $490,000. At that same time, GUMRUKCU deposited into Quadrant's bank account four checks for $150,000 each, all of which described GUMRUKCU as a Turkish prince. These checks eventually bounced because GUMRUKCU's account had insufficient funds. Prior to the last check being returned for insufficient funds, G.G. sent Davis $75,000 as partial payment of Lauran Trading's obligation to pay Mode and Davis. The return of GUMRUKCU's bad checks caused G.G. to use personal funds to cover the $75,000 Lauran Trading payment to Mode and Davis. After the bounced check incident, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. two false bank confirmation statements purporting to show that GUMRUKCU's father was wiring $600,000 to Quadrant to fund Lauran Trading's obligations to pay funds to Mode and Davis. G.G., however, did not receive any funds from [GUMRUKCU] or his father during 2016. By the end of 2016, G.G. had paid out over $100,000 from his personal funds to cover Lauran Trading's obligations to pay Mode and Davis under the Redemption Agreement.

14. During the second half of 2016, GUMRUKCU and Eratay caused the murats Gmail account to make a variety of false claims to delay Lauran Trading's obligations, including false statements about Murat Gumrukcu's travel and payments to G.G. For example, on or about December 13, 2016, GUMRUKCU and Eratay caused the murats Gmail account to send G.G. a fraudulent bank confirmation for $500,000 supposedly from UBS, a Swiss bank. G.G.[] never received any funds from UBS.

15. On February 9, 2017, GUMRUKCU was arrested on state fraud charges in California, including charges related to the bounced checks deposited in Quadrant's account in May 2016. That same day, Eratay deleted the murats Gmail account. Three days later, Eratay began using a new Google email to help GUMRUKCU pose as Murat Gumrukcu, murtagumrukcu@gmail.com ("the murtag Gmail account"). Eratay, at GUMRUKCU's direction, sent G.G. numerous fraudulent emails from the murtag Gmail account between

5

February 2017 and January 2018, including emails falsely claiming that Lauran Trading was obtaining funds from UBS to satisfy Lauran Trading's obligations to fund the escrow account and pay Mode and Davis money due under the Redemption Agreement as well as provide financing for future oil deals. These funds would also repay G.G. the money he extended on Lauran Trading's behalf which was due to Davis and Mode. Eratay, at GUMRUKCU's direction, also sent G.G. numerous emails from the murtag Gmail account falsely documenting Murat Gumrukcu's travel and illnesses.

16. By May 2017, GUMRUKCU was involved in negotiating a multimillion-dollar biotech merger relating in part to GUMRUKCU's alleged discovery of a cure for human immunodeficiency virus (HIV). GUMRUKCU discussed these negotiations with G.G. At this time, Davis was actively complaining to G.G. about the fraudulent representations made to G.G., suggesting that criminal charges against GUMRUKCU should be pursued. G.G. relayed Davis's claims to GUMRUKCU and noted that GUMRUKCU had exposure from the events over the past two years. Davis agreed to "stand down" from legal proceedings in exchange for $20,000 in early May and another $20,000 in late May, paid by GUMRUKCU through G.G. In June 2017, after learning that G.G. would be interviewed by law enforcement investigating the pending California fraud case, GUMRUKCU paid G.G. over $100,000, in part to reimburse G.G.'s 2016 payment to Mode and Davis on behalf of Lauran Trading.

17. Later in 2017, Davis continued making fraud allegations to G.G., who passed the allegations on to GUMRUKCU. Throughout their relationship, G.G. relayed certain information he received from GUMRUKCU to Davis and from Davis to GUMRUKCU, in his role as middleman. By mid-November 2017, GUMRUKCU and Eratay, using the murtag Gmail account, proposed further partial payments to Davis to keep him from going public with his fraud claims. GUMRUKCU paid G.G. $65,000 in November, and G.G. in turn paid Davis $50,000. Nevertheless, Davis never received all of the money due to him under the Redemption Agreement. Thus, Davis was deprived of his right to obtain money.

18. After these payments, GUMRUKCU and Eratay avoided further communications with G.G. as Murat Gumrukcu. By late December 2017, Davis was again threatening legal action, threats G.G. passed

6

>   on to GUMRUKCU. On January 6, 2018, Davis was murdered in Vermont.
>
> 19. Between January 2015 and January 2018, in the District of Vermont and elsewhere, the defendant, SERHAT GUMRUKCU, knowingly and willfully conspired with others including Berk Eratay to commit wire fraud, in violation of 18 U.S.C. § 1343, by devising and executing a scheme to defraud. The dual objects of the scheme to defraud were to deprive G.G. of his personal funds expended on behalf of Lauran Trading and to deprive Gregory Davis of the funds due to him through Mode under the Redemption Agreement by attempting to deceive G.G. and Davis about various matters, including about funds available to GUMRUKCU and Lauran Trading, about the identity of individuals involved with GUMRUKCU and his business activities, and about past and future financial transactions related to Lauran Trading and Mode Lauran.

(Doc. 209 at 3-10.)

### B.   Mr. Gumrukcu's October 6, 2023 Motion to Dismiss.

Pending before the court is Mr. Gumrukcu's third motion to dismiss a wire fraud conspiracy charge against him. On October 6, 2023, Mr. Gumrukcu filed his first motion to dismiss (Doc. 110), arguing Count Four of the Third Superseding Indictment ("TSI") should be dismissed because the government failed to allege that the victims had been deprived of traditional property interests and failed to allege the object of the charged conspiracy was the victims' money or property.

On January 24, 2024, Judge Geoffrey W. Crawford issued an Opinion and Order denying Mr. Gumrukcu's motion. (Doc. 136.) With regard to the alleged fraudulent scheme in which Mr. Gac was the alleged victim, the court found that "[i]t is sufficient to defeat the motion to dismiss that the indictment alleges that [Mr.] Gac was deceived into paying money on behalf of [Mr.] Gumrukcu." *Id.* at 7. "That he later received repayment, especially after he passed along [Mr.] Davis's threats of exposure to criminal prosecution, does not alter the allegation that [Mr.] Gumrukcu . . . engaged in deceit in order to persuade [Mr. Gac] to send his own money to [Mr.] Davis." *Id.*

7

With regard to the fraudulent scheme to deprive Mr. Davis of his money or property, the court did not address whether the rights at issue constituted traditional property interests. Instead, the court concluded:

> The issue of whether [Mr.] Davis was a victim of wire fraud remains in the case and is not resolved by this ruling. Count [Four] is not specific about how the defendant[] sought to separate [Mr.] Davis from his money or property. When pressed, the prosecution advised that there were more facts than those laid out in the indictment. The court is content to postpone answering the question of whether a breach of the [R]edemption [A]greement amounts to a loss of property until the [g]overnment has introduced its evidence at trial or, at a minimum, provided a full proffer in response to a motion in limine directed at issues of relevance and admissibility.

*Id.* at 8-9.

### C. Mr. Gumrukcu's July 16, 2024 Motion to Dismiss.

On July 16, 2024, Mr. Gumrukcu filed a second motion to dismiss Count Four of the TSI, (Doc. 184), "arguing that Judge Crawford's decision 'didn't directly address whether the alleged conspirators agreed to obtain [Mr.] Davis's money, . . . [n]or did the [c]ourt tackle the heart of the issue: . . . whether the [g]overnment may proceed on a theory that "breach of contract" is a property right.'" (Doc. 202 at 7) (quoting Doc. 184 at 3) (alterations in original). The court issued an Opinion and Order on August 16, 2024, (the "August 16 Order"), granting in part and denying in part Mr. Gumrukcu's motion. (Doc. 202.)

The court denied Mr. Gumrukcu's motion as it pertained to Mr. Gac, agreeing with "Judge Crawford's well-reasoned conclusion that the TSI sufficiently alleges a conspiracy to defraud Mr. Gac of his money by causing him to pay Mr. Gumrukcu's debt to Mr. Davis." *Id.* at 10. The court, however, granted Mr. Gumrukcu's motion as to Mr. Davis, ruling that although "the government [was] correct that in certain circumstances[] a contractual right to money may be 'money or property' for purposes of the wire fraud statute[,]" the TSI "fail[ed] to allege that Mr. Davis was entitled to payment under the Redemption Agreement or was deprived of his contractual right to obtain that money."

*Id.* at 13. The TSI further failed to "allege that Mr. Davis and Mode are interchangeable or even that Mr. Davis controls Mode as his alter ego." *Id.*

### D.     The Fourth Superseding Indictment.

In the FSI, the government alleges that "[b]etween 2015 and 2018, [Mr.] GUMRUKCU controlled Lauran Trading and was responsible for funds due from Lauran Trading[,]" (Doc. 209 at 3, ¶ 2), and that Mr. Davis "handled and controlled Mode's funds and received any of its profits or losses" as owner and operator of the corporation.[1] *Id.* at ¶ 4.

Count Three further alleges that "[Mr.] GUMRUKCU agreed to form the Mode Lauran partnership in part to compensate [Mr.] Davis for his losses on the January 2015 Mode deal that failed because of the fraudulent Cyprus First Bank letter." *Id.* at 4, ¶ 7. The FSI provides additional details regarding the Redemption Agreement, which "created an obligation that Lauran Trading pay Mode $225,000 based solely on the execution of the Redemption Agreement[,]" *id.* at 5, ¶ 9, separate and apart from the requirement that Lauran Trading participate in future oil deals with Mode, and that it pay Mode a $75,000 per month late fee for each month that Lauran Trading failed to obtain funding for the deals.

> In the final paragraph of Count Three, the FSI alleges:
>
> The dual objects of the scheme to defraud were to deprive [Greg Gac] of his personal funds expended on behalf of Lauran Trading and to deprive Gregory Davis of the funds due to him through Mode under the Redemption Agreement by attempting to deceive [Mr. Gac] and Davis about various matters, including about funds available to GUMRUKCU and Lauran Trading, about the identity of individuals involved with GUMRUKCU and his business activities, and about past and future financial transactions related to Lauran Trading and Mode Lauran.

*Id.* at 9-10, ¶ 19.

---

[1] Correspondingly, Count Three of the FSI alleges that Mr. Gac "handled and controlled Quadrant's funds and received any of its profits or losses." (Doc. 209 at 3, ¶ 1.)

9

## II.    Conclusions of Law and Analysis.

Mr. Gumrukcu argues that Count Three of the FSI does not address the defects of superseded Count Four because it "does not allege that [Mr.] Davis 'was deprived of his contractual right to obtain' payment under the contract," (Doc. 222 at 5), nor does it allege "that [Mr.] Davis 'was entitled to payment under the Redemption Agreement' *from [Mr.] Gumrukcu*[.]" *Id.* (emphasis in original). The government, relying on the court's August 16 Order, counters that the FSI properly articulates a claim under the wire fraud statute because Mr. Davis's alleged entitlement to money from Mr. Gumrukcu under the Redemption Agreement is a property interest protected by the wire fraud statute.

### A.    Standard of Review.

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted). "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

"Pursuant to Federal Rule of Criminal Procedure 7(c)(1), an indictment 'must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Stringer*, 730 F.3d 120, 123-24 (2d Cir. 2013). The indictment must contain "the elements of the offense charged and fairly inform[] a defendant of the charge against which he [or she] must defend," and must "enable[] him [or her] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* at 124 (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

Detailed allegations "are not contemplated by Rule 7(c)(1)," *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007), and an indictment generally need only "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks omitted)); *see also United States v. Dawkins*, 999 F.3d 767, 779-80 (2d Cir. 2021) (concluding that indictment that provided "more than enough background to inform the

10

defendants of when and where the offense conduct took place[]" was sufficient). "Where there are several ways to violate a criminal statute, . . . '[f]ederal pleading requires . . . that an indictment charge in the conjunctive to inform the accused fully of the charges." *United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) (quoting *United States v. McGinnis*, 783 F.2d 755, 757 (8th Cir. 1986)) (internal citation omitted) (alterations in original).

In determining whether an indictment is sufficient, a court must "read[] the indictment in its entirety[,]" *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), and must "include facts which are necessarily implied by the specific allegations made." *Stavroulakis*, 952 F.2d at 693 (citation and internal quotation marks omitted). If an indictment fails "to allege an essential element expressly[,]" it is not fatally defective so long as "a reading of the indictment in its entirety allow[s] inference of the [missing] element." *United States v. Gonzalez*, 686 F.3d 122, 130 (2d Cir. 2012) (internal quotation marks and citation omitted). A defendant who objects to an indictment before trial "is entitled to a more exacting review[.]" *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

Under Federal Rule of Criminal Procedure 12(b), a defendant "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). When such a defense or objection "raises dispositive 'evidentiary questions,' a district court must defer resolving those questions until trial." *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018) (citing *United States v. Knox*, 396 U.S. 77, 83, 83 n.7 (1969)). In other words, a court may resolve a motion to dismiss an indictment "only when 'trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.'" *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)). When determining a Rule 12 motion, a court may not require the government, before trial, to make a full proffer of its evidence. *Sampson*, 898 F.3d at 282 (observing that "[the court's] research reveals . . . no federal appellate case upholding the authority of a district court to *require* the

11

government, before trial, to make [a detailed] presentation [of the entirety of the evidence]") (emphasis in original).

### B.   Whether the Court Should Dismiss Count Three.

"Any person who attempts or conspires to commit [wire fraud] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349. "Proof of such a conspiracy requires a showing that the defendant agreed with another to commit wire fraud and knowingly engaged in the conspiracy with the intent to commit that offense." *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024) (citing *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021)).

To prove mail or wire fraud, the government must establish "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (internal quotation marks omitted). "The wire fraud statute . . . prohibits only deceptive schemes to deprive the victim of money or property." *Kelly v. United States*, 590 U.S. 391, 398 (2020) (alterations adopted) (citation and internal quotation marks omitted). Money or property "must play more than some bit part in a scheme: It must be an object of the fraud." *Id.* at 402 (internal quotation marks and citation omitted). The government must prove that the defendant's alleged scheme "contemplated some actual harm or injury to [his or her] victims[.]" *United States v. Calderon*, 944 F.3d 72, 88 (2d Cir. 2019) (internal quotation marks and citation omitted).

#### 1.   Whether the FSI Alleges a Conspiracy to Defraud Mr. Gac.

Mr. Gumrukcu argues that Count Three should be dismissed with respect to Mr. Gac because the FSI fails to allege that the conspirators agreed, as part of their fraudulent scheme, to target Mr. Gac's money. He recognizes that the court has previously considered his argument but contends that Judge Crawford's conclusion was based "on an errant reading of the TSI: that '[Mr.] Gumrukcu and [Mr.] Eratay engaged in deceit in

12

order to persuade [Mr.] Gac to send his own money to [Mr.] Davis.'" (alteration omitted) (Doc. 222 at 22) (quoting Doc. 136 at 7).[2]

The government counters that Count Three sufficiently alleges two instances in which Mr. Gac was fraudulently convinced by Mr. Gumrukcu and Mr. Eratay "to use his own funds to pay debts [Mr.] Gumrukcu owed to [Mr.] Davis[,]" and that "[Mr.] Gac was deprived of money because of [Mr. Gumrukcu]'s false statements." (Doc. 226 at 23.) The court agrees.

Count Three of the FSI alleges that, after Mr. Gumrukcu failed to provide Mode Lauran with funding despite his false representation that he had secured financing through a Turkish bank, he "promised to pay [Mr.] Davis $30,000 because of the funding delays." Based on Mr. Gumrukcu's promise, "[Mr. Gac] paid [Mr.] Davis $30,000 in the first half of 2015 without receiving any repayment from [Mr.] GUMRUKCU until later in 2015." (Doc. 209 at 4-5, ¶ 8.) The FSI further alleges that Mr. Gumrukcu used fraudulent checks to induce Mr. Gac to provide $75,000 of his own money to Mr. Davis "as partial payment of Lauran Trading's obligation to pay Mode and Davis." (Doc. 209 at 7, ¶ 13.) In the concluding paragraph, Count Three states that one of the objects of the alleged fraudulent scheme was "to deprive [Mr. Gac] of his personal funds expended on behalf of Lauran Trading[.]" *Id.* at 9, ¶ 19. Accordingly, Count Three sufficiently alleges the object of Mr. Gumrukcu's and Mr. Eratay's fraudulent scheme was to deprive Mr. Gac of money or property by causing him to pay his own money to satisfy Mr. Gumrukcu's and

---

[2] Mr. Gumrukcu further contends that the court has not yet considered his argument that the FSI insufficiently "alleges that [Mr.] Gac and [Mr.] Davis attempted to get [Mr.] Gumrukcu's money; [Mr.] Gumrukcu attempted to give it to them; at the time his account ha[d] insufficient funds, and then [Mr.] Gac, on his own, decided to give money to [Mr.] Davis. The indictment then concedes that [Mr.] Gumrukcu ultimately reimbursed [Mr.] Gac. This hardly alleges a scheme by [Mr.] Eratay and [Mr.] Gumrukcu to steal [Mr.] Gac's money." (Doc. 222 at 23.) The fact that Mr. Gumrukcu did not receive money from Mr. Gac is not dispositive. *See United States v. Gatto*, 986 F.3d 104, 113 (2d Cir. 2021) ("As to the 'object of the scheme' element, a defendant need not literally obtain money or property—in the sense of putting money into his own pocket—to violate the wire fraud statute.") (citing *Porcelli v. United States*, 404 F.3d 157, 162-63 (2d Cir. 2005); *United States v. Males*, 459 F.3d 154, 158 (2d Cir. 2006)).

Lauran Trading's debts. Mr. Gumrukcu's motion to dismiss Count Three as it pertains to Mr. Gac is therefore DENIED.

### 2. Whether the FSI Alleges a Conspiracy to Defraud Mr. Davis.

Mr. Gumrukcu argues that the FSI fails to allege any "attempt to take any money or property *from* Mr. Davis[.]" (Doc. 222 at 10) (emphasis in original). He characterizes Mr. Davis's interests under the Redemption Agreement as mere contract rights and argues that the Supreme Court's decisions in *Ciminelli v. United States*, 598 U.S. 306 (2023) and *Kelly*, 590 U.S. 391, and the Fourth Circuit's decision in *United States v. Adler*, 186 F.3d 574 (4th Cir. 1999), foreclose such a claim. He further argues that the government misinterprets the Supreme Court's holding in *Pasquantino v. United States*, 544 U.S. 349 (2005) insofar as the government argues that *Pasquantino* allows a claim for contract damages to serve as a property interest rather than a claim for a tax debt. He urges the court to adopt the Fourth Circuit's further distinction in *Adler* that a "claim for money," which is merely a "chose in action," does not suffice.[3]

The court previously considered Mr. Gumrukcu's arguments regarding *Ciminelli, Adler*, and *Pasquantino*.[4] *See* Doc. 202 at 10-13. It found that "in certain circumstances, a

---

[3] Mr. Gumrukcu argues that the government fails to allege the Redemption Agreement was "an agreement between two parties, supported by consideration, and performance by the party demanding payment." (Doc. 222 at 13 n.9.) At this stage, the government is not required to do so. Rule 7(c) only requires that an indictment "charge[] a crime with sufficient precision to inform the defendant of the charges he [or she] must meet and with enough detail that he [or she] may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted) (quoting *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992)); *Yannotti*, 541 F.3d at 127 (finding indictment charging defendant of racketeering was sufficient where the defendant "was well aware of the government's theory . . . as well as the identities of any victims and co-conspirators," and where the indictment "ma[de] clear the nature of the criminal conduct, the time span, and the location where this conduct occurred[]").

[4] In its August 16 Order, the court referred to the Third Circuit's decision in *United States v. Kousisis*, 82 F.4th 230 (3d Cir. 2023). In that case, the Third Circuit subsequently "vacate[d] the District Court's forfeiture order" and remanded the case for further proceedings. *United States v. Kousisis*, 2023 WL 6294144, at *4 (3d Cir. Sept. 27, 2023). This did not disturb the Third Circuit's determination, on which the court previously relied, that "disputed contracts themselves do indeed constitute 'property.'" *Kousisis*, 82 F.4th at 242. The Supreme Court subsequently granted certiorari, 144 S. Ct. 2655 (2024), and heard oral arguments on December 9, 2024.

contractual right to money may be 'money or property' for purposes of the wire fraud statute." *Id.* at 13. In its August 16 Order, the court further found that "Count Four [of the TSI] fail[ed] to allege that Mr. Davis was entitled to payment under the Redemption Agreement or was deprived of his contractual right to obtain that money[,]" *id.*, and that it "d[id] not allege that Mr. Davis and Mode [we]re interchangeable or even that Mr. Davis control[led] Mode as his alter ego." *Id.* Count Three of the FSI cures these deficiencies. It alleges that Mr. Davis, as owner and operator of Mode, "handled and controlled [it]s funds and received any of its profits or losses[,]" (Doc. 209 at 3, ¶ 4), and therefore adequately alleges Mr. Davis's control of and property interest in Mode and his right to receive funds to which Mode was contractually entitled.

Count Three further alleges that, pursuant to the Redemption Agreement, Mr. Davis, through Mode, had an "immediate right to collect money without regard to a breach of the Redemption Agreement," (Doc. 226 at 18), because "[t]he Redemption Agreement created an obligation that Lauran Trading pay Mode $225,000 based solely on the execution of the Redemption Agreement." (Doc. 209 at 5, ¶ 9.) Future payments under the Redemption Agreement required Lauran Trading to pay a $75,000 fee to Mode for each month that Lauran Trading failed to appropriately obtain funding for certain oil deals. If Lauran Trading terminated the Redemption Agreement, it owed $950,000 to Mode.

The FSI does not allege that Mode, Mr. Davis's alter ego, merely had the right to bring a cause of action for breach of contract. To the contrary, the FSI alleges an immediate right to a payment of $225,000 upon the mere execution of the Redemption Agreement. Mr. Gumrukcu, who "controlled Lauran Trading and was responsible for funds due from Lauran Trading[,]" *id.* at 3, ¶ 2, thus owed Mr. Davis at least $225,000, which he did not pay and for which he avoided payment through a series of alleged fraudulent representations. The FSI alleges "[Mr.] Davis never received all of the money

---

government's money or property was *precisely* the object of Appellants' fraudulent scheme." *Kousisis*, 82 F.4th at 240 (emphasis in original).

15

due to him under the Redemption Agreement. Thus, [Mr.] Davis was deprived of his right to obtain money."[5] *Id.* at 9, ¶ 17.

Mr. Gumrukcu argues the FSI nonetheless fails to properly allege a claim under the wire fraud statute because "it only alleges [Mr.] Davis had a claim for breach of contract that he never pursued, and which defendants didn't target in the scheme alleged." (Doc. 222 at 13.)

> In *United States v. Sullivan*, the Second Circuit explained that:
>
> Of course, not all intangible interests constitute "property[]" [under the wire fraud statute,] and the Supreme Court has repeatedly cautioned that such interests must be connected to a "traditionally recognized property interest." *Ciminelli* [598 U.S. at 314]. The members' interest in money . . . was an enforceable right to payment created by contract, as the Membership Agreement guaranteed that the members would receive monthly distributions of the entirety of CMEEC Margin. Unlike the "right-to-control" property interest that the Court rejected in *Ciminelli*, such contractual rights to payment have long been recognized as valuable property, even if the payment has not yet occurred. Moreover, courts interpreting the mail and wire fraud statutes have repeatedly concluded that enforceable rights to payment are "property" that, when wrongfully thwarted by a defendant, may underlie a criminal prosecution.

118 F.4th 170, 209 (2d Cir. 2024) (internal citations omitted).

In this case, Mr. Davis's interest, through Mode, in the Redemption Agreement qualifies as a "traditionally recognized property interest." *Id.* (internal quotation marks omitted); *see also United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (reversing judgment of acquittal of wire fraud charges where the fraudulent scheme involved investing in a partnership). By entering into the Redemption Agreement, Mr. Gumrukcu, through Lauran Trading, agreed to immediately pay Mr. Davis, through Mode, $225,000 for its interest in the Joint Venture, thereby "turning [Mr.] Davis's share in a business

---

[5] Mr. Gumrukcu argues that "the FSI comes nothing close to even alleging a valid, enforceable contract, which is necessary even under *its* breach-of-contract theory." (Doc. 222 at 13 n.9) (emphasis in original). He also argues Mr. Davis could not have "'assigned, traded, bought, [or] otherwise disposed of'" Lauran Trading's alleged debt to him[.]" *Id.* at 17. The Redemption Agreement is not before the court and the court does not weigh the evidence in reviewing a Rule 12 motion to dismiss. It instead relies on the FSI's allegations regarding the Redemption Agreement's contents.

16

into an entitlement to collect money." (Doc. 226 at 17-18). Mr. Davis thus had "an enforceable right to payment" created by the Redemption Agreement. *Sullivan*, 118 F.4th at 209; *see also Pasquantino*, 544 U.S. at 356 ("The right to be paid money has long been thought to be a species of property.").

Because the government has adequately alleged that, by failing to pay Mr. Davis the money to which he was entitled, Mr. Gumrukcu deprived Mr. Davis of money or property as the object of his and Mr. Eratay's scheme to defraud through the use of wires, Mr. Gumrukcu's motion to dismiss Count Three as it pertains to Mr. Davis must be DENIED.

## CONCLUSION

For the foregoing reasons, Mr. Gumrukcu's motion to dismiss Count Three of the FSI is DENIED (Doc. 222.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27th day of February, 2025.

Christina Reiss, Chief Judge
United States District Court