UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SERHAT GUMRUKCU,<br>   Defendant. | Docket No. 22-cr-58 |

GOVERNMENT'S MOTION IN LIMINE TO ADMIT
CERTAIN NON-HEARSAY STATEMENTS BEFORE THE GOVERNMENT'S OPENING
STATEMENT

The defendant has been charged with conspiring with Berk Eratay, Aron Ethridge, and Jerry Banks to murder Gregg Davis. At trial, the government will offer various statements among the co-conspirators, including statements by Eratay to Ethridge and by Ethridge to Banks, as non-hearsay statements under Fed. R. Evid. 801. With this motion, the government seeks a pretrial ruling on the admissibility of the co-conspirator statements identified in this motion so that the government may mention them during its opening statement.

Background

The government will present evidence early in the trial outlining the contours of the conspiracy to murder and cover up the murder of Gregg Davis that stretched from 2016 through at least 2020. Testimony from Eratay, Ethridge, Banks, and Deanna Kaya, including co-conspirator statements, will outline the scheme. Eratay will testify that the defendant asked him to assist with murdering Davis in 2016 or early 2017. The defendant suggested that Eratay contact Ethridge, a friend of Eratay's and an acquaintance of the defendant. Eratay then reached out to Ethridge, who agreed to help. Eratay told Ethridge that the defendant was behind the murder scheme and provided Ethridge with basic information about why the defendant wanted Davis killed. Ethridge initially

1

asked an acquaintance to locate Davis in New Jersey, where Davis lived prior to moving to Vermont in 2015. The defendant paid Eratay to pay Ethridge for this initial reconnaissance trip, which failed to locate Davis. Eratay then hired a private investigator who found Davis's Danville, Vermont address. Ethridge will confirm that he was recruited by Eratay, who told him that he was acting on behalf of the defendant. Ethridge will also report that Eratay told him that the defendant wanted to get rid of Davis over a business deal gone badly.

By late spring or early summer of 2017, Ethridge had identified Banks as a likely hitman. In June 2017, the defendant began sending the money for the murder to Eratay. Around that same time, Eratay spoke with a friend, Deanna Kaya, about his need to turn a substantial sum into cash on behalf of the defendant. Ms. Kaya advised Eratay that it would be better to withdraw $9,000 at a time than larger amounts, because larger amounts might draw bank suspicion. Soon thereafter, Eratay began withdrawing the defendant's money in $9,000 increments.

The murder scheme picked up steam in early October when Eratay paid Ethridge money that Ethridge, in turn, shared with Banks. Banks obtained the car used for the murder in late October in Denver, Colorado, and made his first trip to Vermont to find Davis in mid-November. Ethridge explained the purpose of the murder to Banks and told Banks that he had been recruited on behalf of other people. Banks will testify that Ethridge told him that they were doing the hit for the "Turkish Prince," who had hired Ethridge to be a bodyguard on a previous occasion, and who had a business problem with Davis. Banks will also testify that during the course of the murder conspiracy Ethridge referred to the people they were working for as "the Turks."

After Banks' November reconnaissance trip, Banks decided that he could not kill Davis on Davis's property and that he needed to kidnap Davis from his home. Banks told Ethridge that he needed to be paid more for the more complicated job. Ethridge requested more funds from Eratay,

who told Ethridge that he had to ask the defendant, whose money was being used and who wanted the murder. Eratay spoke with the defendant, who approved the price increase, and then relayed the approval to Ethridge. Ethridge reported to Banks that Eratay's boss had approved the price increase, and Eratay paid Ethridge more money. In early January 2018, Banks drove back to Vermont, kidnapped Davis, and murdered him on the side of a Vermont road.

After the murder, Ethridge told Eratay that the defendant should pay Ethridge more money, as Ethridge's commission for setting up the hit. Eratay told Ethridge that he had to check with the defendant, and later reported to Ethridge that the defendant agreed to pay Ethridge some additional money to compensate him for his role in the scheme. Part of those payments were made in cryptocurrency, paid from the defendant's cryptocurrency account at a Turkish broker, Bitlo. Ethridge received a total of about $15,000 in cryptocurrency in five separate payments.

For the reasons set forth below, the Court should find these co-conspirator statements are conditionally admissible at trial and the government may mention them in its opening statement to explain the government's case.

## Discussion

A. Non-Hearsay Under Rule 801(d)(2)

1. Legal Standard

Rule 801(d)(2) contains five separate, related exceptions to the definition of hearsay, all of which are based on the principle that the opposing party's statements are not hearsay. Rule 801(d)(2)(A) allows admissions of the defendant's own statements. Rule 801(d)(2)(D) governs statements "made by the party's agent or employee on a matter within the scope of that relationship and while it existed," and Rule 801(d)(2)(E) defines as non-hearsay "statement[s] made by a conspirator of a party during the course and in furtherance of the conspiracy."

To show that the statement is not hearsay under Rule 801(d)(2)(D), the government must show: "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996) (quoting *Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534, 537 (2d Cir.1992)).

To admit a statement under Rule 801(d)(2)(E), the court must find by a preponderance of the evidence "(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (internal quotation marks omitted); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged co-conspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014); *accord United States v. Diaz*, 176 F.3d 52, 83 (2d Cir. 1999). In cases where "the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." *United States v. Padilla*, 203 F.3d 156, 162 (2d Cir. 2000). While no pretrial ruling is required regarding the existence of a conspiracy, the government seeks a pretrial ruling here to permit it to reference key co-conspirators statements during its opening statement. *See United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993) ("statements proffered as co-conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of

the necessary evidence" establishing that a conspiracy involving the defendant existed); *see also United States v. Saneaux*, 365 F. Supp. 2d 488, 489-92 (S.D.N.Y. 2005) (collecting cases).

At trial, the government will offer abundant testimony and evidence about the existence of the murder-for-hire conspiracy, as well as the conspiracy to cover it up. Although Rule 801(d)(2)(E) "requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." *Gupta*, 747 F.3d at 125.

Statements are considered in furtherance of a conspiracy if they "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy." *United States v. Maldonado-Rivera*, 922 F.2d 934, 959 (2d Cir. 1990); *accord Diaz*, 176 F.3d at 85 ("in furtherance" implies statements "have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy"). While "idle chatter" does not satisfy the in-furtherance standard, *United States v. Desena*, 260 F.3d 150, 157-58 (2d Cir. 2001) (statements describing events from two years past as "casual storytelling"), "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement," *Maldonado-Rivera*, 922 F.2d at 959.

2. <u>Eratay's Statements to Ethridge about the Defendant.</u>

Eratay's statements to Ethridge about the defendant's involvement in the murder conspiracy are non-hearsay under both Rule 801(d)(2)(D) and 801(d)(2)(E). The trial evidence will show that Eratay was an employee of the defendant from 2016 through 2020, that the defendant paid Eratay and directed his work, and that the defendant asked Eratay to hire someone, indeed specifically Ethridge, to find a hitman. In essence, Eratay was the defendant's liaison with

Ethridge. As such, Eratay's statements to Ethridge about the murder scheme, including the defendant's involvement and supervision of the scheme, are "within the scope" of Eratay's relationship with the defendant and admissible under 801(d)(2)(D).

Likewise, the evidence will establish the existence of the conspiracy to kill Davis and cover up the killing, that the defendant and Eratay were members of that conspiracy, and that Eratay's statements to Ethridge were made during the course of and in furtherance of the conspiracy. The proffered statements fostered trust and cohesiveness with Ethridge, and informed Ethridge as to the progress or status of the conspiracy. The Second Circuit has regularly held that statements about the role and actions of other conspirators are in furtherance of the conspiracy. *See United States v. Roldan-Zapata*, 916 F.2d 795, 803 (2d Cir. 1990) ("statement furthered the conspiracy's purpose by informing [one coconspirator] of the identity and role of [another coconspirator]"); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987) ("It is sufficient [in furtherance], therefore, if the listener is told with whom he will be working.") In *Diaz*, the Second Circuit approved the admission of statements by a member of the conspiracy identifying the roles of other members in the commission in a murder conspiracy. 176 F.3d at 85-86; *accord United States v. Kemp*, 2023 WL 405763 *5 (2d Cir. 2023). The court came to a similar conclusion in *United States v. Farhane*, 634 F.3d 127, 161-62 (2d Cir. 2011), finding that a statement by a co-conspirator about his partnership with the defendant was in furtherance of the conspiracy. Here, Eratay's statements to Ethridge about working on behalf of the defendant and the business deal gone badly squarely satisfy the in-furtherance test. The statements are therefore also admissible under 801(d)(2)(E).

Moreover, Eratay's statements to Ethridge about the business deal gone badly between the defendant and Gregg Davis should be admissible under 801(d)(2)(D) and 801(d)(2)(E). This description of the purpose of the murder "related to the scope" of Eratay's agent relationship and

it furthered the conspiracy's goals by helping explain and justify the murder. In essence, Eratay painted Davis in a bad light to make killing him more reasonable.

   3. Ethridge's Statements to Banks about the "Turkish Prince" and the Business Deal Gone Wrong.

Banks should likewise be allowed to testify about what Ethridge's identification of the "Turkish Prince" as the person behind the murder-for-hire plan. Banks will likely testify that during the course of the conspiracy, Ethridge identified the "Turkish Prince" as the person in charge of the scheme and told Banks and that the "Prince" had previously hired Ethridge to work as a bodyguard. This statement "foster[ed] trust and cohesiveness" between Ethridge and Banks and thus furthered the conspiracy. *See Roldan-Zapata*, 916 F.2d at 803; *Diaz*, 176 F.3d at 85-86. It, too, should be admitted under 801(d)(2)(E). Moreover, just as the statements by Eratay to Ethridge about the business deal between the defendant and Davis furthered the conspiracy, Ethridge's report of that information to Banks, the hitman, similarly furthered the goals of the conspiracy. Further, the defendant asked Eratay to recruit Ethridge to find the hitman, and thus Ethridge's statements to Banks are admissible under 801(d)(3)(D) for the same reasons that Eratay's statements to Ethridge are agent statements.

   4. Eratay's Statements to Ms. Kaya about Withdrawing Cash for the Defendant.

Eratay's statements to Ms. Kaya about withdrawing cash are also admissible co-conspirator statements under 801(d)(2)(E). This circuit has held that statements prompting a non-coconspirator listener to respond in a way that facilitates the criminal activity are made in furtherance of a conspiracy. *See Gupta*, 747 F.3d at 125; *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989). Eratay's conversation with Ms. Kaya was not simply "idle chatter," but rather concerned the logistics and implications of withdrawing and transferring money to fund the

conspiracy's key actions. Indeed, as the evidence will show, Eratay followed Ms. Kaya's advice to withdraw the cash he needed to pay Ethridge, showing that the statement and conversation furthered the conspiracy. The Court should also rule these statements are admissible.[1]

> 5. Eratay and Ethridge's Testimony that Ethridge was Hired as the Defendant's Bodyguard and that the Defendant Suggested Including Ethridge in the Conspiracy.

The evidence the government seeks to admit through testimony of Ethridge and Eratay will show that Ethridge and Eratay met as neighbors in Henderson, Nevada, just outside Las Vegas. The defendant regularly visited Las Vegas. Moreover, in May 2015, the defendant and Eratay needed to hire someone as a bodyguard. Eratay recruited Ethridge to be the bodyguard. The Court previously reserved judgment on whether it would allow a full description of the bodyguard meeting at the Cosmopolitan Hotel, where another friend of Eratay's was hired to pose an Arab Price to fool a Los Angeles businessman. The government argued previously that a full description of the event helped show the relationship among the defendant, Eratay, and Ethridge, a key

---

[1] The government also plans to describe the kidnapping of Gregg Davis in its opening statement, including what Gregg told his wife Melissa about information provided by Jerry Banks, the hitman posing as a United States Marshal on the evening of January 6, 2018. The government's evidence will establish that the murder plot involved removing Gregg from his home before killing him. This kidnapping was based on a fake arrest. Banks dealt directly with Gregg, who reported several of the "marshal's" false statements to her in the successful attempt to make her think that her husband was really being arrested. As a result, Melissa Davis did not contact law enforcement about Gregg leaving the house on January 6, 2018. She did not learn that he was not arrested until she learned that he was killed. The information provided by Banks to Gregg to be relayed to his wife does not run afoul of the hearsay rules for multiple reasons. To begin with, the words said by Gregg Davis are verbal acts meant to influence Melissa Davis and are not being offered for their truth. Only statements offered for "the truth of the matter asserted" are hearsay. Fed. R. Evid. 801(c); *see United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (statements offered for effect on listener not hearsay). Rather, the statements are part of a fraud vital to the murder plot. Moreover, false statements and directions are not hearsay under Rule 801(c). *See United States v. Bellomo,* 176 F.3d 580, 586 (2d Cir. 1999) (commands or threats not hearsay); *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) (questions not hearsay).

member of the conspiracy. But the full description included evidence showing that the defendant was committing a fraud with regard to the businessman, and the Court reserved ruling on whether this full description was admissible under Rule 404(b). The government seeks permission to offer merely that the defendant hired Ethridge to be a bodyguard at the Cosmopolitan. This evidence does not run afoul of Rule 404(b) because it does not raise any suggestion of a bad act or a crime by the defendant. It is merely relevant evidence, that should be admitted, and that the government should be allowed to mention in its opening statement.

   Indeed, this limited information is highly probative and poses no risk of unfair prejudice under Rule 403. To begin with, this evidence explains Ethridge's identification of the Turkish Prince, the person behind the murder plot. As noted above, the Court should admit Ethridge's description of their boss to Banks, and the limited bodyguard evidence ties the description directly to the defendant, as opposed to some other Turkish Prince. Moreover, through this interaction, the defendant observed Ethridge's size and presentation. The defendant's interactions with Ethridge early in their acquaintance provided the bases for the defendant's suggestion to Eratay that he should ask Ethridge to find a hit man. Specifically, the defendant knew Ethridge as "Rusty," and in the summer of 2017, the defendant suggested to Eratay that he ask Ethridge to join the murder-for-hire conspiracy. Here, the evidence explains Ethridge's identification of another conspirator as well as the purpose of including Ethridge in the then existing conspiracy between the defendant

and Eratay to murder Gregg Davis. Thus, this evidence—admitted through questions to Eratay and Ethridge—is critically probative of the formation of the conspiracy.[2]

## Conclusion

For the reasons set forth above, the Court should rule before trial that the identified statements are admissible, and the government may mention them during its opening statement. The Court should also rule that limited information about Ethridge working for the defendant as a bodyguard is admissible and can be mentioned during it opening statement. The government will seek to admit additional co-conspirator statements during the course of the trial.

---

[2] While the Court has ruled that the full bodyguard evidence is not allowed in opening, the Court "defer[ed] ruling on it beyond that." Specifically, the Court explained, "So with regards to Count 1 and Count 2, this is before the conspiracy, does not seem to be linked to it, and it strikes me as somewhat far afield. I am not going to be hearing testimony about the Cosmopolitan, I call it the royal -- royalty incident, in opening statement. That is collateral. It doesn't strike the Court as the motive. It's an unrelated event, another act of fraud that kind of went nowhere, so I'm not going to hear about it in opening statement. The door may be opened to it. I don't find it outrageously inflammatory, but it's not something that needs to be introduced in opening statement. Its relevance appears to be fairly limited. It seems to indicate a propensity for fraud. It may be that it's relevant to the relationship of trust between the parties, but I think that could be established other ways." July 26, 2024 Hearing Trans. at 73-74. The government believes that this evidence can be sanitized to the extent that it demonstrates to the Jury that the defendant knows Ethridge from his prior work as a bodyguard, and explains why it was the defendant's idea to ask Ethridge to participate in the murder for hire conspiracy. This limited evidence does not implicate "an act of fraud" by the defendant. The Court has not previously addressed the admissibility of this limited presentation of the bodyguard evidence.

Dated at Burlington, in the District of Vermont, 3rd day of March 2025.

    Respectfully submitted,
.
MICHAEL P. DRESCHER
Acting United States Attorney

By: */s/Zachary Stendig*
PAUL J. VAN DE GRAAF
ZACHARY STENDIG
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725