UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SERHAT GUMRUKCU,<br>    Defendant. | Crim. No. 2:22-cr-00058 |

GOVERNMENT'S SENTENCING MEMORANDUM

    Serhat Gumrukcu committed a heinous and unforgivable crime. He financed the murder of Gregory Davis, who he needed silenced because of a bad business deal, and he set into motion a truly monstrous killing. As proven at trial, when Gumrukcu's biotech payday neared fruition, Gumrukcu needed to ensure Davis would never go to authorities, after defrauding Davis for years. So Gumrukcu turned to Berk Eratay, his assistant and a man he called "brother." Berk Eratay hired his former next-door neighbor, Aron Ethridge, to find a hitman to execute Gregory Davis on behalf of Gumrukcu. Ethridge hired Jerry Banks. On January 6, 2018, Banks posed as a Deputy U.S. Marshal and drove to Davis's house in Danville, Vermont in what appeared to be an unmarked police vehicle. Banks knocked on the door to Davis's house and, when he answered, presented a phony arrest warrant purporting to show that Davis was under arrest for various federal offenses. Davis entered Banks's car in handcuffs, and Banks drove him to Barnet, Vermont where he shot Davis in the back more than ten times from close range. Banks buried Davis's body in snow and left him by the side of the road.

    Gumrukcu accomplished his objective. He silenced Davis. In the weeks that followed Davis's death, Gumrukcu biotech deal closed. Gumrukcu was paid millions of dollars. And he almost got away with it.

For his crimes, Gumrukcu deserves a life sentence. He takes no responsibility for his monstrous actions. Gumrukcu has shown no remorse. At trial, Gumrukcu lied about his involvement in the murder-for-hire scheme and called dozens of witnesses to talk about how he was a savior. Of course, Gumrukcu is no savior, and as proven at trial, he is the furthest thing from it. He is a cold-blooded murderer. He deserves full incapacitation, and such a sentence is also mandated by the law. Accordingly, on September 25, 2025, this Court must sentence the defendant to imprisonment for his natural life.

A.     Factual Background

The Presentence Report ("PSR") accurately summarizes the defendant's conduct. PSR at ¶¶ 19-55. As explained in the PSR, this summary was "supported by trial testimony and discovery documentation." PSR ¶ 19. Nevertheless, the defendant alleges potential objections to the summary. More than five months have passed since the verdict in this case, but the defendant has neither provided an alternative summary nor provided any differing documentation to contest the PSR's summary. Additionally, the defendant has not provided any specificity as to his objections, either. At this point, Gumrukcu simply seems to disapprove of the jury's verdict. Fortunately, the Court is well-versed in the defendant's involvement in the murder-for-hire and related crimes having presided over the defendant's five-month trial, and the Court should reject his factual objections. *See United States v. Ware,* No. 04 Cr. 1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. Jan. 14, 2009) (rejecting factual objections to PSR as "contrary to the record at trial").

B.     Sentencing Guidelines

The government submits that the Probation Office correctly calculated the defendant's sentencing range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.")

in the PSR.

*The Defendant's Offense Level*

Specifically, the PSR calculated a total offense level of 43 under the Guidelines, which is premised on a base offense level of 43 pursuant to U.S.S.G. §2A1.1(a), a two-point enhancement for the physical restraint of the victim pursuant to U.S.S.G. §3A1.3, and another two-point enhancement under U.S.S.G. § 3C1.1 for obstruction due to the defendant's perjurious testimony, however pursuant to Chapter 5, Part A (comment n.2), the highest possible total offense level is 43. PSR ¶¶ 53-64.[1]

1. *The Obstruction of Justice Enhancement Under § 3C1.1 Applies.*

To the extent that there is a dispute, the PSR correctly applies a two-level enhancement for Gumrukcu's obstruction of justice under § 3C1.1. PSR ¶ 60. In objecting to this enhancement, if he in fact objects, Gumrukcu ignores the most obvious reason for its application: his blatantly false, self-serving testimony at trial. Gumrukcu's perjury makes application of the enhancement mandatory.

A. *Legal Framework*

It is well-recognized that "false trial testimony is an appropriate basis for imposing an obstruction of justice upgrade." *United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991). Indeed,

---

[1] The defendant has mentioned a potential objection to the Obstruction of Justice enhancement. The Court should reject this argument because, as described in this memorandum, there is ample basis to conclude this two-point enhancement applies. However, since the Guidelines do not allow for a total offense level exceeding 43, as described above, pursuant to the Federal Rules of Criminal Procedure, the Court may "determine that a ruling is unnecessary" on whatever factual objections arise (if they in fact arise, as during the most recent status conference, defense counsel mysteriously stated that she would be entirely unavailable in the days prior to sentencing without expanding further). Fed. R. Crim. P.32(i)(3)(B). This is "because [when] the matter[s] will not affect sentencing" no ruling is necessary. *Id.* Considering the mandatory minimum life sentence that the defendant faces, the government acknowledges that the Court may decide not to rule on whatever objections the defendant ultimately makes. *Id.*

3

"[w]here the defendant lies under oath, the application of a sentence enhancement is mandatory." *United States v. Morissett*, 49 F. App'x 334, 339 (2d Cir. 2002); *see also United States v. Shonubi*, 998 F.2d 84, 86–87 (2d Cir.1993) (reversing for failure to apply U.S.S.G. § 3C1.1 sentence enhancement because "[i]f a defendant's lies are found to be willful, an obstruction of justice enhancement must be imposed at sentencing."). Although "[a]ny ambiguity regarding the testimony must be evaluated in the light most favorable to the defendant[,] … such an enhancement is mandatory once its factual predicates have been established." *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996).

That factual predicate is easily established in a case where a defendant's lies go directly to the conduct at the core of counts for which he ultimately was convicted. As the Second Circuit has recognized:

> Where, as here, the defendant's testimony relates to an essential element of his offense, such as his state of mind or his participation in the acts charged in the indictment, the judgment of conviction necessarily constitutes a finding that the contested testimony was false. Accordingly, assuming that the evidence also persuades the sentencing judge that the defendant knew, at the time of testifying, that the statements to which he testified were untrue, a section 3C1.1 enhancement would be appropriate.

*Bonds*, 933 F.2d at 155; *see also United States v. Stewart*, 686 F.3d 156, 177 (2d Cir. 2012)("Here, as in *Bonds*, the jury's findings of guilt on Count One, charging conspiracy to defraud the United States, and Counts Four and Five, charging material support of terrorism, each required the jury to find that Stewart's actions were undertaken knowingly. The jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly.").

  B. *Argument*

Gumrukcu repeatedly made claims that were demonstrably false. Among other things, he

expressly denied participating in conversations with Berk Eratay about planning the murder of Gregory Davis, that went to the core of his conduct, along with denying much participation or even knowledge of the scheme to defraud Gregory Davis of money due to him under the redemption agreement. He also denied financing the murder-for-hire scheme, even though cryptocurrency records indicated that Gumrukcu's account sent Bitcoin to Aron Ethridge.

He did not merely deny participation in general terms; he made expressly false claims about his conduct and that of others, specifically Eratay, in the defendant's attempt to refute Eratay's damning testimony against him. The jury's comprehensive verdict "necessarily constitutes a finding that the contested testimony was false," *Bonds*, 933 F.2d at 155, and the application of the perjury enhancement is therefore mandatory. *See also United States v. Hunter, et al.*, No. 13 Cr. 521 (RA), 2018 WL 4961453, at *4 n.10 (S.D.N.Y. Oct. 15, 2018) ("Samia unequivocally denied being involved in a murder-for-hire plot and thus the jury appears not to have credited his testimony."); *see also United States v. Matos,* 907 F.2d 274, 275-76 (2d Cir. 1990) (upholding imposition of two-level upward adjustment where defendant offered testimony that was flatly contradicted by the record).

While Gumrukcu's false denials of involvement alone are sufficient for the enhancement, Gumrukcu made myriad false statements, including by not limited to: "1) his use of the Murat and Murtag Gmail accounts; 2) the legitimacy of certain documents provided in connection with his FBAR application; 3) his manipulation of data related to HIV treatments for his 'patient,' Sam Cimino; 4) the nature of his relationship with Berk Eratay; 5) his understanding of a debt owed to Gregory Davis pursuant to the Redemption Agreement." PSR ¶ 51. Specifically, Gumrukcu's lies are connected to the following statements in his direct testimony: a) his false claim that he did not have a hand in the Gregory Davis threats; b) that he was not deeply involved in the 2017

5

communications with Gregory Davis even; c) that the money he sent Eratay in 2017 (used to finance the murder) was a loan for cryptocurrency mining machines; and d) that Gumrukcu did not know about the Bitlo payments to Ethridge.

On cross-examination, Gumrukcu essentially doubled-down on his false statements. He also provided testimony that undercut any potential credibility in terms of his testimony in toto. In fact, Gumrukcu testified during cross-examination on April 16, 2025, "it's so many lies, I can't remember which were true, which were lies[.]" That same day he also stated, "I made very overt lies[.]" Taken as a whole, Gumrukcu's testimony was entirely incredible because he admitted that he told so many lies that the defendant himself could not remember what was true and what was fiction. Accordingly, the court must impose the obstruction enhancement as the "factual predicates have been satisfied." *Mylett*, 97 F.3d at 668.

### *The Defendant's Criminal History*

Based on the defendant's criminal history, the PSR correctly found the defendant to be in criminal history category I. PSR ¶ 70. Of course, this is the lowest possible category. The defendant's PSR also reflects his prior California State conviction, which while demonstrating that he has a prior conviction, otherwise does not score. PSR ¶ 68. Nevertheless, the defendant has implied a potential objection to the facts supporting this zero-point offense. This comes *after* the defendant admitted to this very conduct during his own testimony at trial. To the extent the defendant objects to this section of the PSR, it is like his other untimely objections: entirely frivolous and designed to delay his inevitable life sentence.

### *The Advisory Guidelines Range and Mandatory Minimum Sentence*

With a total offense level of 43 and a criminal history category of I, the defendant's advisory guidelines range is life imprisonment. Ultimately, the defendant was convicted under 18

U.S.C. § 1958, thus he faces a mandatory life sentence. This sentence would nevertheless be appropriate under 18 U.S.C. § 3553(a) as described below.

    C.    <u>Section 3553(a) Factors</u>

Regardless of the mandatory minimum sentence, life imprisonment is sufficient, but not greater than necessary, to accomplish the goals of the Sentencing Reform Act.

First, the nature and circumstances of this offense are nearly unimaginable. *See* 18 U.S.C. § 3553(a)(1). The murder-for-hire conspiracy that took the life of Gregory Davis is unconscionable. The killing of Davis was planned and premeditated. Gregory Davis's death was a brutal, execution style, killing of a father of six (Davis's wife was pregnant with their seventh child at the time of his death). Of course, this all happened due to Gumrukcu's greed and fear that Davis would disrupt his bright future in biotech. The nature and seriousness of the defendant's conduct demands the most serious sanction available.

A Guidelines sentence of life imprisonment is also appropriate considering the defendant's history and characteristics. The defendant committed his crimes despite having immense privilege and intelligence. He had many resources at his disposal, including relationships with many wealthy investors who believed in his potential as a scientist. Gumrukcu has shown no remorse for his actions. He has shown no regard for the life of Gregory Davis that he senselessly stole. Thus, his history and characteristics further militate in favor of the life sentence.

In crafting the defendant's sentence, the Court should consider the need to promote respect for the law. There is a compelling need for general deterrence in this case. Murder strikes at the fabric of society. Sadly, no matter what sentence the Court gives to Eratay and his co-conspirators, it will not undo Davis's murder. The Davis family will never see their son, husband,

or father ever again. Furthermore, the actions underlying the defendant's crimes are not the result of accident or mistake. Rather, the defendant's actions appear to have been motivated by his own greed. All the defendant's actions appear to have been part of an intentional plan to protect himself from Davis going to authorities with evidence of his fraud, which would have scrapped Gumrukcu's lucrative bio-tech payout. In so doing, Gumrukcu committed the most serious offense contemplated by our criminal justice system, even if it was not Gumrukcu himself who fired the fatal shots into Davis's back.

A life sentence is also necessary to achieve adequate deterrence. Given the defendant's continued pronouncement of innocence in the face of overwhelming evidence of his guilt, there is every reason to believe that the defendant has the incentive to commit crimes against the United States in the future should he ever be released from prison. In terms of general deterrence, a life sentence for the defendant will send a clear message that the American justice system does not tolerate such abhorrent conduct.

Finally, as the government has indicated in prior filings, the United States is not seeking a fine.

Fines are imposed based upon the statute of conviction, the Guidelines, and case law interpreting both. *United States v. Corace*, 146 F.3d 51, 55 (2d Cir. 1998). For his convictions under 18 U.S.C. § 1958, the defendant faces a maximum fine of $250,000. The same is true for his convictions under 18 U.S.C. § 1349. The Guidelines state that the court "*shall* impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added).

It is the defendant's burden to establish indigence and thus avoid imposition of a fine. *See United States v. Puello*, 21 F.3d 7, 11 (2d Cir. 1994). A defendant may meet that burden "by an

independent showing, or by reference to his [PSR]." *United States v. Rivera*, 971 F.2d 876, 895 (2d Cir. 1992). "Objective evidence of inability to pay, such as representation by assigned counsel, will obviously strengthen a defendant's claim of financial inability." *Corace*, 146 F.3d at 56 (citation omitted).

Once the defendant has met the burden to show his indigence, the sentencing court is not barred from imposing a fine; however, "the discretion vested in sentencing courts . . . to waive a fine . . . should generally be executed in favor of such a waiver[.]" *United States v. Wong*, 40 F.3d 1347, 1383 (2d Cir. 1994).  If the sentencing court imposes a fine in such a circumstance, in addition to the general requirement that it "state in open court the reasons for its imposition of the particular sentence," 18 U.S.C. § 3553(c), it should also address its conclusion that the defendant can be expected to pay the fine imposed. *Corace*, 146 F.3d at 57.

Here, the defendant has declined the PSR interview.  Thus, he has chosen not to provide details about his finances.  Furthermore, at the conclusion of the defendant's cross-examination on April 16, 2025, he stated that the government did not have information for all of the defendant's bank accounts.  Presumably, the defendant has assets in those accounts that the government did not identify despite years of investigation.  Furthermore, the defendant testified at trial at great length about his patents and the brilliance of his scientific discoveries.  It is reasonable to conclude from that testimony that the defendant will earn a great deal of money while incarcerated.  Nevertheless, the government is not seeking a fine because the United States believes that all the defendant's available assets should go toward paying restitution to the Davis family and paying the civil judgement that the Davis family may one day obtain.

As to restitution, it is well settled that a restitution award need be only a reasonable estimate of the victim's actual losses. *See, e.g.*, *United States* v. *Carboni*, 204 F.3d 39, 46 (2d Cir.

9

2000) (holding that a court setting restitution "need not establish the loss with precision but rather 'need only make a reasonable estimate of the loss, given the available information'"). In making such a reasonable estimate, a court may extrapolate from known data to arrive at an appropriate approximation of loss. *See, e.g.*, *United States* v. *Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (holding that district court's estimate of loss for restitution purposes in food stamp fraud case, which was based on extrapolation from known data regarding fraud and witness observations, was reasonable). The government is preparing evidence to allow the court to extrapolate lost wages due to the Davis family. The government will seek restitution orders from Gumrukcu, as well as Banks, Ethridge and Eratay, and believes any restitution order should be joint and several as to the four defendants.

D.     Conclusion

The mandated sentence of life imprisonment is the only appropriate sentence in this case. It is the only sentence that will provide sufficient punishment for the defendant's crimes, reflect the seriousness of those crimes, and provide adequate justice for Gregory Davis.

Dated at Burlington, in the District of Vermont, September 22, 2025.

        Respectfully submitted,

        UNITED STATES OF AMERICA

        MICHAEL P. DRESCHER
        Acting United States Attorney

By:     */s/ Zachary B. Stendig*
        ZACHARY B. STENDIG
        PAUL VAN DE GRAAF
        Assistant United States Attorneys
        P.O. Box 570
        Burlington, VT 05402-0570
        (802) 951-6725