**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF VERMONT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-CR-58 |
| Plaintiff, | |
| v. | |
| SERHAT GUMRUKCU, | |
| Defendant. | |

**SENTENCING MEMORANDUM**

Serhat Gumrukcu was convicted of murder for hire under 18 U.S.C. § 1958, which mandates a sentence of life without the possibility of release. Under currently applicable authorities, no grounds are available to support a variance or departure. Further, nothing in the Pre-sentence Investigation Report (the "PSR") filed by the Probation Office affects that sentence. Nevertheless, he submits this memorandum to object to certain portions of the PSR, to argue against a fine, to dispute the government's restitution calculation, and to argue against any enhancements.

Serhat Gumrukcu sent objections to the government and to the probation officer on November 3, 2025. Office Bonneville responded that the final PSR had already been issued; thus any further objections should be made to the Court. Serhat Gumrukcu requests that the Court amend the PSR according to the following objections:

I.    Factual Objections

Serhat Gumrukcu makes the following factual objections to the PSR:

Paragraph 35: "*Neither Gumrukcu nor Eratay ever intended to perform on the business dealings with Davis; specifically, to purchase oil through Davis for resale purposes.* However, Davis complained frequently to

Gumrukcu, and Eratay had access to these emailed complaints, about the non-performance on the business transaction."

Gumrukcu requests that the first sentence of this paragraph be stricken. It was his intent to perform on the business dealings with Davis, and nothing in the testimony at trial contradicts this. The government cites *United States v. Ware,* No. 04-CR-1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. 2009) for the proposition that a Court should reject factual objections to the PSR that are "contrary to the record at trial." We agree. There is no testimony or evidence to support the government's claim; thus this sentence should be stricken.

Paragraph 36: this paragraph states that Gumrukcu never obtained a medical degree or Ph.D. The government did not present evidence to support this; this was the government's theory. Gumrukcu testified that he did in fact obtain a medical degree and a Ph.D. from Russia. He admitted that he purchased the degrees; however, his testimony was that these are legitimate degrees from Russia. We request that these sentences be stricken: "Gumrukcu held himself out to be a medical doctor, even though he never obtained a medical degree or a Ph.D. Gumrukcu obtained fraudulent diplomas from Russia that purported to be his medical degree."

Paragraph 47: Gumrukcu disputes that he paid Etheridge an additional compensation through Bitlo. We request that this entire paragraph be stricken.

It was established through testimony, messages, and records that this transfer was done by Berk Eratay without Gumrukcu's knowledge; and Eratay in fact told Gumrukcu he was paying a man named Faik Altay, an attorney in Turkey. Testimony from Berk Eratay on April 8, 2025, pp. 82-86, during which time he is being examined about a text thread on Threema between himself and Serhat Gumrukcu, Defense KK12, proves this:

> Q: And the way it's going to be paid, the 20,000 from Garanti to Sergei, is 10 and 10; is that right? Do you remember that?
> A Looking at the later pages -- I'm sorry, because you didn't ask me to look -- that is not referring to Sergei. That refers to another payment, that 10, 10.

Q That refers to Faik, right?

A Yes, sir.

Q Okay. So he wants to pay Faik $20,000, right?

A Yes, sir.

Q And this is on – you're having this conversation on February 28th, right?

A Yes, sir.

Q And he says we're going to do the money to Faik 10 and 10 to two different accounts, right?

A That is not what it refers to. It says, like, we send 10,000 to his bank account as wire and 10 as Bitcoin.

Q So that's how – that's how Mr. Gumrukcu wants to pay the money to Faik; is that right?

A No. That's how I told him to do it, because that's how people want to get paid.

Q Okay. Thank you for that correction. So you're guiding -- he wants to get that amount of money to Faik, and you're the one that's going to guide the transaction, so – in this way to achieve his goals, right?

A Yes, sir.

Q Okay. So after that, you provide -- you provide the Garanti Bank information for Faik Altay; is that right?

A Yes, sir.

Q And that's where you say we'll do 10 here from Bitlo and 10 from Bitcoin, right?

A Yes, sir.

Q And that's money for Faik, right?

A Yes, sir.

Q And then the rest of this, you complete the transaction to Faik on -- if you look at page 7, do you remember doing that on March 30th, 2020 --

MS. MARCUS: 3rd.

Q Sorry. -- March 3rd, 2020, at 8:16 AM UTC time? Is that right?

A Can you repeat the question, please?

Q Sure. This text -- this Threema stream --

A Um-hum.

Q -- reflects and you remember that it reflects that you sent the money per his instructions to Faik on March 3rd, 2020, at 8:16 AM, right?

A That's not what it says on the seventh page, sir.

Q What does it say to you, sir?

A He says I'm sending the wire transfer now, and then there's no remarks regarding me sending it.

Q So he's "sending Garanti now" at that time?

A Yes, sir.

Q Okay. And does that mean he's sending money to Faik from his Garanti Bank account?

A I believe so.

Q Okay.

THE COURT: So who are we talking about in terms of "he"? You or Faik or somebody else?

THE WITNESS: Faik is the person getting paid. He is sending money to Faik.

THE COURT: Who is the "he"?

THE WITNESS: Mr. Serhat.

Q… Mr. Gumrukcu informs you that that $10,000 from Garanti already went to Faik; he's done the transaction, right?

A Yes, sir.

Q Is that a "yes," sir?

A Yes, sir.

Q Okay. And then he informs you the other money already went to Bitlo. Do you see that?

A Yes, sir.

Q And he asks you to handle the Bitlo money to Mr. Faik because you already have the log in information. Do you remember that?

A Yes, sir.

Q And you didn't really remember, but you're going to look into it to execute the transaction, right?

A I said, "I don't remember the password. I deleted it. But I will look into it."

Q Okay. And then he -- and then you ask for -- first you ask for a receipt of the first $10,000 to Mr. Faik on March 3rd, right?

A Yes, sir.

Q And then Mr. Gumrukcu gives you the password you're going to need to complete the transaction, correct?

A Yes, sir.

Q And he gives you his Gmail address so you can complete the transaction, right?

A Yes, sir.

Q And then 10 -- he -- you -- you confirm that he wants the 10 -- withdrawn. You confirm that $10,000 from those two accounts is going to Mr. Faik, right?

A Yes.

II.    Obstruction of Justice[1]

Serhat Gumrukcu should not be given an additional two points for obstruction of justice. The government cited certain aspects of his testimony that they believe to be false. None of these bases for an obstruction of justice enhancement relate to "an essential element of his offense," *see United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991). Thus they are not appropriate bases to apply a two-point enhancement under U.S.S.G. § 3C1.1.

The Sentencing Guidelines provide for a two-level increase in offense level where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration

---

[1] The government's footnote 1 notes that "since the Guidelines do not allow for a total offense level exceeding 43, and since he faces a mandatory sentence of life imprisonment, pursuant to the Fed. R. Crim. P.32(i)(3)(B), a ruling on any enhancement would be unnecessary because the matter will not affect sentencing. Gumrukcu agrees that the Court may decline to impose sentencing enchancements without making any specific factual findings, and he would request that first and foremost. However, in an abundance of caution, he makes the enclosed objections to the enhancements in the PSR.

of justice during the investigation, prosecution, or sentencing of the instant offense. . . ." U.S.SG. §
3C1.1. The enhancement applies to a defendant who commits perjury. *Id.* at comment. (nn. 1 &
3). Perjury is defined by statute as willfully giving false testimony under oath concerning a material
matter. 18 U.S.C. § 1621 (1988).

      The Supreme Court has held that to apply § 3C1.1, a sentencing court must carefully review
the evidence and "make independent findings necessary to establish a willful impediment to or
obstruction of justice, or an attempt to do the same, under the perjury definition. . . ." *United States v.*
*Dunnigan*, 507 U.S. 87, 95 (1993). In making that determination the allegedly perjurious statements
must be evaluated "in a light most favorable to the defendant." U.S.S.G. § 3C1.1, comment. (n.1); *see*
*also United States v. Matos,* 907 F.2d 274, 276 (2d Cir. 1990).  Courts must ensure that "defendants are
not penalized merely for taking the stand, which otherwise would raise troubling constitutional
issues. The fact that a defendant who testifies at trial is disbelieved by the jury and convicted is not
alone sufficient evidence of perjury to bring about sentence enhancement…." *United States v. Shonubi*,
988 F.2d 84, 88 (2d Cir. 1991) (citing *Dunnigan).*

      None of the bases for obstruction of justice cited by the government meet all of these
requirements. Either they do not relate to the elements of the offense, or do not rise to the level of
willful lies.

      <u>Paragraph 51</u>: Gumrukcu makes the following objections to the government's allegations:

      1). Government's allegation of obstruction of justice: "his use of the Muratand Murtag
Gmail accounts." Gumrukcu objects to a finding of obstruction of justice on this basis. In his
testimony, he admitted he created and used the first murat gmail account. He told the truth when he
said he did not create or use the second account, and no testimony or evidence contradicts this. The
government's own computer expert, and Berk Eratay, admitted that Berk Eratay created and used
the second Murtag gmail account. Further, this does not support an element of the offense.

2). Gumrukcu did not provide false documents in connection with his FBAR application, and he objects to a finding of obstruction of justice on this basis. As established at trial, only the highest amount in a year was necessary to report on an FBAR application; the testimony was that this was truthfully reported. It was not established at trial that Gumrukcu emailed anyone any detailed bank records with the intent to provide false information in connection with his FBAR application. Neither does this point relate to an element of the offense.

3). It was not established at trial that Gumrukcu manipulated any data related to Sam Cimino. The government made insinuations through questions. As the Court instructed the jury, "the arguments of the attorneys and the questions asked by the attorneys are not evidence in the case." No testimony supports these allegations; nor was this a fact found by the jury, and we object to a finding of obstruction of justice on this basis. Again, this does not relate to an element of the offense.

4). Gumrukcu admitted his close relationship with Berk Eratay. This is vague and we object to a finding that Gumrukcu obstructed justice.

5). We object to the finding that Gumrukcu obstructed justice about "his understanding of a debt owed to Davis under the Redemption Agreement." There was nothing to contradict the nature of Gumrukcu's understanding of what was "owed" to Davis. Gumrukcu is the only one who can speak to his own understanding. His testimony spoke to his understanding, which was that he did not believe he "owed" Davis money. Further, text messages admitted into evidence support Gumrukcu's understanding. On September 25th, 2017, Serhat texted Gregory Gac, "Does Gregg not have a smart enough counsel to tell him that he has to be defrauded, not paid hundreds of thousands of dollars, to actually report 'fraud'". Government Exhibit 118 (Pg. 85).

6). Gumrukcu maintains his innocence and disputes that he was involved in the murder for hire conspiracy. He did not lie on the witness stand. The jury's verdict proved that they believed the

government proved their case beyond a reasonable doubt. They did not make specific findings about Gumrukcu's statements on the witness stand. A finding of and enhancement for obstruction of justice is not warranted.

III.     Objection to Enhancement for Restraint of the Victim

Paragraph 58: We object to the upward adjustment of two points because the victim was restrained under U.S.S.G. § 3A1.3. Adjustments under the sentencing guidelines shall be determined on the basis of "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A). He can only be held accountable for acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity. 1B1.3(a)(1)(B). The restraint of Davis was a decision made by Banks. There was no testimony that Gumrukcu had any knowledge let alone agreement about Banks' decision to restrain Davis. It was not within the scope or reasonably foreseeable. Further, at the last hearing, the government indicated it is not requesting this enhancement.

IV.     Objection to Arrest Evidence in the PSR

Paragraph 68: we object to the inclusion of this paragraph and case in the PSR. This case was dismissed, and should therefore not be included in the PSR. The certified docket is attached as Exhibit 1. Page 11 indicates that the case was dismissed on September 4, 2020.

Federal Rule of Criminal Procedure 32(d) instructs that a PSR should: (A) identify the applicable guidelines and policy statements; (B) calculate offense level and criminal history; (C) state the sentencing range; (D) identify any basis for departure. The PSR may also contain information about the defendant's history and characteristics, including his criminal record, "and circumstances affecting the defendant's behavior that may be helpful in imposing sentence or in correctional

treatment," *see* Rule 32(d)(2)(A); information regarding victim impact, Rule 32(d)(2)(B); and any other information relevant to the 18 U.S.C. § 3553(a) factors.

This paragraph referencing his prior case in Los Angeles, which was dismissed, does not serve any of the purposes for inclusion in a PSR. Gumrukcu faces a mandatory sentence of life in prison; thus, this paragraph is not helpful in imposing sentence. It does not bear on any "treatment" that would be provided in the Bureau of Prisons. It is not related to victim impact, or any other 3553(a) factors. Nor does it result in criminal history points. It is not his "prior criminal record" under Rule 32(d)(2)(A)(i). Thus there is no basis to include this paragraph. Gumrukcu requests that the Court strike this paragraph from the PSR.

<u>Paragraph 82</u>: It was in fact demonstrated at trial, through Gumrukcu's testimony, that he in fact does have a medical degree and a Ph.D. The government did not present evidence to the contrary. This paragraph should be stricken.

V.    <u>Gumrukcu Should Not Be Assessed a Fine</u>

The government stated that it is not requesting a fine in this case. The PSR, in ¶ 84 and 85 lists income and assets of Serhat Gumrukcu. None of these exist at this time. Gumrukcu has been incarcerated and has not been working since his arrest. He has no income. Nor does he have any cash or assets. All of the stock in his name has been attached to the wrongful death lawsuit. All of his bank accounts have been seized, and he has no other income. He has significant liens, lawsuits and debts. He will be sentenced to life in prison. A forthcoming affidavit from his husband, Anderson Wittekind, attests that he has no assets to pay a fine.[2] Their joint residence is currently subjected to federal and state tax liens, and is subject to foreclosure for failure to pay the mortgage.

Gumrukcu requests that the Court not impose a fine.

VI.    <u>Restitution</u>

---

[2] We expect to file this under separate cover tomorrow.

A.  *Objecting to the Government's Calculation*

The government provided an accounting by its trial expert, Richard Westfall, of lost wages in its justification for a restitution award of $1.36 million. The government stated that "[t]his is based on a present value of $1.1 million as of January 6, 2018 that is then increased by the annual discount rate of 2.81% to November 24, 2025." The government provided Mr. Davis' W2 from 2017, which showed a gross pay of $77,901.27. Mr. Westfall added a 3.79% income growth increase, pursuant to the "20-year average annual growth rate of a full-time worker per the Bureau of Labor Statistics." He then added an inflation growth rate of 2.24%, citing the Federal Reserve Bank of Cleveland 10-year expected inflation rate average over the prior 20 years as of December 2017." He then added a discount rate of 2.81%, citing the United States Treasury 30-Year Treasury Bond return as of the date closest to 1/6/2018. These percentage increases are speculative and should not be applied in determining lost wages.

The Mandatory Victims Restitution Act ("MVRA") provides for mandatory restitution to victims of certain crimes, including offenses resulting in physical injury. 18 U.S.C. § 3663A(c)(1)(B). Although Gumrukcu maintains his innocence; we agree generally that the statute applies, and that his conviction provides a basis for the Court to order him to reimburse the victim's widow for "income lost" as a result of the offense. *Id.* § 3663A(b)(2)(C). We also agree that restitution includes "future income lost as a result of the offense of conviction." *United States v. Messina*, 806 F.3d 55, 67 (2d Cir. 2015).

However, Gumrukcu disagrees with the government's calculation of lost income. The "primary and overarching purpose of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006) (internal quotation marks omitted).  A district court has "broad discretion" to determine restitution. *United States v. Milstein*,

481 F.3d 132, 137 (2d Cir. 2007). While the calculation does not have to be precise, losses cannot be "hypothetical or speculative." *United States v. Gushlak*, 728 F.3d 184, 195 (2d Cir. 2013). The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government. 18 U.S.C. §3664(d).

The government's calculation is hypothetical and speculative. Nor does the government provide legal support for the inclusion of a 3.79% income growth increase, an inflation growth rate of 2.24%, and a discount rate of 2.81%. Westfall's calculation assumes increases that may or may not have been given to Mr. Davis. Considering that between 2018 and today we have experienced a national pandemic and economic instability, these increases may very well not have been awarded to Mr. Davis. At most, the amount of restitution for lost wages should be $615,417.90, which is the amount of money Mr. Davis was making in 2017 multiplied by 7.9, which is the government's calculated years since his death.

However, even this number may be inflated, because the government did not provide the job title or basis for Mr. Davis's compensation. What was his pay in prior years? What is this job being paid today in the company? Without a more informed picture of his compensation, it is impossible to calculate if in future years his earning potential would be the same, let alone increased.

While the calculation does not have to be mathematically precise, nor can it be speculative. The Court should decline to include lost wages restitution without more specific evidence from the government. At the very least, the Court should not order more than $615,417.90 as lost wages restitution.

B. *Serhat Gumrukcu's Inability to Pay*

Relevant to the Court's determination of restitution is the economic circumstances of the defendant. As stated above, Serhat Gumrukcu has no income, and no assets. He has no ability to pay restitution. All assets he has are already attached to the civil wrongful death suit brought by Ms.

Davis. There are no additional assets to pay restitution. This mitigates in favor of a lower restitution amount.

### C.  *Retaining Money for Commissary and Telephone Calls*

Finally, should the Court impose restitution on Serhat Gumrukcu, we ask the Court to approve a minimum amount in commissary to ensure that Gumrukcu has sufficient funds from month to month to purchase items from commissary and communicate with his family. His family members live overseas, and calls are more expensive.[3] His father and brother are very ill. Further, having access to a minimum amount of commissary money is also necessary for Serhat Gumrukcu's most basic well-being. Commissary is where inmates obtain rudimentary hygiene necessities, including bar soap, deodorant, and a toothbrush. It is also the main source of over-the-counter medications (such as ibuprofen) and the only source for food to supplement that which is provided by the institution (for example, when an institution is on lockdown, hot food service is often suspended).

A similar provision was used in the restitution order in *United States v. Lawrence Ray*, 20-CR-110 (LJL), Dkt. No. 640 (S.D.N.Y. Mar. 7, 2023), where the defendant was sentenced to 720 months imprisonment and had significant restitution obligations, the Court allowed $50/month to be retained as agreed by the parties; and in *United States v. Bowers*, a capital case in which a similar request from the defense was granted. *See* 18-CR-292 (RJC), Dkt. No. 1546 (W.D. Pa. Aug. 3, 2023) (allowing $75/month to be retained). Neither of these defendants had immediate family overseas.

Gumrukcu requests the addition of the following language in the judgment:

> While serving the term of imprisonment, Serhat Gumrukcu shall make installment payments toward his restitution and mandatory assessment obligations through the Bureau of Prisons'

---

[3] The rates for phone calls in the Bureau of Prisons fluctuate, and maximums have increased in 2025. *See https://www.prisonpolicy.org/blog/2025/10/30/fcc-new-caps.* Pre-pandemic, international calls were as high as $0.99/minute. *See https://www.bop.gov/news/20241004-fbop-updates-to-phone-call-policies-and-time-credit-system.jsp.* Inmates are allowed 300 minutes of phone calls; Serhat Gumrukcu wouldn't even have enough money with a $150 minimum to use his allotment of phone calls, let alone afford commissary.

(BOP) Inmate Financial Responsibility Plan (IFRP). Pursuant to the IFRP, the BOP may establish a payment plan by evaluating the Defendant's six-month deposit history and subtracting an amount determined by the BOP to be used to maintain contact with family and friends, send mail, and buy commissary items. That subtracted amount to be used to maintain contact with family, send mail, and buy commissary items shall not be determined to be less than $150 per month. In other words, installment payments should permit at least $150 to be used to maintain contact with family, send mail, and buy commissary items each month. The remaining balance may be used to determine a repayment schedule. BOP staff shall help the Defendant develop a financial plan and shall monitor the inmate's progress in meeting his restitution and mandatory-assessment obligations.

## **CONCLUSION**

For the foregoing reasons, Serhat Gumrukcu respectfully requests that the Court strike the above-mentioned portions of the PSR, decline to impose an obstruction of justice enhancement; decline to impose additional points for restraint of the victim, decline to impose a fine, and limit the lost wages of Mr. Davis to a non-speculative amount.

Dated this 10th day of November, 2025

Respectfully submitted,

*/s/ Susan K. Marcus*
SUSAN K. MARCUS
Law Firm of Susan K Marcus LLC
29 Broadway, Suite 1412
New York, NY 10006
(212) 792-5131
susan@skmarcuslaw.com